FILED IN CLERK'S OFFICE
U.S.D.C. - Atlanta
MAY 30 2023
KEVIN P. WEIMER, Clerk
By: Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF GEORGIA**
**_____________ DIVISION**

Dr. Mohammed Rahim Uddin Chowdhury
1555 River Oak Dr, Roswell, GA, 30075
(Print your full name) Cell: 765 212 5120
Plaintiff *pro se*,
Email: mohammed@gwmail.gwu.edu

v.

Kennesaw State University (KSU)
1000, Chastain Rd, Kennesaw, GA, 30144

(Print full name of each defendant; an employer is usually the defendant)

Defendant(s).

CIVIL ACTION FILE NO.

1:23-CV-2420

(to be assigned by Clerk)

***PRO SE*** **EMPLOYMENT DISCRIMINATION COMPLAINT FORM**

**Claims and Jurisdiction**

1. This employment discrimination lawsuit is brought under (check only those that apply):

✓ Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e et seq., for employment discrimination on the basis of race, color, religion, sex, or national origin, or retaliation for exercising rights under this statute.

**NOTE**: To sue under Title VII, you generally must have received a notice of right-to-sue letter from the Equal Employment Opportunity Commission ("EEOC").

_____ Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621 et seq., for employment discrimination against persons age 40 and over, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Age Discrimination in Employment Act, you generally must first file a charge of discrimination with the EEOC.

_____ Americans With Disabilities Act of 1990, 42 U.S.C. §§ 12101 et seq., for employment discrimination on the basis of disability, or retaliation for exercising rights under this statute.

> **NOTE**: To sue under the Americans With Disabilities Act, you generally must have received a notice of right-to-sue letter from the EEOC.

✓ Other (describe) Promotion and Tenure (P&T) guideline clearly states that P&T will be given based on meeting expectation either in Teaching or Research. Two conjunction (Either, or) used in the above statement, by using which people before and after me got P&T. In annual reviews of 5 consecutive years, I met and exceeded expectation in Research, which is enough for P&T award. I also met expectation in first consecutive years in Teaching and Professional Services (PS). In 5th year, based on 2 student evalutions, I was rated not meeting expectation in Teaching and PS. Later, they denied my P&T. P&T denial usually begins from mid-year and final warning is given at the end of 4th year, which I did not receive at all. Even at the end of 5th year, I was not given warning about P&T denial. However, they have denied my P&T without any of those warning. They (P&T committee, chair, Dean & College Committee) retaliated and harassed me in front of students, faculty, staff and people from my own country. Office of Institutional Equity (OIE) of KSU also directly involved in retaliation by not releasing report in due time and also by not releasing report of harassments at all.

2. This Court has subject matter jurisdiction over this case under the above-listed statutes and under 28 U.S.C. §§ 1331 and 1343.

## Parties

3. Plaintiff. Print your full name and mailing address below:

Name Mohammed Rahim Uddin Chowdhury

Address 1555 River Oak Dr, Roswell, GA, 30075

4. Defendant(s). Print below the name and address of each defendant listed on page 1 of this form:

Name Kennesaw State University (KSU)

Address 1000, Chastain Rd, Kennesaw, GA, 30144

Name

Address

Name

Address

## Location and Time

5. If the alleged discriminatory conduct occurred at a location <u>different</u> from the address provided for defendant(s), state where that discrimination occurred:

6. When did the alleged discrimination occur? (State date or time period)

Nov/19/2019 to May/14/2022

## Administrative Procedures

7. Did you file a charge of discrimination against defendant(s) with the EEOC or any other federal agency? ✓ Yes ____ No

If you checked "Yes," attach a copy of the charge to this complaint.

8. Have you received a Notice of Right-to-Sue letter from the EEOC?

✓ Yes ____ No

If you checked "Yes," attach a copy of that letter to this complaint and state the date on which you received that letter: ____________________

9. If you are suing for **age discrimination**, check one of the following:

____ 60 days or more have elapsed since I filed my charge of age discrimination with the EEOC

____ Less than 60 days have passed since I filed my charge of age discrimination with the EEOC

10. If you were employed by an agency of the State of Georgia or unsuccessfully sought employment with a State agency, did you file a complaint against defendant(s) with the Georgia Commission on Equal Opportunity?

_____ Yes _____ No _____ Not applicable, because I was not an employee of, or applicant with, a State agency.

If you checked "Yes," attach a copy of the complaint you filed with the Georgia Commission on Equal Opportunity and describe below what happened with it (i.e., the complaint was dismissed, there was a hearing before a special master, or there was an appeal to Superior Court):

______________________________________________

______________________________________________

______________________________________________

______________________________________________

11. If you were employed by a Federal agency or unsuccessfully sought employment with a Federal agency, did you complete the administrative process established by that agency for persons alleging denial of equal employment opportunity?

_____ Yes _____ No _____ Not applicable, because I was not an employee of, or applicant with, a Federal agency.

If you checked "Yes," describe below what happened in that administrative process:

______________________________________________

______________________________________________

______________________________________________

______________________________________________

## Nature of the Case

12. The conduct complained about in this lawsuit involves (check only those that apply):

- ______ failure to hire me
- ✓ failure to promote me
- ______ demotion
- ______ reduction in my wages
- ______ working under terms and conditions of employment that differed from similarly situated employees
- ✓ harassment
- ✓ retaliation
- ✓ termination of my employment
- ______ failure to accommodate my disability
- ✓ other (please specify) Denying me from promotion and tenure by violating KSU's own P&T guideline. Using same guideline, 3 faculty before and after me got P&T, but my P&T was denied.

13. I believe that I was discriminated against because of (check only those that apply):

- ✓ my race or color, which is Asian
- ✓ my religion, which is Islam and a Muslim
- ______ my sex (gender), which is ____ male ____ female
- ✓ my national origin, which is Bangladesh
- ______ my age (my date of birth is ______________________)
- ______ my disability or perceived disability, which is: ______________________
- ✓ my opposition to a practice of my employer that I believe violated the federal anti-discrimination laws or my participation in an EEOC investigation
- ✓ other (please specify) Retaliated by KSU's office of Institutional Equity (OIE) They (chair, Director, Dean, Colleagues, chair of college committee) retaliated and harassed me in their letters, emails and also in Department and College level meeting.

14. Write below, as clearly as possible, the essential facts of your claim(s). Describe specifically the conduct that you believe was discriminatory or retaliatory and how each defendant was involved. Include any facts which show that the actions you are complaining about were discriminatory or retaliatory. Take time to organize your statements; you may use numbered paragraphs if you find that helpful. Do not make legal arguments or cite cases or statutes. (1) I filed 2 complaints to OIE of KSU. They were (a) unfairly denying me from P&T. (b) Retaliations and harassments towards me at several levels of KSU. OIE released delayed report of (a) after my job contract was over. However, OIE never released any report of (b). So, OIE (The Judicial Branch of KSU) was directly involved in retaliation instead of providing justice. Because OIE wanted to save higher administrators of KSU who were involved in unfairly denying me from promotion and tenure, harassments, and retaliation.

(2) In January 2021 College meeting, Dr. Hayes (Director) did not introduce me as a faculty member whereas other faculty members, staff, and graduate students were introduced in alphabatical order. Dr. Hayes did this when I was a tenure-track full-time Assistant professor and my P&T was under review. My 2nd rebuttal letter contains all details about previously promoted and tenured faculty and for this reason Dr. Hayes got infuriated. In that meeting, there were 2 faculty from Bangladesh, who were also my family friend as well. Dr Hayes sent message to my family friend that I will be denied from P&T.

(3) In August 2020 Virtual department meeting, Dr Ni blocked me to attend dept meeting.

(4) OIE director Dr. Reddix Was demoted from her position. She Was denied access to her email, hard drive when she was fairly conducting the investigation. She was lated fired. (5) P&T review Committee wrote 31 lies and falsehood in their letter (6) Chair wrote 27 lies and falsehood in her letter (7) Dean Wrote 1 big lie in his letter (8) My research profile and credentials were deleted from my student research presentation (9) Big data lecture Series Presenter did not join to my zoom link where I was the organizer of the event. Instead, she joined to a link Created by a Lecturer.

(10) Please read addition 5 Sheets and FRL-EEOC (Final Rebuttal Letter to EEOC) vs KSU.

(Attach no more than five additional sheets if necessary; type or write legibly only on one side of a page.)

| | | | |
|---|---|---|---|
| **ARD** | Annual Review Document | **OIE** | Office of Institutional Equity |
| **CRC** | College Review Committee | **PS** | Professional Services |
| **CETL** | Center for Excellence in Teaching & Research | **PSofKSU** | Position Statement of KSU |
| **DPT** | Department Promotion and Tenure | **P&T** | Promotion and Tenure |
| **DRC** | Department Review Committee | **RCA** | Research and Creative Activity |
| **FPA** | Faculty Performance Agreement | **TSM** | Teaching, Research and Mentoring |
| **KSU** | Kennesaw State University | **TYR** | Third Year Review |
| **FRL_EEOC** | Final Rebuttal Letter: Mohammed_Chowdhury Vs. KSU Via EEOC | | |

I request federal **"Judges"** to read **"FRL_EEOC"** document. This document contains information about retaliation and insults. Every Department at KSU has its own **"DPT Guideline**." This guideline provides pathways to tenure track faculty to fulfill **minimum** requirements in **TSM, RCA, and PS**. These requirements were specific and vary by Department, which are not mentioned in **College** or **University P&T Guidelines**. So, **DPT Guideline** is the basis for awarding or denying **P&T**. As a part of **P&T** process, candidate must attach **DPT Guideline** with his application packet meaning that candidate must have a copy of it, thoroughly read it, and understand the minimal requirements of it. College and University guidelines are not required to attach with P&T application. **DPT Guideline** clearly states on **page 3, lines 28-30**: ***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."***

Conjunctions (**Either**, **OR**) used in the above statement need to receive high attention because by using these conjunctions applicants **before and after me got P&T. Interestingly,** these conjunctions have been removed recently from DPT guideline after awarding P&T to Dr. Gita. In all areas (TSM, RCA, PS), I exceeded her achievements in terms of number course teachings, quality and significance of the articles, and number of services. In 4 hierarchical P&T reviews (DRC, Chair, Dean and CRC), **they clearly stated** that I met and exceeded expectations in **RCA** and **PS**, which is enough to secure **P&T** as mentioned in DPT guideline. In rebuttal letters, I mentioned about them (Either/OR) multiple times; however, none of their letters (Chair, Dean, CRC, Provost, President, OIE) ever mentioned anything about DPT guideline and the above quote from that guideline. So, at all levels, DPT guideline was **willfully violated and ignored.** They **randomly used** guideline to different candidates to deny and award P&T.

**Unfortunately,** in **PSofKSU** to EEOC, there was no mention of **DPT Guideline** at all, which is the starting point of **P&T** process. Supplement documents of **PSofKSU** does not contain DPT guideline. Anyone meets **minimum** criteria of **DPT Guideline** got positive review from DRC and receives **P&T.** My workload percentages for TSM, RCA and PS were 46%, 47% and 7%. DPT guideline said 2 to 3 unique course preparation is the minimum requirements of TSM. I taught 11 unique courses, which was way higher than minimum requirements. I had 7 peer reviewed articles and minimum requirement was 3 articles (Dr. Nicole had only 3 articles). I also provided a large number of professional services. Dr. **Nicole** met minimal requirements and got **P&T.** She was one of the members of DRC, who denied my **P&T.** In all areas (**numbers, volumes, quality and significance**), I had more than double achievements than **Dr. Nicole** as mentioned in **Table 1** of "FRL_EEOC" document. **Table 1** also contains comparison in 3 areas (TSM, RCA, PS) among 4 faculty where 3 of them got P&T before and after me with much less accomplishments, but **I was denied.** High quality of my Teaching and Research were well documented by support letters of former chairs, former dean and **TYR** letters. High quality of teaching was also documented by letters from a colleague, who observed my teaching 3 times, a representative from **CETL**, and a senior lecturer, who had 15 years of teaching experiences. I also met all other Teaching, Research and Service criteria mentioned in DPT guideline. In addition, I met all criteria mentioned in college and university guidelines exclusively. **I never violated any clause mentioned in all 3 guidelines and never received any warning for anything in my all years at KSU.** I was highly recommended for **Outstanding Early Career Award** by two chairs in 2019. These letters were written based on **4-years of retrospective observations of my Teaching, Research, Service, and interaction** with other colleagues (I am a **Good Department citizen**, mentioned multiple times in support letters).

**Regrettably,** in PSofKSU, there was no mention about retrospective rating of my TSM, RCA and PS for previous years. These ratings tell that my **P&T denial** was unfair as mentioned in **Table 2** of **"FRL_EEOC"** document. **ARD** is based on past year performances on TSM, RCA and PS. FPA is the projected performance goal for ongoing year. **ARD evaluations and FPA projections** are done by the mutual agreement of Chair & faculty at the start of calendar year. At the end of 5th year, most/all of projected goals from FPA were met by my P&T portfolio. Also, 5-years workload are calculated based on percentage of workload completed in each ARD and not on projection from FPA. DPT Guideline state that ***"Faculty members seeking promotion should already be meeting expectations of the next rank."***

**RCA: I met and exceeded expectation** for all 5 years, which is enough for P&T award according to guideline.

**PS:** I **met expectation** in first 4 consecutive years. I was providing service at an associate professor level mentioned in 2017 ARD comments by Dr. VanBrackle. None of their letters mentioned about it.

**TSM:** I met expectation in first 4 consecutive years. I had outstanding teaching accomplishments (**taught 11 unique courses; 6 were graduate level, maintained graduate faculty status consistently, supervised 1 PhD student, mentored 7 master & bachelor students with several publications, developed 1 graduate course, and also developed 1 most useful undergraduate python programming course**). Student evaluations from 4 courses exceeded all benchmark student evaluations taught by other faculty (Table 4 of **"FRL_EEOC"** document). None of the 3 faculty who got P&T had achieved that landmark in teaching. **I adopted scholarly approach and cyclical development approach** mentioned in my 2017 ARD. **Both Chair and Dean wrote in TYR letters** that I was meeting expectation in all areas to achieve P&T. Rating **not meeting expectation** on TSM and PS in 5th year was purposeful to deny **P&T,** because after 5th year there is no way to show improvement.

P&T denial starts from a multiple year of warnings usually begins from mid-year review (TYR) and continue until end of 4th year. After 4th year, faculty had one complete year to meet minimum requirement. Faculty received dire warning if minimum criteria were not met in past 4 years. If improvement is not achieved by the end of 5th year, P&T would not be awarded. **I had never received any warning about P&T denial when I completed first 4 years.** Even after 5th year, Chair did not give me warning about jeopardy of my P&T. Based on 2 student evaluations, I was given not meeting expectation in TSM. One student wrote two-page evaluation and said to terminate me from KSU. Chair also rated not meeting expectation in PS in 5th year. She said my service did not account 10% service workload whereas in past four years, same service accounted 10% service. **In two documents, chair showed contradictions.** Chair wrote 11% workload in her P&T letter and said service does not account 10% in 5th year ARD. **What a contradiction?** DPT guideline also stated that ***"A favorable review is dependent upon the case made by the faculty member in his/her narrative and supporting documentation. A poor narrative and/or lack of relevant documentation are/is grounds for a negative decision"***

My 12-page narrative (with 171 supporting documents) was thoroughly read by three faculty (Dr. VanBrackle and Dr. Gardner, and Dr. Karim from Civil Engineering Department). Many faculties such as Dr. Gardner, Dr. Ni, Dr. Ray, and Dr. Nicole got **P&T** when Dr. VanBrackle was Chair. They thoroughly read my narrative and said following things:

> Lewis VanBrackle Tue, Aug 11, 2020, 4:02 PM
> Mohammed,
> I read your narrative, and it is quite good. You seem to have linked to the documentation thoroughly. I did find one typo. On page 10 on the 7th line up from the bottom, you refer to the Georgia Teach faculty. I think it should be Georgia Tech faculty. Overall, it appears very well done. Good luck, Lewis.
>
> Kimberly Gardner Mon, Aug10, 2020, 11:47 AM
> Hello Mohommed,
> Your narrative reads beautifully. I attached the signed department guidelines document you have to upload to Digital Measures, in case you haven't downloaded it yet. A few suggestions: Check the KSU handbook guidelines (at the end of chapter 3 there is a checklist), I believe the page limit is 12. I also found the FAQs helpful for some of my questions:
> https://digitalmeasures.kennesaw.edu/activityinsight/PortfolioSubmissionFAQsV4.pdf
> .....

Two faculty from our own Department approved my P&T narrative and their documentations, which indicate that my narrative must deserve a favorable review. However, DRC and Chair intentionally said my narrative was poorly written and was a list of works. Please read 3 narratives (Dr. Chowdhury, Dr. Ray, and Dr. Nicole) together to differentiate them. DPT guideline also states that ***"Tenure should only be granted to those faculty members whose achievements demonstrate the quality and significance expected of an Associate Professor and who demonstrate potential effectiveness at the University. Tenure requires prior or simultaneous promotion to the rank of Associate Professor."***

I met all requirements mentioned above such as (a) nomination for Outstanding Early Career Award by retrospective 4-years analyses of my TSM, RCA and PS. (b) got selected among top 45 statisticians from USA and Canada for a two-day training session organized by International Biometric Society in 2017. I am the only one who got this selection for my outstanding research from a R2 University like KSU. Chair and DRC never mentioned about it in their letters (c) Meeting and Exceeding expectations on RCA in all 5 years (d) Meeting expectation in TSM for first 4 consecutive years. Got rating that I am adopting scholarly approach and showing cyclical improvement in my teaching (all students passed advanced SAS certification exam). (e) Meeting expectation in PS in first 4 years. Got rating that I was already providing services at an Associate Professor level (DRC and Chair never mentioned about it in their letters). (f) I wrote half million-dollar grants proposal to NSF in 2018, which will generate 15 to 20 research articles (already 6 articles got published after P&T portfolio submission) and clearly shows long-term effectiveness in research. (g) I already taught 11 unique courses in a 5-year period, which is very rare and may not be found elsewhere. Dr. VanBrackle and Dr. Priestley said multiple

times that I can teach any course, which indicates long-term effectiveness in teaching. (h) P&T support letters from former Dean and Chair further strengthen my abilities of long-term effectiveness. (i) I may be the only teacher in the world who taught three programming courses (SAS, R, and Python). Python Programming course was developed from scratch, which I never heard before joining KSU (j) I taught both Frequentist and Bayesian Courses for graduate students, which is also rare (I have published articles in both areas). None of the promoted and tenured faculty have teaching and research expertise in both areas let alone having publications in both areas. (k) 82% of my student evaluations were positive and rest were neutral or negative. (l) I provided many voluntary services at College level and University level (spending fuel cost from my own money in the weekend) even though I was not assigned one service at those levels after repeated request. (m) Dr. Gardner wrote a letter to Provost by saying that Dr. Chowdhury is the most talented faculty in the Department. (o) I ran short course with title "Side-by-Side Learning of R and Python Programming" in American Statistical Association conference. My short course had the highest number of attendees (32 attendees). I popularized KSU to rest of the world compared to others who got P&T because thousands of booklets of the short courses were mailed across globe where my short course information was in the first page after cover page. Unfortunately, there is no mention about this accomplishment in the letters of DRC and Chair. Due to page limit, please read "FRL_EEOC" document.

**Explanation for 5th Year not Meeting Expectation:** At the start of 5th year, I had little disagreement with Chair. I said her, "As you are insulting me before students, one day students will insult you." This happened in a one-to-one meeting when she severely criticized my teaching for one section of a course. For this minor incidence, I apologized her via email with Dean Dr. Bell was in CC. I apologized before beginning of my P&T. **In the email I asked her after apology that we should both apply famous $f^3$(forgive, forget and forward) rule. However, she did not apply the $f^3$ rule.** So, my P&T denial is a retaliation as I am a junior faculty. As an under represented faculty, I do not have a right to express my opinion to my chair and my **documented apology did not soften her heart to forgive me.** By capitalizing this she started systematic retaliation by provoking others against me. She rated me 'not meeting expectations in TSM and PS in 5th year and then denied P&T by misleading other people in the Department, College and University. She showed repeated interest to come for student evaluation at one of my courses. She then provoked students to write in their evaluation about my termination. From that student evaluation, she opened false and bogus investigation via OIE. Student neither called police not did open the investigation. A lot of time was wasted from my life for preparing answers for that bogus investigation.

**Retaliation and Harassments:**

1. I submitted two complaints to OIE. **(1)** Unfairly denying my P&T. **(2)** Harassments, retaliations done against me by colleagues. OIE released delayed report of **complaint one** after expiration of my job contract. However, OIE **never released or explained** anything about **Complaint two.** This retaliation came from the highest office (judicial branch of KSU) from where everyone expect justice. They did not release the report for Complaint two, because **senior KSU administrators were involved in insults and retaliations.** Details can be found **"FRL_EEOC"** document.
2. My **average** work-load percentage over 5-years period was **46% TSM, 47% RCA, and 7% PS.** TSM workload is always constant because teaching 1 course is always equal to 10% workload. However, they (DRC, Chair, and PSoKSU) **intentionally** put **more than 50% workload** in TSM. Their **falsehoods** are **"crystal clear"** because if I do not meet **more than 50%** of the work-load (according to them), then **I do not deserve P&T.** Consequently, Dean and CRC **believed** on it **ignoring my rebuttals. This documented falsehood is a retaliation from all levels.**
3. DRC put 31 documented lies, falsehood, inaccurate and misleading information in their P&T letter after reviewing my portfolio. Some of those are falsified work-load percentage, no signature on ARD and FPA documents by Chair and Dean, no rating on ARD and FPA, and bad Third Year Review to name a few. Please read "FRL_EEOC."
4. Chair Dr. Ni denied my P&T by **twenty-seven** lies, falsehood, inaccurate and misleading information in her letter. Some of these are falsified workload percentage, so called poor document preparation, non-existence of e-signature, weakly meeting expectation in 4th year, difficulty of finding supplement documents, B-grade journal to name a few.
5. **Documented lies in Dean Review Letter:** Dean undermined my P&T portfolio by mentioning that I taught 11 **undergraduate courses,** which is a falsehood written by a **high-level administrator.** Dean completely ignored **six graduate courses** that I taught in five years. Graduate faculty status depends on continuous teaching of graduate courses. His letter **nullified my graduate faculty status** to the next level of reviewers. **He did not give me appointment to meet. He did not upload my most important 2nd rebuttal letter to the Digital Measure so that each member of CRC can see it before making their decision.** Second rebuttal letter had side-by-side comparisons among faculty who previously got P&T. After seeing my 2nd rebuttal letter, the rate of retaliation and insults increased exponentially. My 2nd rebuttal letter was not uploaded on 24th of October 2020, the day Dean uploaded his letter. I requested him multiple times but he never replied and never uploaded my rebuttal letter (I have email proofs and

screenshot). It is his responsibility and duty to be fair to upload his review letter and my rebuttal letter. If a faculty does not get justice at one level, he has right to go next level. My repeated email attempts did not penetrate his heart and mind for reply. No member of the college committee was able to see my 2nd rebuttal letter as it was uploaded after the decision of the college committee on November 20, 2020 (have screen shot). When one new level of review is done, then rebuttal letter from previous level with new level review letter are uploaded together in online portal. This norm was violated by Dean Kojo even after multiple request. Dean Kojo further undermined my achievement by aligning with the falsehood of DRC. He quoted from the "Unprofessional Outcome" section created by DRC in their letter and said I showed unprofessional behavior even though there were a lot of evidence that I was a good department citizen and most students said highly about my kindness, generosity, and respectfulness. DRC and Chair cherry picked few student evaluations and Dean blindly believed in it as they decided during my P&T process that **Dean will look strongly about the DRC and Chair letter for P&T.** My assumption is that Dean did not read my 2nd rebuttal letter at all, which contained details falsehood of DRC and Chair letters.

6. **<u>Documented lies in CRC Letter:</u>** CRC chair did not upload my 2nd rebuttal letter even after multiple requests. He said that he would make 2nd rebuttal letter available to other members of the college committee. By reading falsehood (DRC, Chair, Dean, and student comments), CRC chair wrote, **"I even do not meet expectation at an Assistant Professor level"** whereas I was meeting and exceeding expectation in RCA for 5 years, meeting expectation in TSM and PS for first four years, and meeting all expectations in third year review letter.
7. **<u>Documented harassments and retaliation done against me before, during, and after P&T process</u>**
   They purposely did harassments and retaliation on me in front of students, colleagues, staff, and people from my own country, who were unaware of my P&T denial until harassments happened.

a. In August 2020 Department virtual Meeting, I was denied access to the Department meeting by Chair Dr. Ni. I sent multiple emails to Dr. Ni during meeting time but she did not reply. However, Dr. Kane sent the meeting link during meeting time which was same as Dr. Ni provided for all. But the link did not help me to join meeting as I was blocked by Dr. Ni. By doing this, Dr. Ni insulted me in front of all DSAS faculty and staff.

b. In Fall 2020 Department meeting, Dr. Ni together with Dr. Nicole and Lecturer Hardy forced me to resume Big Data Lecture Series talk. However, due to Covid-19, R Day (Organized by Dr. Ferguson), the biggest departmental event, was cancelled. However, after feel pressured, I decided to arrange two talks in October and November of 2020. After October event, the November talk was scheduled to be held on November 12 at 4 pm. However, Ms. Hardy without having my permission, opened a zoom link and all attendees including speaker Dr. Gita joined her link. At 4:11 p.m., she sent an email and asked me to join her link. When I asked about this to Dr. Gita in a MS team call (I have screen shot), she said she had done this because of the direction of the higher authority. For this pre planned incidence, I was rated not meeting expectation in PS in 6th year ARD. This retaliation happened during my P&T process.

c. In Spring 2021 college meeting, worst harassments done to me by Dr. Hayes in front of people from my own country, who were unaware of my P&T denial. Dr. Hayes introduced each person in alphabetical orders. After introducing few persons, alphabetical order had been changed and reinstalled. However, he did not call my name for introduction. Dr. Hayes ended the session, "I am going to introduce our last person", which was not me. All members of Department including PhD students were introduced in that meeting except me. I was insulted in front of the faculty, staff and students of the entire College. In that meeting, there were two faculty from my home country Bangladesh (Dr. Shariar and Dr. Hossain), whom are my family friends as well. I was seriously humiliated for this purposeful insult. By doing this, Dr. Hayes informed to people of my country that my P&T would be denied. Meeting was recorded, please ask for 'meeting recording' for Spring 2021 kick off meeting. Before meeting started, Dean Jeff said, "Meeting has been recorded." This insult is purposely done to demonstrate that I am no longer a member of the Department even though my P&T was yet to be denied by provost and president. This insult happened during my P&T process.

d. In November 2019 Department meeting, 5 faculty members (Franklin, Susan, Nicole, Louise, and Dr. Ni) insulted me about my Python Syllabus. The Syllabus was approved in Fall 2018 by Curriculum Committee (Gardner, DeMaio, Franklin) and the course was successfully taught in Spring 2019. However, one year later, Dr. Ni and others insulted me as they thought Syllabus was at high level. If Syllabus was at high level, why did they approve syllabus in 2018? Students never complained about Syllabus in their evaluation. In the meeting, I said that any suggestions to change syllabus will be incorporated but they kept insulting me even after meeting time was over. Dr. Gardner said to OIE investigator, "Dr. Chowdhury told in the meeting to incorporate any suggestion to syllabus, but they did not stop insulting him." In my entire professional life, I never got such insult. This insult was done before beginning of P&T.

e. In Fall 2019, I spent $320 for a Department event. I sent at least 5 emails to Dr. Ni and Secretary Leann for reimbursement, but emails were not replied and money were not paid until I reported it to Provost in December 2020. In March 2021, I received reimbursement. In past, all expenses were reimbursed immediately. Dr. Ni insulted me by Department Secretary. This retaliation was done before and during P&T process.

f. Dr. Ni Told to Dr. Gardner that I had gender issue in Fall 2021. I immediate told it to Dr. Reddix (OIE investigator). They (DRC and Chair) wrote gender issue in my 2019 ARD and P&T letter. OIE investigation report nullified gender issue on 17/DEC/2020. However, they did not stop spreading false gender issue even after release of OIE report, which is a crime. This incidence happened after my P&T denial.
g. Falsehood, lies, inaccurate, misquoting, misleading and twisted information are insults and harassments. Four hierarchical letters of P&T committees are nothing but insults and harassments. Provoking students to write bad evaluations for termination is also retaliation. Publicizing confidential students' evaluations are insults and retaliation.
h. Mr. Ryan had been doing research as a sophomore student since Spring 2021. We had a paper accepted in a peer reviewed journal. We are working on multiple projects and two papers are under review. He has been accepted as bioinformatics PhD students at Georgia Tech, which is a very high accomplishment for an undergrad student from KSU. His research was selected from a pool of students for presentation. In acknowledgments, Ryan gave me a lot of credit for mentoring him. **However, my name was completely removed** from his research presentation making me very upset whereas other mentors with their students' name from research presentation were not removed. This was intentionally retaliation to insult me before my students. They have done this because I submitted two complaints to OIE. From this incidence, my student came to know that my P&T was denied. If Ryan will be testified, he can give further details.
i. In Spring 2021 a white girl from SAS class sent me 53 email in 23 days. She wanted to meet me to discuss her grade. While I asked her to meet in the presence of Dr. Hayes, she declined but want to meet me privately, I told it to Dr. Hayes. In Fall 2021, a black girl purposely showed erratic behavior during class time and submitted wrong project and I did not give her good credit for that project and she ended up with C. Her mother and grandmother called my cell and continuously disparaged me. In Spring 2022, two black girls showed very erratic behavior. One of them always came 10 minutes late in my class and asked question like is this the first topic for today's class? Another girl enrolled 2 weeks late in the class. She did not complete the 3rd exam and project at all. But when I did not give her good grade, she emailed provost and president. These four girls were programmed to show disrespectful behavior, but I patiently handled them because I was sure that KSU was trying to find loophole to fire me by accusing that I am a racist. Later, I received email from registrar office that student grades have been changed. I immediately notified it to director Hayes.
j. My 2nd rebuttal letter, which compares 5-year accomplishments of three faculty angered DRC and Chair. Their anger became clear when Dr. Gita first started sending emails where my email address was not in CC whereas other faculty emails were in CC. I received email from general email account, which all else also received. But I did not see my name on CC. Dr. Gita was academically two-years junior to me. However, she dared to do this email insults by the direct order from Chair Dr. Ni. By doing this, I was insulted before all faculty, lecturer and staff. They sent clear message that I no longer belong to the Department even though I was a tenure track faculty in that time period.
k. My minimum and maximum salary increment was $1300 and $1700 when Dr. VanBrackle was Chair. When Dr. Ni became chair, I got only $1000 salary increment in her first year. In rest three years, I was not given any salary increment even though my TSM workload increased from 60% to 70%. Dr. Ni later tried to increase my TSM 80%.
l. Dr. Donna Reddix was the director of OIE when I submitted complaints. Later she was removed from director position as the investigation was run fairly. Investigation was completed and reports were to be release by the end of December 2021. However, suddenly Dr. Reddix was blocked from email access, did not have access to her hard drive and OIE new directory Ms. Williams said Dr. Reddix no longer worked for KSU. Later Ms. Williams said Dr. Reddix worked part time. So, KSU high official not retaliated against me but also against person who was fairly doing investigation. If Dr. Reddix is testified, she can answer more.

During P&T process, if anomalies are found, a new P&T committee could be formed to reevaluate candidate profile. Dean or Provost have that authority, which they did not exercise. Specially after nullification of Gender and Race issue by OIE investigation, I requested Provost to revise wrong decision about my P&T. However, my request was turned down.

**Conclusion: In any law-abiding nation, Judicial branch must be independent of Executive branch.** All people of that nation must have hope that they would receive a fair trial on their case if they go to Judiciary. OIE is a judicial branch of KSU and must work impartially and independently to deliver their findings based on documents and investigations and not based on false knowledge. In Statistics, **Type II error is an error in which an innocent person is sentenced to death** whereas in Type I error is an error when a guilty person is freed from prison. In my P&T denial, **DRC, Chair, Dean, and CRC** intentionally committed **type II error, which is a gross crime.** I went to OIE to receive justice for two complaints. Regrettably, I got retaliation and injustice from OIE as (i) OIE never released report of documented harassments and retaliation (ii) intentional delayed release of P&T denial report after expiration of my job contract. In their report, OIE said, "investigation is closed and no more complaints will be taken." Our constitution said (i) Leader must follow the law (ii) everyone must follow the law and (iii) no one is above the law. In my P&T denial, I have noticed that DRC, Chair, Dean, CRC and Provost thought they were above the law. **I therefore, request federal judge to deliver verdict based on documents and not based on knowledge.**

15. Plaintiff ____ still works for defendant(s)
 ✓ no longer works for defendant(s) or was not hired

16. If this is a disability-related claim, did defendant(s) deny a request for reasonable accommodation? ____ Yes ____ No

If you checked "Yes," please explain: ____________________

______________________________

______________________________

______________________________

______________________________

17. If your case goes to trial, it will be heard by a judge unless you elect a jury trial. Do you request a jury trial? ____ Yes ✓ No

**Request for Relief**

As relief from the allegations of discrimination and/or retaliation stated above, plaintiff prays that the Court grant the following relief (check any that apply):

✓ Defendant(s) be directed to Brandi Williams, Dr. Ni, Dr Hayes, Dr. Kojo Should be Removed from administrator & leadership Position.

✓ Money damages (list amounts) $3.5 Million

______________________________

✓ Costs and fees involved in litigating this case

✓ Such other relief as my be appropriate. Promotion and Tenured Award to SDSA or another department

**PLEASE READ BEFORE SIGNING THIS COMPLAINT**

Before you sign this Complaint and file it with the Clerk, please review Rule 11 of the Federal Rules of Civil Procedure for a full description of your obligation of good faith in filing this Complaint and any motion or pleading in this Court, as well as the sanctions that may be imposed by the Court when a litigant (whether plaintiff or defendant) violates the provisions of Rule 11. These sanctions may include an order directing you to pay part or all of the reasonable attorney's fees and other expenses incurred by the defendant(s). Finally, if the defendant(s) is the prevailing party in this lawsuit, costs (other than attorney's fees) may be imposed upon you under Federal Rule of Civil Procedure 54(d)(1).

Signed, this 30 day of MAY, 2023

[signature]

(Signature of plaintiff *pro se*)

Mohammed Rahim Uddin Chowdhury

(Printed name of plaintiff *pro se*)

1555 River Oak Dr, Roswell, GA, 30075

(street address)

Roswell, GA, 30075

(City, State, and zip code)

mohammed@gwmail.gwu.edu

(email address)

765-212-5120

(telephone number)

# U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION

**Atlanta District Office**
100 Alabama Street, SW, Suite 4R30
Atlanta, GA 30303
1-800-669-4000
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

Issued On: 03/22/2023

**To:** Dr. Mohammed R. Chowdhury
1555 River Oak Drive
Roswell, GA 30075
Charge No: 410-2022-06563

EEOC Representative and email: STEVEN GARCIA-REYES
Investigator
steven.garcia-reyes@eeoc.gov

---

### DETERMINATION OF CHARGE

The EEOC issues the following determination: The EEOC will not proceed further with its investigation and makes no determination about whether further investigation would establish violations of the statute. This does not mean the claims have no merit. This determination does not certify that the respondent is in compliance with the statutes. The EEOC makes no finding as to the merits of any other issues that might be construed as having been raised by this charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law in federal or state court, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) view this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

If you file a lawsuit based on this charge, please sign-in to the EEOC Public Portal and upload the court complaint to charge 410-2022-06563.

On behalf of the Commission,

Digitally Signed By:Darrell Graham
03/22/2023

Darrell Graham
District Director

**Cc:**
Nwakaego Nkumeh Walker
Kennesaw State University
100 CHASTAIN RD NW
Kennesaw, GA 30144

Carmen Alexander
Kennesaw State University
100 CHASTAIN RD NW
Kennesaw, GA 30144

Christopher A McGraw
Kennesaw State University
270 Washington Street SW
Atlanta, GA 30334

Please retain this notice for your records.

# INFORMATION RELATED TO FILING SUIT UNDER THE LAWS ENFORCED BY THE EEOC

*(This information relates to filing suit in Federal or State court* ***under Federal law****. If you also plan to sue claiming violations of State law, please be aware that time limits may be shorter and other provisions of State law may be different than those described below.)*

## IMPORTANT TIME LIMITS – 90 DAYS TO FILE A LAWSUIT

If you choose to file a lawsuit against the respondent(s) named in the charge of discrimination, you must file a complaint in court **within 90 days of the date you *receive* this Notice**. Receipt generally means the date when you (or your representative) opened this email or mail. You should **keep a record of the date you received this notice.** Once this 90-day period has passed, your right to sue based on the charge referred to in this Notice will be lost. If you intend to consult an attorney, you should do so promptly. Give your attorney a copy of this Notice, and the record of your receiving it (email or envelope).

If your lawsuit includes a claim under the Equal Pay Act (EPA), you must file your complaint in court within 2 years (3 years for willful violations) of the date you did not receive equal pay. This time limit for filing an EPA lawsuit is separate from the 90-day filing period under Title VII, the ADA, GINA or the ADEA referred to above. Therefore, if you also plan to sue under Title VII, the ADA, GINA or the ADEA, in addition to suing on the EPA claim, your lawsuit must be filed within 90 days of this Notice **and** within the 2- or 3-year EPA period.

Your lawsuit may be filed in U.S. District Court or a State court of competent jurisdiction. Whether you file in Federal or State court is a matter for you to decide after talking to your attorney. You must file a "complaint" that contains a short statement of the facts of your case which shows that you are entitled to relief. Filing this Notice is not enough. For more information about filing a lawsuit, go to https://www.eeoc.gov/employees/lawsuit.cfm.

## ATTORNEY REPRESENTATION

For information about locating an attorney to represent you, go to:
https://www.eeoc.gov/employees/lawsuit.cfm.

In very limited circumstances, a U.S. District Court may appoint an attorney to represent individuals who demonstrate that they are financially unable to afford an attorney.

## HOW TO REQUEST YOUR CHARGE FILE AND 90-DAY TIME LIMIT FOR REQUESTS

There are two ways to request a charge file: 1) a FOIA Request or 2) a Section 83 request. You may request your charge file under either or both procedures. EEOC can generally respond to Section 83 requests more promptly than FOIA requests.

Since a lawsuit must be filed within 90 days of this notice, please submit your request for the charge file promptly to allow sufficient time for EEOC to respond and for your review. Submit a signed written request stating it is a "FOIA Request" or a "Section 83 Request" for Charge Number 410-2022-06563 to the District Director at Darrell Graham, 100 Alabama Street, SW Suite 4R30

Atlanta, GA 30303.

You can also make a FOIA request online at https://eeoc.arkcase.com/foia/portal/login.

You may request the charge file up to 90 days after receiving this Notice of Right to Sue. After the 90 days have passed, you may request the charge file only if you have filed a lawsuit in court and provide a copy of the court complaint to EEOC.

For more information on submitting FOIA Requests and Section 83 Requests, go to: https://www.eeoc.gov/eeoc/foia/index.cfm.

FRL-EEOC

Date: Jan/03/2022

**ABBREVIATION**

| | |
|---|---|
| **ARD** | Annual Review Document |
| **CRC** | College Review Committee |
| **CSM** | College of Science and Mathematics |
| **DRC** | Department Review Committee |
| **FPA** | Faculty Performance Agreement |
| **KSU** | Kennesaw State University |
| **PS** | Professional Services |
| **P&T** | Promotion and Tenure |
| **RCA** | Research and Creative Activity |
| **TSM** | Teaching, Research and Mentoring |
| **TYR** | Third Year Review |

I request the Investigator **"Steven Garcia-Reyes"** to read the documents sequentially to understand chain of events:

1. Narrative_Nicole_Ferguson (she got P&T but denied mine)
2. Narrative_ Herman_Ray (got P&T)
3. Narrative_ Mohammed_Chowdhury
4. Yellow_annotated_DRC_Letter
5. 1st_rebuttal_letter
6. Yellow_annotated_Chair_Letter
7. 2nd_rebuttal_letter
8. Dean_letter
9. College_committee_letter
10. Mohammed_Chowdhury_letter_to_Provost_letter
11. Attorney's_letter_President
12. Mohammed_Chowdhury's_letter_to_OIE
13. **Final_Rebuttal_letter_Mohammed_Chowdhury_VS_KSU_VIA_EEOC**

Date: 01/03/2023
Steven Garcia-Reyes
Investigator
U.S. Equal Employment Opportunity Commission
Atlanta District Office 100 Alabama Street SW, Suite 4R30
Atlanta, Georgia 30303

Re: Mohammed R. Chowdhury v. Kennesaw State University (KSU)
Charge No. 410-2022-06563 – Rebuttal Letter against KSU's Position Statement.

Dear Investigator Garcia-Reyes,
I am writing this rebuttal letter against KSU's Position Statement. This letter also stands against letters written by Department Review Committee, Chair, Dean and College Review Committee to demonstrate that

(1) My Promotion and Tenure (**P&T**) was denied unfairly by **violating KSU's own P&T guideline.**
(2) Independent Levels of Review Claim is a **documented FALSEHOOD.**
(3) **Lack of integrity** in Office of Institutional Equity's (OIE) investigation process.
(4) Third year Review comments **by DRC, Chair and Dean.**
(5) **Contradiction** between DRC's 3rd year and 5th year review letters.
(6) **Documented falsehood** on **KSU's position statement.**
(7) **Documented lies, falsehood, inaccurate, and misleading information** on Four **P&T letters**.
(8) **Documented harassments** done against me **before, during, and after** P&T process.
(9) Provost and Dean did not form **new committee by following P&T guidelines.**

**(1) <u>My Promotion and Tenure (P&T) was denied unfairly by KSU</u>**

Every Department at KSU has its own "Departmental Promotion and Tenure Guideline." This document (Signed_DSAS_P_and_T_Guideline) is uploaded on EEOC portal. This guideline was created to provide pathways to tenure track faculty to fulfill **minimum** requirements in **Teaching, Research and Services to achieve P&T**. These requirements were specific and vary by Department. These specific requirements are not mentioned in the **College P&T Guideline** or **University P&T Guideline**. So, **Department P&T Guideline** is fundamental for awarding or denying **P&T**. As a part of the **P&T** application, the candidate must attach and upload **"Department P&T Guideline"** with his application packet. Uploading this document has been made mandatory so that candidate can have a copy of it, thoroughly read it, and understand the minimal requirements of **P&T.** College and University level Guidelines are not required to attach or upload with the P&T application. Department P&T Guideline on **page 3 & lines 28-30** clearly states

***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."***
Where

**TSM** stands for **Teaching, Supervision and Mentoring,**
**RCA** stands for **Research and Creative Activity,** and
**PS** stands for **Professional Service**

A conjunction **OR** is used in the above statement, which needs to receive high attention because by using this conjunction applicants **before and after me got P&T.** Interestingly, this conjunction has been removed recently from Department P&T guideline after awarding P&T to Gita Taashoobseraji (who received P&T after me where same P&T guideline was used. In all three areas I exceeded her in quality and significance). In my rebuttal letters, I mentioned about this conjunction at least 4 times; however, none of their six letters (Chair, Dean, College Committee, Provost, President, OIE of KSU) ever mentioned anything about Department P&T guideline and the above quote from that guideline. So, at all levels, Department P&T guideline was **willfully violated and ignored.**

**Unfortunately,** in KSU's Position Statement, there is also no mention of Department **P&T** Guideline at all, which is the starting point of the **P&T** procedure. Supplement document (Combined Exhibit 1-13) of KSU's position statement does not contain Department P&T guideline. Anyone meets **minimum** requirements of the Department P&T Guideline got positive review from the Department and receives the **P&T.** Dr. Nicole Ferguson met the minimal requirements and got **P&T.** She was one of the members of Department **P&T** review committee who denied my **P&T.** In all areas (**numbers** as well as in **quality and significance**), **I** had more than double achievements than **Dr. Nicole Ferguson** as mentioned in **Table 1** where both of us used the same Department P&T guideline. **Table 1** also contains comparison in three areas (TSM, RCA and PS) among 4 faculty where 3 of them got P&T before and after me and **I was denied from P&T.**

Table 1: Comparison of **TSM, RCA** and **PS** among faculty with P&T status

| Faculty Name | **TSM** | **RCA** | **PS** | **P&T status** |
|---|---|---|---|---|
| Dr. Herman Ray(White male). He got P&T after 4 years | 7 courses taught (3 or 4 graduate courses). No PhD supervision | 5 articles (1 methodological and 4 applied). Only 1 paper was at B grade level. **23 citations.** | Provided less service than me. **I know from portfolio** | **Got P&T before me.** See his portfolio on EEOC portal |
| **Dr. Nicole Ferguson. She was one of the P&T committee members** (White female). She got P&T after 5th year | 6 (1 graduate course) No PhD supervision. She did not have graduate faculty status for many years as she does not like to teach graduate courses. **She also told me not to teach any new course, which I mentioned in an email to Dr. Ni.** | 3 (No methodological paper. **All 3 are applied papers). Minimum number of papers required for P&T is 3 and she had only 3. No B grade level paper.** No paper was on Statistical methods. **27 citations.** | Provided less service than me. **I know from portfolio** | **Got P&T** before me with very minimal accomplishments in all 3 areas than my accomplishments. See her portfolio on EEOC portal |
| Dr. Mohammed Chowdhury. Denied P&T after 5th year (Asian, Male, Muslim Faith) | 11 (6 grad & 5 undergrad courses. 2 courses developed) **Supervised 1 PhD,** mentored 7. Among most frequently taught 4 courses, student evaluations of at least one section exceed all bench mark evaluations. **Consistently maintained graduate faculty status** by teaching Master and PhD level courses. **82% of the teaching evaluations were good. Rest are neutral or negative. All teaching improvement criteria** were incorporated at least once during 5-years period. | 7 (4 methodological, 2 applied and 1 book review). **71 citations.** My research was outstanding mentioned in the letters of former Dean and Former Chair. I got undergraduate research award. **One of the papers was top article in the month of May, 2016.** However, Dr. Ni wrote that I had two B grade level journal articles. However, I claim that I had 4 papers that are at B grade level. **I had a sole author methodological paper.** I did not publish any of my paper by **huge publication fees.** | I provided more services than others as mentioned in the letter of the P&T review committee. I provided high level services mentioned in review letter. | Denied P&T. See my portfolio on EEOC portal. **171 supporting documents** of my five years academic accomplishments were added to my P&T portfolio. Dr. VanBrackle and Dr. Gardner reviewed my P&T narrative & **highly appreciated it.** Dr. Gardner wrote a letter to provost for **unfairly denying my P&T.** |
| Dr. Gita Taasoobshiraji (Parsian female). She insulted me. She got P&T after 4th year. | 4/5 courses. No PhD supervision. She obtained PhD **in Psychology and struggling in teaching graduate courses,** but got P&T after 4 years. SAS certification exam requirement was removed by Dr. Ni by her request, which is compromise with academic integrity. | None of the paper is at B grade level. Neither of the paper is on Statistical methods. All the papers are on psychology. | Provided less service than me | **Got P&T after me and use the same P&T guideline** |

By using the same **P&T** guideline, three faculty got **P&T** before and after me with much less accomplishments in all three areas **in terms of quality and significance as well as in terms of number of publications or number of course teachings.** High quality and significance of my Teaching and Research were well documented by the support letters (Former_Dean_Support_letter and Former_Chair_Support_letter are on EEOC portal) of former chair, former dean and their-third year review letters (pages 123-135, Combined Exhibit 1-13). High quality of teaching was also documented by the letters from a colleague, who observed my teaching three times (Lynda_Galloway_Letter on EEOC portal), a representative from **Center for Excellence in Teaching and Learning**, which helps faculty to improve teaching (CETL_class_observations on EEOC portal), and a senior lecturer, who had 15 years of teaching experiences and took two courses with me (Symon_Kitimei_Letter on EEOC portal).

In 4 hierarchical levels of P&T review (Dept committee, Chair, Dean and College committee), **they clearly mentioned in their letters** that I met and exceeded expectations in **RCA** and **PS**, which is enough to secure **P&T** as mentioned in the Department guideline. I also met all other Teaching, Research and Service requirements mentioned in the Department P&T guideline (1st and 2nd rebuttal letters on EEOC portal). In addition, all criteria mentioned in the college and university guidelines for P&T were exclusively met by my P&T portfolio. I never violate any clause mentioned in all 3 P&T Guidelines. I was recommended highly for **Outstanding Early Career Award** by the former chairs in two letters (Sherry_Outstanding_Early_Career_Award and Lewis_Outstanding_Early_Career_Award on EEOC portal) in 2019. These letters were written based on **4-years retrospective observations (2015-2016 to 2018-2019) of my Teaching, Research, Service, and interaction** with other colleagues (I am a **Good Department citizen**, mentioned multiple times in many support letters).

**Regrettably,** in KSU's Position Statement, there is **also no mention about retrospective rating** of my **TSM, RCA** and **PS** in previous five years. These ratings also indicate that my P&T was denied very unfairly as mentioned in Table 2.

**Table 2:** Retrospective rating of **TSM, RCA** and **PS** for Dr. Mohammed Chowdhury.

| Years | TSM rating | RCA rating | PS rating |
|---|---|---|---|
| 1st year | **Meeting expectation** | **Meeting Expectation** | Meeting Expectation |
| 2nd year | **Meeting expectation** (very good comments were made in the ARD). Rated that I am adopting scholarly approach in my Teaching. All students passed the advanced SAS certification exam, which is a record in the Dept history. I was heavily applauded by Dean and Chair. | **Meeting Expectation.** Dr. Herman Ray said slow down the rate of publications and give time to your family. | **Meeting Expectation** |
| 3rd year | **Meeting expectation** | **Exceed Expectation.** With 2 and half years, I had 5 publications | **Meeting Expectation.** Rated that **I am already providing service at an Associate Professor level.** (10% service) |
| 4th year | **Meeting Expectation** | **Meeting Expectation** | **Meeting Expectation** (10% service) |
| 5th year | Not Meeting Expectation | **Meeting Expectation** | Not Meeting Expectation. I provided same services as previous years and also provided a lot of voluntary service including spending my own pocket money, but Dr. Ni said my service does not sum up 10%. I requested additional service via email but she did not assign. **She realized that Dr. Chowdhury could not be stopped in RCA; only way to stop him from P&T is to give him not meeting expectation in Teaching and Service.** |

The ratings are based on **ARD.**
where
**ARD** stands for Annual Review Document (previous year performance evaluations) and
**FPA** stands for faculty performance agreement (current year future goal).

**ARD** is prepared based on previous year performance on Teaching, Research and Service and FPA is performance goal for the ongoing year. **ARD evaluations and FPA projections** are done at the beginning of each calendar year. At the end of the fifth year, most/all of the goals from FPA were met by me (2nd rebuttal letter). Also, 5-years retrospective workload are computed based on percentage of **workload completed in each ARD and not on the FPA.**

Department P&T guideline explicitly state that

***"Faculty members seeking promotion should already be meeting expectations of the next rank"***

**RCA: I met and exceed expectation in RCA** (I have outstanding future research agenda with good publication records).
**PS:** I was providing service at an associate professor level (2017 ARD comments by Dr. VanBrackle).
**TSM:** I have outstanding teaching accomplishments (**taught 11 unique courses, 6 of them were graduate level, consistently maintained graduate faculty status, supervised 1 PhD student, 7 master and bachelor students were mentored with publications, developed one graduate course and one most useful undergraduate python programming course)**. Student evaluations from 4 courses exceed all benchmark student evaluations taught by other faculty as mentioned in the Table 4. **I adopted scholarly approach and cyclical development approach** mentioned in my 2017 ARD comments by Dr. VanBrackle. **Both Chair and Dean wrote in their 3rd year review letter** that I was meeting expectation in all areas to achieve P&T. Consistently got meeting and exceed expectation in all areas except **TSM and PS** in final year. Final year not meeting expectation on TSM and PS was purposeful to deny **P&T.**

Table 4: Student evaluation of the four courses. Best evaluations occur years after worst evaluations, which indicates scholarly approach in teaching. CSM-College of Science and Mathematics.

| Course Number<br>Course Name<br>(# of times taught) | Worst Evaluation (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4<br>CSM average result | Best Evaluation (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4<br>CSM average result |
|---|---|---|
| STAT 3125<br>Biostatistics (14)<br>Includes summer teaching as well | Course Content (1.75, NA)<br>Teaching Effectiveness (1.75, NA)<br>(14.3%, Spring 2018)<br>CSM result Spring 2017 (3.58, 3.61) | Course Content (3.6, 4)<br>Teaching Effective (3.8, 4)<br>(56%, Fall 2019)<br>CSM result Spring 2017 (3.58, 3.61) |
| STAT 1107/1401<br>Basic Stat (7)<br>Includes summer teaching as well | Course Content (2.00, NA)<br>Teaching Effectiveness (1.80, NA)<br>(14.7%, Spring 2016)<br>CSM result (3.49, 3.45) | Course Content (3.3, 3)<br>Teaching Effective (3, 3)<br>(47%, Summer 2020)<br>CSM result Spring 2017 (3.49, 3.45) |
| STAT 8020<br>Advanced SAS<br>Programming (3) | Course Contents 1.83<br>Strength of the Instructor 1.00<br>(58.3%, Fall 2015)<br>CSM result (3.50, 3.45) | Course Contents 3.71<br>Strength of the Instructor 3.29<br>(58.3%, Fall 2016)<br>CSM result (3.50, 3.45)<br>In this year all students passed Advanced SAS certification Exam, which is a record. |
| STAT 4490<br>Python<br>Programming (2) | Course contents (4, 4)<br>Strength of the instructor (3.7,4)<br>(Spring, 2019)<br>CSM result (NA) | Due to covid-19, Spring 2020 student evaluations were cancelled |

Department P&T guideline also stated that

***"A favorable review is dependent upon the case made by the faculty member in his/her narrative and supporting documentation. A poor narrative and/or lack of relevant documentation are/is grounds for a negative decision"***

My 12-page narrative (with 171 supporting documents embedded with hyper link) was thoroughly read by three faculty (Dr. VanBrackle and Dr. Gardner from our own department, and Dr. Mohammad Karim from Civil Engineering Department of KSU). Many faculties such as Dr. Gardner, Dr. Ni, Dr. Ray, and Dr. Ferguson got **P&T** when Dr. VanBrackle was Chair at our Department. He thoroughly read my narrative and said following things in the box:

| |
|---|
| Email response from Dr. VanBrackle after reading my narrative:<br>Lewis Vanbrackle Tue, Aug 11, 2020, 4:02 PM<br>to me<br>Mohammed,<br>I read your narrative, and it is quite good. You seem to have linked to the documentation thoroughly. I did find one typo. On page 10 on the 7th line up from the bottom, you refer to the Georgia Teach faculty. I think it should be Georgia Tech faculty.<br>Overall, it appears very well done.<br>Good luck,<br>Lewis |

Another faculty Dr. Gardner said following thing about my narrative in the box below

| |
|---|
| Email response from Dr. Gardner:<br>Kimberly Gardner Mon, Aug10, 2020, 11:47 AM<br>To: Mohammed Chowdhury<br>Final_Narrative_P&T (Kimberly Gardner).docx<br>Hello Mohommed,<br>Your narrative reads beautifully. I attached the signed department guidelines document you have to upload to Digital Measures, in case you haven't downloaded it yet.<br>A few suggestions:<br>Check the KSU handbook guidelines (at the end of chapter 3 there is a checklist), I believe the page limit is 12. I also found the FAQs helpful for some of my questions: https://digitalmeasures.kennesaw.edu/activityinsight/PortfolioSubmissionFAQsV4.pdf<br>........ |

Two faculty from our own Department approved that my P&T narrative and their documentations were well organized and reads beautifully, which indicate that my narrative must deserve a favorable review. However, DRC and Chair intentionally said my narrative was poorly written and was a list of works. Please read 3 narrative together to differentiate them.

Department P&T guideline also states that

***"Tenure should only be granted to those faculty members whose achievements demonstrate the quality and significance expected of an Associate Professor and who demonstrate potential effectiveness at the University. Tenure requires prior or simultaneous promotion to the rank of Associate Professor."***

I met all requirements mentioned in the above statement. I had a plenty of achievements such as (a). nomination for Outstanding Early Career Award by two former chairs by retrospective 4-years analyses of my TSM, RCA and PS (b). got selected among top 45 statisticians from USA and Canada for a two-day training session organized by International Biometric Society Conference in 2017 (Enar_Workshop_Booklet on EEOC portal). I am the only one who got selected for my outstanding research from a R2 University like KSU. Chair and DRC never mentioned about it in their letter (c). Meeting and Exceeding expectations on RCA in all 5 years (d). Meeting expectation in TSM for first 4 years. Got rating that I am adopting scholarly approach in my teaching and I showed cyclical improvement in my teaching (all students passed advanced SAS certification exam). (e). Meeting expectation in PS in first 4 years. Got rating that I was already providing services at an Associate Professor level by Dr. VanBrackle (DRC and Dr. Ni never mentioned those comments from my ARDs in their letters). (f). I wrote half million-dollar grants proposal to NSF in 2018, which will generate 15 to 20 research articles (already got published 6 articles after submitting my P&T portfolio) and clearly shows long-term research effectiveness at KSU. (g). I already taught 11 unique undergraduate and graduate courses in a 5-year period, which is very rare and may be found rarely. Dr. VanBrackle and Dr. Priestley said multiple times that I can teach any

course, which indicates the long-term effectiveness in teaching at KSU. (h). Dean and Chair wrote support letters for my P&T. (i). I may be the only teacher in the world who taught three programming courses (SAS programing courses, R programming courses, and Python programming course. Python Programming course was developed from scratch and I never heard about it before coming to KSU) (j). I taught both Frequentist and Bayesian Statistics Courses for graduate students, which is also rare (**I have published articles in both aread known as Frequentist and Bayesian Statistics. None of the promoted and tenured faculty have teaching and research expertise in both areas let alone having publications in both areas.**) (k). 82% of my student evaluations are positive and rest are neutral or negative. (l). I provided many voluntary services at College level and University level (spending fuel cost from my own money in the weekend) even though I was not assigned one service at those levels after repeated request. (m). Dr. Kimberly Gardner wrote a letter to Provost by saying that Dr. Chowdhury is the most talented faculty in the Department. (o). I ran short course with title "Side-by-Side Learning of R and Python Programming" in American Statistical Association conference in February, 2020. My short course has a highest number of attendees (32 attendees). Per attendee pay $1500 for this 4-hours long short course to the Conference organizer. I also received finance reward for running this short course. I popularized KSU to the rest of the world more than any other faculty at KSU because thousands of booklets (booklet on EEOC portal) of the short courses with conference information were mailed across globe where my short course information was in the first page after cover page. Unfortunately, there is no mention about this accomplishment in the letters of DRC and Chair.

KSU faculty handbook states, ***"Highly effective teaching and learning are the central institutional priorities of Kennesaw State University."*** The department guidelines continue to say that, ***"As such, teaching and mentoring effectiveness is considered to be fundamental and essential for continued faculty employment, tenure, and promotion in rank."***

I also met each of the above two statements because, (a) my classes were observed by Dr. Galloway 3 times and wrote in a support letter that I am an effective Teacher. (b) a representative from Center for Excellence in Teaching and Learning observed my class and rated very highly in a support letter by mentioning that I am a very effective teacher. (c) a senior lecturer (15 years of teaching experiences) who took two courses with me and had a publication with me in a highly ranked journal (impact factor 8) also told that I am a student engaging and effective teacher. (d) I supervised and mentored 7 students, 6 of them took courses with me before selecting me as their mentor, which indicate my teaching and mentoring effectiveness. (e) I developed and taught two most useful courses for graduate and undergraduate students for the benefit of the students and for our degree program. (f). Page 2 & line 29 of DRC letter mentioned that "It is **significant** that you have taught a variety classes and student levels while at KSU." So, they admitted my significance in Teaching. (g). Page 8 & line 10 of Chair P&T letter admitted that I have **significant contributions in advising and mentoring students.**

The department guidelines define, ***"Faculty members are expected to approach their teaching in a scholarly manner, meaning they engage in a cyclical process that is deliberate and intentional, systematic and planned, measured and evaluated, revised and rethought"***

I met each criterion mentioned above for the cyclical development of my teaching. Table 4 shows that my best evaluations of the courses came after my worst evaluations of the course. All worst student evaluation years preceded the best evaluation years, which means that (a) I adopted scholarly manner for improvement of my teaching (b) I used cyclical process (c) I changed syllabi (d) I added new Quizzes, Exams, projects in each year (e) Nobody (DRC, Chair Dr. Ni, and students) were able to identify any sub-standard teaching materials from my course contents. (f) Chair admitted in her P&T letter (page 3 & line 23) that I completed one cycle of teaching improvement by scholarly approach. Where does in the guideline mention about completing 2 or 3 cycle of teaching improvement?

Department Guideline clearly mentions that expectation for an Assistant Professor in the area of TSM is being **"proficient in the delivery of at least two courses."**

I taught multiple sections of 5 courses (STAT 1401, STAT 3125, STAT 4030, STAT 4490 and STAT 8020), rest of the 6 courses were taught only one time. **Very unfortunately, DRC said in their letter that I taught only multiple sections of 3 courses, which is an intentional lie.** My student evaluations for 4 of these courses have exceed all benchmark

student evaluations taught by other faculty (Table 4). DRC and Chair never mentioned anything about the contents of this table. After submitting my P&T portfolio, I taught multiple sections of another course (STAT 2332) for engineering major and **had student evaluation 4 out of 4 in all areas.** So, each criterion mentioned in the Department P&T guideline were met by me.

Department Guideline mentioned about performance area of PS as ***"An Associate Professor should: Have taken on a leadership role in at least one of the following: Departmental, College, University Service or Professional Service within their discipline."***

I arranged Big Data Lecture Series Talk since Fall 2017 until Spring 2020. I reached out my colleagues in academia and industry to find speakers. I made the flyer and advertised those via Social media and via email (three email, the day talk is schedule, exactly 1 week before the talk and in the day of the talk). In 2017 ARD service rating, Dr. VanBrackle wrote "You are already providing service at an Associate Professor Level."

***So, "I was clearly at a meeting expectations level of the next rank known as Associate Professor"***

**Explanation of not meeting Expectation in 5th Year:**
In the fifth year (2019-2000), I had little disagreement with the then Chair Dr. Ni and I said to her "As you are insulting me before students, one day students will insult you." I said this in a one-to-one meeting when she severely criticized my teaching for one section of a course. By capitalizing this, she rated me 'not meeting expectations' in TSM and PS in the final year and consequently denied my P&T by misleading other people in the Department, College and University. For this minor incidence, I apologized her via email (apology_email_sherry) with Dean Dr. Marla Bell was in the CC. I apologized before beginning of my P&T procedure. **In the email I asked her after apology that we should both apply famous $f^3$(forgive, forget and forward) rule. However, she did not apply the $f^3$ rule.** So, everybody will understand that this is a revenge and a retaliation against me as a junior faculty. As an under represented faculty, I do not have a right to express my opinion to my chair and my **documented apology did not soften her heart to forgive me.**

Dr. Ni did not rate me meeting expectation in 5th year from three female student evaluations from two courses (STAT 4030 and STAT 4490). Dr. Ni (then chairman) managed three undergraduate white female students (one of them was single mom) and asked them to write only negative evaluations (on EEOC portal) about my teaching of a course STAT4030 (which, I did not want to teach) so that I could be terminated from KSU based on their evaluations. Dr. Ni repeatedly showed interest (verbally as well as via email) to come to STAT4030 class to monitor student evaluations in the absence of me. She wanted to do this because she wanted most of the students to listen her words before starting evaluations and also wanted to give extended time to evaluate me. When I observed her repeated interest to observe my class, I choose Dr. Gardner to come to my STAT 4030 class to observe student evaluations. In this section, many students said highly positive about my teaching abilities except two white girls.

One of the two female students wrote in her evaluation that I must be terminated from KSU based on her evaluations. She wrote many other false things in her two-page long evaluation. No student ever wrote two-page long evaluations about my teaching abilities. During my tenure track position, I taught 685 students, none of the students wrote about my termination except this student. Single mom student wrote that I am slightly racist, texted me 'f' word, email me from her gmail account, and texted me her gmail address. She contacted me even after the semester was over. A third girl wrote in her evaluation that I am marginally sexy.

Students neither called the police and nor did complain to OIE (Office of Institutional Equity) of KSU for investigation. From these three student evaluations, Dr. Ni wrote in my 5th year (final year) ARD review that **I had Gender Issue. She then rated me not meeting expectation on TSM (as mentioned in Table 2)**. She also rated me not meeting expectation in **PS** as service did not sum up 10% (in her calculation) whereas in previous three years same service accounted for 10%. So, intension was very clear because I was providing same amount of services as I did previous year. In 2019 ARD rebuttal letters I provided all of these information (rebuttal_ni_ARD2019 and rebuttal_marla_ARD2019 on EEOC portal), but Dean Dr. Marla Bell wrote that she is **disturbed by the student's evaluation**. Student evaluations are confidential and it must not be disclosed in public portal. Dr. Ni copied student evaluations and pasted it in my 5th year ARD review

letter. Dr. Ni then opened an investigation based on these three female student evaluations at OIE. After seven-month long investigation, OIE released the report and never gave me any warning and completely **dismissed the false and bogus investigation** (EEO portal). In my entire **7 years of working at KSU, I had never received any warning in any form from anywhere in KSU.**

Before OIE investigation report got published (began in 05/19/2020 and published 12/17/2020), **very unfortunately**, Department P&T review committee quoted in their letter that **"I had gender Issue"** and **"Dean Dr. Bell was disturbed by the student evaluations"** from 2019 ARD reviews and denied my P&T by rating my TSM not meeting expectation **(from 685 students, they cherry picked only 3 students' comments. These students were 100% programmed by a coordinated effort to terminate me**). P&T committee were well aware of the investigation from Dr. Ni and also one of the members was interviewed by OIE. **But they convicted me on an ongoing investigation matter in their letter and did not wait until the investigation report gets released.** Isn't it a gross crime to convict a person before completion of the investigation?

However, after investigation report got published, I immediately wrote a third rebuttal letter to Provost by mentioning that many things that Department Review Committee wrote in their letter were proven to be false. I also mentioned many falsehoods found in the letters of Department Review Committee, Chair and Dean in my third rebuttal letter. **During the P&T procedure, if anomalies were found, Dean or Provost can form a new P&T committee and reevaluate the P&T process (there was precedence), for which I requested multiple times, but my request was not heard.** Dean never give me appointment for meeting, never responded my repeated emails, never uploaded my 2nd rebuttal letter in online portal to make it available to all members of the college committee. College committee chair also did not upload my 2nd rebuttal letter in online portal. After all college committee members said **'NO'** to my P&T, then Chair of the College committee uploaded my 2nd rebuttal letter online. But the rebuttal letter must be made available to each member of the college committee when Dean uploaded his letter, which was not done at my case (screen_short_date_check on EEOC portal). Dean uploaded his letter on 24th of October, 2020 but my letter was not uploaded on 24th of October. So, for one months none of the college committee member saw my rebuttal letter on digital measure, an online portal. Please see the **'date of upload'** in the document "2nd_Rebuttal_Letter_Not_uploaded" on digital measure in due time.

**(2) Independent Levels of Review Claim is a documented FALSEHOOD:**

KSU's position Statement (on page 9 & line 2) says **extensive independent levels of review** (at 5 different levels) deny me from P&T. This is a false and contradictory statement. Because, on Sep/30/2020 College Committee Meeting **(CC_Deciosn_Sep_30_2020 on EEOC portal, page 1, line 20)**, it was purposely decided that for P&T reviews, Dean and College Committee **will look strongly in the letter of Chair and DRC.** This is done during my P&T process, which is against P&T guidelines. New law cannot be made during trial period. Existing law must be used. **There was no mention about strongly looking at the rebuttal letters of the candidates**. As stated in the document "CC_Decision_Sep_30_2020" during P&T process, they (Dean and College Committee) blindly follows the lies, falsehood, inaccurate and misleading information in the letters of DRC and Chair. This decision has been **made after I submitted my P&T portfolio**. So, after my P&T application they made this **new rule and law, which was not mention in any P&T guidelines.** Dr. Joseph DeMaio, who was the P&T committee member as well as college committee member sent the email to all members of the Department and indirectly declared that my P&T will not be approved because of DRC's complete negative evaluations. He said in the email body that **"That document contains some very interesting information which is ultimately only of short-term interest to us as a department. But still interesting."** I was getting enormous pain for my well-deserved P&T denial and Dr. Joe DeMaio is celebrating my pain with others via email. He was doing this celebration because he was 100% sure that my P&T will be rejected one hundred percent in all next levels by ignoring all falsehood DRC wrote in their letter. This insulting email (Joe_DeMaio_Email on EEOC portal) sent on 10/12/2020 let everyone in the Department know that I would not be given P&T even though remaining evaluations from Dean, College Committee, Provost and President were yet to come. So, during the tenure process they cannot a make new rule or law. **So, there was no independent evaluation in each next level,** instead there is blind followings of documented lies, falsehood, inaccurate and misleading information at each level beginning from letters of DRC and Chair. If there is an independent evaluation, then they must upload my 2nd rebuttal letter on digital measures on 24th of October

after my repeated email requests. But they did not. Dean did not give me time for meeting. Dean did not reply to my emails. CRC chair did not reply to my email and did not upload my 2nd rebuttal letter on digital measures.

**(3) Lack of integrity in Office of Institutional Equity's (OIE) investigation process**

I submitted two complaints at OIE of KSU for investigation. Complaints were:
**Complaint one:** Unfairly denying my promotion and tenure.
**Complaint two:** Harassments, retaliations, insults done against me by colleagues.

OIE released delayed investigation report for **complaint one.** However, OIE **never released or explained** anything about **Complaint two.** Explanations are as follows:

I submitted both complaints on July/01/2021. During that time Dr. Donna Reddix was the Director of OIE and she assigned Ms. Brandi Williams as the investigator. I Provided all information and documents about unfairly denying me from P&T as well as documents of harassments. I also provided answers for additional follow-up questions of OIE. **In multiple emails and documents I said that** *"OIE is the judicial branch of KSU and it must work independently from the executive branch (the office of Provost and academic affairs)."* However, all the interactions and correspondence that happened among 4 persons (Provost Evan Pulinkala, Ms. William, Dr. Reddix, and Dr. Chowdhury) clearly showed that OIE did not work independently or does not have guts to work independently (at least Ms. Williams was not honest). Ms. Williams did not show any professional honesty during investigation period even though she has a law degree. She clearly worked by the direction of Executive Branch of KSU. **Following email correspondences** would clarify that Ms. Brandi Williams were well aware of a tentative meeting between Provost Evan Pulinkala and Dr. Chowdhury depending on the release of investigation report.

- **a.** After submitting my complaints to OIE, I contacted Provost Evan Pulinkala on Oct/01/2021 for a meeting. Provost replied email (Provost_email_Ivan_brandi_in_cc is on EEOC portal) **with Ms. Brandi in the CC**. So, Brandi was well aware about the meeting between Provost and Dr. Chowdhury on 1st day of October, because **email reply came from the Provost.** So, KSU's position statement (last paragraph of page 8) of Ms. Williams lack of memory or lack of recalling the important meeting is not acceptable. **I reminded her multiple times** about this meeting in subsequent emails **and my last day of work at KSU.**
- **b.** In October 1 of 2021, before sending email to Provost, I sent another email to Dr. Reddix (email_donna_reddix_1_Oct_2021 on EEOC portal) and mentioned that I am seeking an appointment from Provost. **Ms. Williams knew about it from Dr. Reddix, Because Ms. Williams was director of OIE from September 29, 2021.**
- **c.** In December 9, 2021, Dr. Reddix told me via email (Donna_Reddix_initial_investigation on EEOC portal) that she had completed her review of my initial complaint. In that email she also said that **another couple of weeks required to release the investigation report.**
- **d.** In 19th Jan, 2022, email sent to **Dr. Reddix** (Donna_reddix_Barred_from_accessing_investigation on EEOC portal) **bounced back**. She is barred from accessing her own KSU assigned computer drive and email. If email was down, then it should be down for all individuals at KSU. This means that **Dr. Reddix was barred to work independently.** She was working independently, but she was demoted from the director position. She did not have access to any files related to my investigation (she told me about it on 8th of February via Team Meeting).
- **e.** On 21st Jan, 2022, I personally reached to Ms. Williams via email given in the box below

> Mohammed Chowdhury <mchowd10@kennesaw.edu>
> Attachments
> Jan 21, 2022, 3:19 PM
> to Brandi, Brandi, me
>
> Dear Brandi Williams,
> I hope this email finds you well. I sent you an email on Jan/19/2022 to know the update of the investigation about unfairly denying my P&T. I have not received any email response from you. Previously, you responded

> emails very quickly and when transition about investigation was made, I was quickly notified via email Sep/29/2021. On Dec/09/2021, Dr. Donna Reddix told me via email that she completed initial investigation and it will take another couple of weeks to reveal the investigation result. **Our provost also sent you an email where I was put in the CC asking me to wait to meet him until OIE investigation report was revealed. I have attached those documents with this email.**
>
> I therefore, request you to let me know the tentative date when the report for unfairly denying my promotion and tenure will be provided. As, May is the last date of my employment, so, I have to make decisions. Thanks, and have a nice weekend.
> Mohammed.

f. On January and February of 2022, I tried to communicate but could not. Please see the email copy (purposfull_delay_OIE_investigation and delaying_investigation_proof) on EEOC portal. Their explanation was "the delay and technical difficulties were unexpected." **This man-made delay and man-made technical difficulties were done purposely so that I miss meeting with provost during my job contract.**

g. On March 1st 2022, Ms. Williams said via an email (Dr_Reddix_no_longer_work_KSU on EEOC portal) that Dr. Reddix no longer work at KSU, but will work for my case. Later, in another email, she said Dr. Reddix work part time.

h. On last day of my work (05/13/2022), I again contacted (delaying_investigation_proof_1 on EEOC portal) in early morning to release my investigation report to Brandi Williams, but email was not answered.

i. In KSU's position statement, they are claiming that there **was a shortage of employees**, which is an absolute falsehood. Three times OIE gave time to release my report, but they never released report. There are no documents in our conversations about shortage of employees at OIE for which my investigation was delayed. **There was no document that investigator resigned or left the job.** They never mentioned it. Investigation were based on provided documents (letters, email etc.) and interviewing only 1 or 2 persons. All report was ready, but they did not release the report until my job contract was over.

j. I did not provide any additional document in February (no email attachment) but meet with Dr. Reddix virtually via Team to know the date when my investigation report will be released. So, the position statement claims of additional documents provided by me is the reason of delay to complete investigation is nothing but a complete falsehood. In their report, they mentioned that they interviewed only one person, which means that they did not spent lot of time for interviewing other people. OIE_investigation_report_P_and_T_denial is on EEOC portal.

k. I also received few emails from Dr. Donna Reddix email account but those emails pretend to be from Dr. Reddix but I suspect that those emails were sent by proxy. For example, all emails from Dr. Reddix had KSU logo and her signature. But few of those email responses did not have KSU logo and signature. I can provide those emails upon request.

So, in multiple times, Ms. Williams was informed about **THE** meeting between Provost and Dr. Chowdhury, but purposeful delay of releasing the report barred me to have a meeting with Provost. There is no way to believe that Ms. Williams forgot or cannot recall about an important meeting between Dr. Chowdhury and Provost while she was informed about it multiple times via email. In those email conversations, there was no mention about lack of manpower. Moreover, after completion of initial investigation, three different time-points of releasing report were mentioned via email (i) report will be released another couple of weeks in December (ii) Report will be released with two weeks in February and (iii) Report will be release in next week in February and March of 2022. **After submitting my complaints, Ms. Williams took 10 months and 16 days to release report (released date 16th May of 2022). However, when Dr. Ni (Chair) opened false and bogus investigation about my gender issue, they completed that investigation in 6 months and 27 days.** It is clear from the above documents that **Executive Branch of KSU (office of provost and academic affairs) put immense pressure on OIE so that my allegations of discrimination were nullified. But, Dr. Reddix maintained her neutral position throughout the investigation process and for this reason she was demoted from director to investigator position even though she had a PhD in Law. When she was completing investigation neutrally, she was barred from accessing computers, hard drive and email.** It is known to everybody that Judge deliver decision based on documents and not based on knowledge. The documents of discrimination and harassments that I provided to several levels at KSU are more than enough for a 10th grade student to come up with a decision that discrimination and

harassments happened against me in multiple settings and at least three senior administrators are directly involved in those discrimination.

**Page 9 & line 3 of Position Statement** said that it is unlikely that a meeting with Provost would have changed Dr. Chowdhury's KSU employment status, which is a contradiction in several ways. **(i)** During my P&T process, if Dean or Provost wanted, they can form a new P&T committee and reevaluate my P&T portfolio, which was not done for my case. **(ii)** If Provost wanted I could be relocated to another Department for which I requested to Provost Kathy Schwaig and in a meeting with Dr. Priestley. Previously, faculty were relocated from one department to another department (please read Letter_to_ Provost on EEOC portal). Dr. DeMaio was the Chair of the Math Department. A female faculty complained about him and finally filed lawsuit against him and subsequently he was relocated to Statistics Department. Similarly, another professor was relocated from IT department to Computer Science department or vice-versa. However, my plea to relocate was not heard. **(iii)** If University wanted, they can advertise a new position for Tenured Associate Professor and asked me to apply for reappointment as a tenured associate Professor, which was not done. **VERY UNFORTUNATLY,** Dr. Herman Ray, who got P&T before me with less accomplishment in all areas, left KSU job in May 2020 for assuming highly paid industry job. However, when he intended to return to KSU, a new position was opened for him and he was appointed as Tenured Associate Professor in Fall 2022. I am non-white, Muslim from south-east Asian Poor county Bangladesh but Dr. Herman Ray is white American, which makes the difference of denying and awarding P&T. By chance some are white and some are non-white. Superiority does not depend on race or religion. Superiority depends on honesty and truthfulness. So, **I was not given P&T and was not relocated to another Dept. A new P&T committee was not formed to reevaluate my P&T case and a new position for my employment was not opened even though I asked for it. My request and plea were not heard at any level.** Finally, in KSU's position statement, none of my five ARD documents, Letter_to_Provost, most importantly **"Department P&T guideline"**, and many other documents (171 supporting documents I shared with my P&T portfolio) such P&T support letters were not added to the supplement documents (Combined Exhibit 1-13).

**Position statement (last line of Page 7)** claims of minimizing quality and significance standard by solely focusing on volume and number (number of course teaching and number of publications) in comparison to two white professors (who previously got P&T) are an absolute falsehood. I mentioned in my rebuttal letters, if three narratives (who previously got P&T and mine) are read side by side (one after another in any arrangement), anyone will blindly recommend my P&T. If a top Statistics Professor from an R1 school reviews three narratives (Dr. Ferguson, Dr. Ray and Dr. Chowdhury), I will definitely get the highest rating of meeting and exceeding expectation in all areas.

**(4) Third Year Review Comments by DRC, Chair and Dean**

DRC Evaluation: In my 3rd year review letter by DRC on 2nd last paragraph of 1st page (Combined Exhibit 1-13, page-123), they admitted the quality and significance of my teaching. They further said highly about my teaching by quoting from Dr. Galloway observations as: Dr. Galloway was very impressed with how you have addressed all of the recommendations that (she) made in (her) initial observation. Dr. Galloway praised your significant improvement in the organization structure of you lecture and its delivery. Dr. Galloway closes her letter by stating your "efforts to seek out my opinion on your improvement shows that you care about your teaching and you want to be a good teacher for your students." DRC finally said, "This committee wholeheartedly agrees and recommend that you continue to engage in additional forms of scholarly reflection and improvements in teaching." 3rd year review committee never made one bad and disparaging comment in my TSM part at all. They gave all good suggestions, which I incorporated in my final P&T narrative. Their comments on my TSM is less than two pages. DRC also gave me good advice and a lot of appreciation on my RCA and PS (Combined-Exhibit 1-13). **DRC never said anywhere in their letter that I am not on a track to get P&T.**

Chair Evaluation: Chair also highly appreciated in his 3rd year review letter by quantifying that average SAS exam pass rate in our department was 50%. However, 3-year average SAS exam pass rate while Dr. Chowdhury teaching STAT 8020 course was 75% which was a great achievement. **In the 2nd last sentence of Chair letter, he mentioned that, "I believe you are performing at a level and improving at a rate that will ultimately lead to you being tenured and promoted."**

Dean Evaluations: Dean also said (last sentence of the 1st page) in his 3rd year review letter that "This was quite an accomplishment for the students, and speaks to, the quality of your instruction." Last sentence of the 2nd paragraph of Dean letter further confirmed that, **"All of those activities demonstrate that you are conscientious, reflective instructor." Dean also wrote in his first two sentence of the Summary of my 3rd year review as below: "Based on the evidence on your portfolio and comments in the letters from your chair and from your Department's P&T committee, as well as those in the past annual reviews, it is apparent that you are a productive and valued colleague. From my perspective, your professional accomplishment is on an appropriate trajectory and is consistent with that expected as an Assistant Professor in their third year."** [please read all 3rd year review letter from page 123-135, Combined Exhibit 1-13].

***"Also, Chair and Dean never mentioned about signature of the ARD and FPA documents anywhere in their letter."***

**(5) Contradiction between DRC's 3rd year and 5th year review letters**

DRC said (page 126 Combined Exhibit 1-13) in their third-year review letter that my narrative should be more closely aligned with my workload percentage. I took their advice and tried to align 45% for TSM, 45% for RCA and 10% for PS in my fifth-year narrative, which was 12 page long. However, they (DRC and Chair) used 75% of their letter to disparage my TSM and never gave any credit for my RCA and PS. **They did not follow their own advice that they gave me in their 3rd year letter.** In their P&T letter they should write 4.5 pages for TSM, 4.5 pages for RCA and 1 page for PS. But they did not follow that rule. Instead they intentionally created sections like "unprofessional outcome", "Gender Issue", "Unresponsive" etc. in their final year letter. In KSU's P&T denial history, is there any evidence that they rejected P&T by cherry picking student comments? In P&T guideline there is no mention about P&T denial based on only few student comments.

**(6). Documented falsehood on KSU's position statement.**

**Unfortunately, in the KSU position statement**, it is claimed that work-load is based on FPA, **which is a false argument** (position statement, page-7, last paragraph and foot note) and **directly contradicts** with the workload computation done in Chair's P&T letter (page 5, 2nd paragraph). This contradiction and many other documented falsehoods clearly indicate that **KSU randomly and hatefully** used their guidelines to deny me from P&T. Table 3 shows workload accomplished in five years and its average. **Teaching one course is always equal to 10%.**

**Real Mathematical computation of workload percentage:** 5 years (10 semesters, Fall and Spring) of teaching 23 sections of 11 unique course yield 23/10=2.3 courses per semester. Multiplying 2.3 by 2 semester equal 4.6 courses per year or 4.6*5=23 sections per year. Which means 46% workload is for TSM. Unfortunately, Dr. Ni forgot basic math calculation to my P&T. Please see her calculation on page 5, 2nd paragraph on Chair P&T letter.

KSU's position statement (page 4 & line 11 and 12) claimed that I have troubling teaching and performance issues over last five years, which is a blunt lie. I was not given one warning or troubling ratings in first four years annual review about teaching and performance. Even in the pre-tenure review, I was not given any advice that is troubling, but consistently said I am progressing for tenure and promotion in all letters in first 4 years. Please read third-year review letters from DRC, Chair and Dean. Read the rating for first five years. Not an iota of bad things mentioned in my first 4 annual reviews and in my 3rd year review. Meeting and exceeding expectation in first four years and mid-year reviews. My fifth-year narrative was not prepared hastily at all. It got highest approval from former chair who approve promotion and tenure to many faculties. So, hastily prepared comment is copied from third-year review letter and 5th year letter of DRC, which is full of falsehood.

So, falsehoods are not only prevalent in the letters of DRC, Chair, Dean and CRC but also in the KSU' position statement as mentioned in the above two instances.

Table 3: Workload distribution in TSM, RCA and PS. **I send Table 3 to OIE on October/29/2021.**

| Academic year (# of courses) Fall and Spring Semester Each course equals to 10% load | TSM load | RCA load | PS load |
|---|---|---|---|
| 2015-2016 (4 courses teaching) | 40% | 60% | Voluntary Services. Master student admission committee, attending R day, session chair etc |
| 2016-2017 (6 courses teaching), PhD mentoring begins | 60% | 35% | 5%, Search committee. Voluntary services. PhD and Master admission committee, attending R day. |
| 2017-2018 (4 courses teaching) PhD mentoring begins | 40% | 50% | 10%, Big data lecture series talk organizer, voluntary services |
| 2018-2019 (4 courses teaching) PhD mentoring ends | 40% | 50% | 10%, Big data lecture series talk organizer, voluntary services |
| 2019-2020 (5 courses teaching) | 50% | 40% | 10%, Big data lecture series talk organizer, voluntary services |
| **Average Workload percentage (Retrospective Average over 5 academic years)** | **46%** | **47%** | **7%** |
| Department Review Committee Average (wrong calculation) | 50%-60% | 30%-40% | 10% |
| Chair Dr. Ni's computation Average (wrong calculation) | 52% | 37% | 11% |

So, my **AVERAGE** work-load percentage over the 5-years period (retrospective) is **46% TSM, 47% RCA, and 7% PS.** There must not be any change in work-load percentage in **TSM** since teaching each course equals exactly 10% work-load. So, they (Department Review Committee, Chair, and this position statement) **intentionally** put **more than 50% workload** on TSM and **targeted** my teaching to rate **"not meeting expectation"** and **denied** my **P&T.** Their **falsehoods** are **"crystal clear"** because I do not meet **more than 50%** of the work-load (according to them), so **I do not deserve P&T** and Consequently, Dean, and College Committee **believed** on it **ignoring my rebuttals.**

2. **Documented lies, falsehood, inaccurate, and misleading information in Four P&T letters:**

   a. **Documented lies in Department Review Committee Letter:**
   The Department P&T committee denied my P&T by **thirty-one** lies, falsehood, inaccurate and misleading information in their letter as mentioned below. Their letter is uploaded to EEOC portal with name "DRC_Review_Letter."

   **ONE:** On page 1 & line 7, DRC lies about my workload. They purposely put three ranges of workload percentage on TSM, RCA and PS, each of which was completely wrong. They put more than 50% workload on my TSM. Proof of this lie was provided above. This lie is purposely done by three members of the P&T committee who had the highest education (PhD in mathematics & statistics), who knows very well about how to compute percentage. Two of the DRC members were chairs in previous terms. **This is not an error, it is an intentional wrongdoing.**

   **TWO:** On page 1 & line 16, DRC lies about signature on my ARD and FPA and their rating. In my 1st and 2nd rebuttal letters, I clearly mentioned that FPAs (for the years 2015, 2016, 2017, and 2018) and ARDs (2015, 2016, 2017) were signed by me, Chair and Dean with only exception is that 2015 FPA was not signed by Dean (Dr. Ni also admitted that in her letter), which was not my fault. All of the ARD's has rating as well. Dean and Chair highly rated my annual review documents in their 3rd year letter as mentioned above. I uploaded all ARD and FPA (please read 2nd_Rebuttal_Letter_ Not_Uploaded) on EEOC portal. It must be mentioned that FPA does not have any option to get rating. After 1st Rebuttal letter, Dr. Ni admitted that only FPA 2015 does not have signature of the Dean, for which I am not responsible because Chair and I signed on it, Chair might forget to forward it to Dean. So, false allegation

and lies by DRC were nullified by Dr. Ni's P&T letter (please see page 2, 2nd rebuttal letter, and page 2, 1st rebuttal letter, and also Dr. Ni's review letter). Dr. Ni was the Chair when my P&T was denied. **So, DRC openly lied about the document signature.** Dr. Chowdhury submitted 11 documents (6 FPA-Faculty Performance Agreement and 5 ARD-Annual Review Document). 5 of these documents were submitted digitally since 2018 (ARD 2018, ARD 2019, FPA 2018, FPA 2019 and FPA 2020) and no signatures are required (Dr. Chowdhury is confirmed by many KSU faculty that they did not sign it and he was not asked to sign those documents by any administrators). Rest of the documents were signed by himself, the Chair and the Dean. FPA 2015 is completely irrelevant because he started working at KSU in August 2015. That FPA is not required to submit for the P&T portfolio. However, in that FPA, Chair and Dr. Chowdhury signed. But DRC mentioned that only 3/11=27.27% percent of the documents were signed. KSU must not have different policies for employees. Dr. Chowdhury's Attorney saw that all ARD and FPA of Dr. Chowdhury's P&T portfolio were signed. This is just one of the many lies. I have mentioned a number of lies, wrong, inaccurate and misleading information mentioned by DRC, Chair and Dean via two letters to EEO.

**Three:** On page 2 & line 2 and 3, DRC mentioned about 3rd year review letters. In 3rd year review letters, I was given good advice to write the narrative by focusing on quality and significance for my fifth-year portfolio submission, which I incorporated completely. Indeed, Chair and Dean highly appreciated my accomplishments in TSM, RCA, and PS (Combined Exhibit 1-13 and pages 223-235). I was given meeting expectations in all areas. **I was not warned at all about student evaluations in third year review letters written by DRC, Chair and Dean.** However, in final year, both DRC, and Chair cherry picked few student evaluations and denied my P&T. DRC also copied some comments from 3rd year review letter (plagiarism) and pasted in my 5th P&T letter, which is totally irrelevant, because those advice were taken seriously and incorporated in my 5th year portfolio. **In all three guidelines, there is no mention about denying P&T by focusing only few student evaluations (Students were programmed by Dr. Ni to write bad evaluations).** I incorporated all advice and suggestion given to me via ARD reviews and third year review in my final year narrative, which was highly appreciated by Dr. VanBrackle and Dr. Gardner, and Dr, Karim. Also, cyclical and scholarly approaches were adopted by Dr. Chowdhury were specifically mentioned by Dr. VanBrackle's ARD review letters in 2016 and 2017.

**Four:** On page 3 & lines 1 to 4, and 12, DRC mentioned that I **contradicted** with my teaching philosophy between a graduate course (STAT 8020) course and two undergraduate courses (STAT 4030 and STAT 4490). **It is a great misrepresentation because they compared teaching philosophy between a graduate and undergraduate course.** Graduate course must have different teaching philosophy than undergraduate courses, which I also mentioned at the beginning of the narrative. So, teaching philosophy must be different grad and undergrad courses. Graduate course requires passing of certification exam while undergraduate courses do not have that requirement. This is one of the many **misleading information** DRC wrote in their letter.

**Five:** On page 3 & line 9, DRC said that **I could compare SAS certification exam pass rate with other faculty, who taught the course in previous years.** In my 3rd year review, Chair Dr. VanBrackle mentioned that previous year SAS exam pass rate was 50% whereas my 3 years average SAS certification pass rate was **75%**. Moreover, I requested SAS certification exam pass rate in previous years via email to a faculty who tracked record that information, but I was not provided that information (details of the email can be found in the 1st rebuttal letter). My email query was not responded. DRC intentionally raised unnecessary SAS exam pass rate comparison because they knew that in the entire history of the department, no batch had **100% pass rate** whether it is **Base SAS or Advanced SAS** certification exam.

**Six:** On page 3 & lines 14 and 15, DRC mentioned **apparent contradiction** in my teaching philosophy, which is a **blunt lie**. If anyone reads my narrative (Narrative_Chowdhury) and compares it with two other narratives (Narrative_Nicole_Feguson and Narrative_Herman_Ray), who were previously promoted and tenured, he/she will notice that there is not a list of activities in my narrative. Instead, Cyclical and

Scholarly approaches of teaching would be noticed in my narrative. **Three different occasions Dr. Galloway observed my classes and wrote that I engaged my students during class time and I am an effective teacher.** Dr. VanBrackle wrote in his ARD evaluation that I adopted scholarly and cyclical approach for my teaching, which yielded 100% SAS examination pass rate. My course syllabi were continuously updated (all syllabi were online). Moreover, my 12-page narrative received high appreciation and approval from Dr. VanBrackle and Dr. Gardner.

**Seven:** On page 3 & lines 21-23, DRC mentioned that I did not document various stages of preparedness of student supervision, which is another misleading information and exactly copied from the 3rd year review letters to undermine my narrative to next level reviewer. I exactly mentioned details of one student supervision in my narrative (1st rebuttal letter). In my narrative I mentioned that research started with a class project, then R day presentation, then multiple meeting for NCUR presentation, submitted for publication and got the paper published. Narrative must be written in 12 pages with double space and font size of 12. Within these pages limit, I have to write 3 narratives; one for TSM; one for RCA, and one for PS. Narrative must aligned with workload percentage. So, I cannot document several stages of preparation for research publications done with many mentored students in the narrative. So, I made supplementary 171 documents and used hyperlink to connect them by point click.

**Eight:** On page 3 & line 24, DRC raised questions about learning outcome assessments suggested by Dean Anderson in my third-year review. I immediately conducted learning outcome assessments in two courses and reported in my ARD and also in my narrative. However, DRC criticized my learning outcome results in line 13 on page 4 unnecessarily by raising concern on p-value. P value is the only statistical approach well suited and acceptable to scientific community for small sample. Alternative of P value has not been developed yet. In first two-years ARD review, I was not asked about learning outcome experiments because they (Chair and Dean) saw very high-quality teaching and they rightly thought that I am equally good in teaching and research (I am realistically very good in both teaching and research). For this reason, they did not raise any concern.

**Nine:** On page 3 & line 32, DRC mentioned that Dr. Ni asked me to contact CETL for assessing my teaching effectiveness in my 2019 ARD review (Done in March 2020. That was my last ARD before applying P&T). I contacted CETL immediately (CETL_Class_observations on EEOC portal), but due to the COVID-19 lockdown, they stopped observing the class. When Covid-19 lockdown removed, they restarted class observation and I have the class observation letter uploaded in EEOC portal. That letter clearly mentioned that I am an effective teacher, engaged student during class time. However, DRC had predetermination to deny me from P&T and for this reason, they put lies, falsehood, inaccurate, misleading information in their letter. **For example,** I developed two most useful courses **(Bayesian and Python Programming)** for the students of Data Science and Analytics, but they **never mentioned** about it let alone giving me credit. First time teaching of the Python programming course yielded an overall **student evaluation** on course contents and strengths of the instructor as **3.70 and 3.74** out of a scale of **4.** If they do not have predetermination about denying me from P&T, they must not lie with their highest level of education (PhD).

**Ten:** On page 4 & line 3, DRC bluntly **lies** that I used only **10%** of the TSM narrative for teaching improvement and **show no growth** in scholarly evaluation of my Teaching. In 1st rebuttal letter, I mentioned that "In TSM section of my narrative, there are 120 lines and 62 of those discussed the effectiveness and improvements of my teaching. Where did DRC got that 10% percent? **Dr. Linda Galloway's** letter clearly mentioned my **improvement and growth** in teaching.

**Eleven:** On page 4 & line 5, **DRC admitted my classroom skill growth, which is nothing by distortion.** They very **cleverly** twisted/distorted/changed the Dr. Galloway comments of '**scholarly growth in teaching'** to **'classroom skill growth'** like the way DRC said "**these are all good teaching practices but not teaching philosophy**".

**Twelve:** Page 4 & Line 9, DRC criticized me for having a teaching evaluation letter from **Senior lecturer (Symon Kitimie),** who has been teaching more than 15 years. Dr. Galloway and Symon Kitmie both were senior lecturers on the same Mathematics Department at KSU. Dr. Galloway observed my teaching three times on three different topics, but Kitimie observed my teaching in two entire semesters (one graduate course and one undergraduate course). So, Symon Kitimie's letter is stronger than Dr. Galloway letter. Both of the letter highly appreciated my Scholarly teaching. Many times, undergraduate and graduate students said I am the best Teacher in the Department, who had knowledge and expertise on multiple areas. DRC **criticism** of Symon Kitimie teaching evaluation letter about myself clearly indicates their **hatefulness** about my **extra-ordinary** achievements on several areas.

**Thirteen:** Page 4 & line 13, DRC criticized me for **pre-test and post-test** analysis. In 3rd year review, Dean asked me to do the pre-test and post-test analysis for the first time in order to show that students learn after taking my course. At the beginning of the semester, we take a test when student have no or little knowledge about the subject matter, which is known as a pre-test and at the end of the semester we retook the same test, known as post-test. These pre-test and post-test are done to check the differences between test scores. Statistical Test of Hypothesis known as paired t test is used to report statistically significant difference. If P value (standard metric to identify the difference) is less than 0.05, we report that there is a significant difference between pre-test and post-test. Every statistician and all statistical paper report the p-value in a short format to come up with a rejection of the null hypothesis (hypothesis of no difference) based on p value. Previously promoted faculty Dr. Ray and Dr. Ferguson also reported p value in their narrative. There is a page limit, for which I cannot put all information in the narrative. DRC knew about this but they want my narrative to look bad to the next level and for this reason, they criticized my reporting of the P value. **DRC already decided not to give me P&T** before reading my narrative and for this reason they continuously disparaged my narrative in their letter (details in 1st rebuttal letter).

**Fourteen:** Page 4 & line 19-20, DRC criticized me for learning outcome questions. There were 5 ARDs (2015, 2016, 2017, 2018, and 2019) and Six FPAs (2015,2016,2017,2018,2019 and 2020). In first 3 ARDs, Chair Dr. VanBrackle never asked or introduced me for conducting Learning Outcome (no comments in ARD rating) experiments because Dr. VanBrackle already identified me as an effective teacher and wrote in his ARD review that Dr. Chowdhury **adopted Scholarly and cyclical approach in his teaching.** However, when Dr. Ni assumed Chairmanship, she asked me about Learning outcome experiment in her 2018 ARD review (done at January 2019) for the first time and I immediate conducted learning outcome experiment for my 2019 ARD review (done in March 2020, Last ARD review before submitting my P&T portfolio) as suggested by Dr. Ni. **Summer teaching are not counted in the ARD review as they are not within Job Contract.** Learning outcome experiments between two student groups are not comparable because student groups (their major, their semester level, their intellectual level, class size) are different and distinct. One group may consist of more senior students than another group. One group might have more science major students than other group. However, I had done learning outcome experiments and reported it my 2019 ARD and in my P&T Narrative by incorporating suggestion of the Department chair, but fault-finding DRC misled the next level of reviewer by misreporting the learning outcome experiments. **These Learning outcome experiments and Pre-test and Post-test were not mentioned in any guideline.**

**Fifteen:** Page 4 & Line 21, DRC mentioned that learning outcome question "Basic principle of Counting" is not in the course description. Any undergraduate statistics book that discusses probability begins with "Basic Principle of Counting" technique. I gave detail information in my 1st rebuttal letter and 2019 ARD rebuttal letter (with page number, text book name) about Basic Principle of Counting. If anybody does not teach basic principle of counting **must not teach probability.**

**Sixteen:** Page 4 & Line 29, DRC said that my learning outcome question is **poorly worded** at best. They also said that I did not specify type of the variable in the Leaning outcome question. If I specify the types of variable then **answer is almost given**. DRC are very well aware of it. But they just want to adopt falsehood and misrepresentation and for this reason they purposely targeted my TSM to deny me from P&T. I mentioned about it my 1st rebuttal letter. Suppose, I specified the types of the variable in the learning outcome question, then DRC would criticize that my learning outcome question by saying that I almost provided the answer to learning outcome question. So, their criticism never stopped. If there is now way to criticize, then they would lie.

**Seventeen:** Page 4 & Line 35, DRC said that Learning outcome question did not meet the standard of the Department P&T guideline. **There is nothing mentioned about learning outcome question standard in the guideline.** Anything from the course contents can be used for learning outcome. If so, then why DRC did not mention any of those standard criteria in their letter with page number or complete quote or complete statement. Why I was not asked to do the learning outcome experiments in my 1st, 2nd and 3rd years ARD review completed under the chairmanship of Dr. VanBrackle. This is a **BLUNT LIE** by DRC.

**Eighteen:** Page 4 & Line 36, DRC said that **I should have listened to the advice provided by administrators**, which is falsehood, because I listened each administrator and completed all tasks I had been asked for such as (a) Pre-test and Post-test asked by Dean. (b) Learning outcome experiments asked by Chair (c) Class observations by a colleague asked by Chair (d) Class observation by a CETL representative asked by Chair and Dean. (e) taught all courses I was asked or order or requested. (f) Used EXCEL before R to teach Biostatistics course asked by Chair. After one student complaint in 8 sections of STAT 3125 students, no other student ever complained about using R instead of EXCEL. Dr. VanBrackle told me to use R statistical software after using EXCEL, which I followed strictly. The student complained about using R instead of EXCEL because he was failing the course and he wanted a way out and the student was given permission to withdraw at the end of the semester by Dr. VanBrackle.

**Nineteen:** Page 5 & line 8, DRC said that I did not give the projects for STAT 3125. Other faculty (Dr. Ray, Dr. Ferguson, and late Dr. Lawson) who were teaching the courses unanimously decided that project for STAT3125 would be optional. However, course description in a course catalog include only few things and courses teacher will develop the syllabus and teach the courses by his or her own ease depending on the student's quality. Dr. Ferguson knew about this. Please read 1st and 2nd rebuttal letters to understand more deeply about class projects where I elaborated about class project by semesters. All syllabi were online.

**Twenty:** Page 5 & line 10, DRC said that I have lack of understanding of curriculum alignment. In Spring 2017, there was a meeting among faculty teaching STAT3125 course. In that meeting, **first Dr. Ferguson said she was in favor of using R instead of EXCEL** (I pointed it in multiple times in rebuttal letter and also in emails), **then through an email Dr. Ray said Software requirement should be removed from course catalog**, I verbally give opinion on course meeting by supporting Dr. Ferguson and Dr. Ray **(please read 1st, 2nd, and ARD rebuttal letters with email proof).** I completely understand the curriculum alignment procedure and for this reason I gave my opinion in the meeting of course instructors. **I did not bypass course coordinator to reach Chair or Dean or College Committee to independently change the software requirement. Nobody can show one email proof that I bypassed any forum or force other people to accept my opinion.** From Fall 2020, the software restriction was removed completely. Is it possible if I am the only one who wants R software instead of EXCEL? It is all Dr. Ray and Dr. Ferguson who took initiative to remove that specific software requirement. However, DRC **targeted me** even the DRC member **Dr. Ferguson** knew about it very well.

**Twenty-one:** Page 5 & line 11, DRC said I changed course alignment for STAT1401, which is another lie. Why did they not mention misalignment in the course STAT1401 that I made. I never changed

anything in the course. **This is blunt lie.** In the letters, they just said I changed the course alignment without mentioning any specific misalignment from my syllabus.

**Twenty-two:** Page 5 & line 12, DRC said that I changed everything for the STAT 8220 course in Spring 2017, which is an Applied Time Series Course for advanced Master and PhD students. Changes were done by the order and direction of Dr. Priestley and Dr. VanBrackle. Dr. Priestley, director of Data Science PhD program came to my office (I mentioned multiple times in rebuttal letters) and told me that I must teach the course in combination of theory (60%) and application (40%) so that PhD students would be benefitted. She also hired me as a chair of the search committee. So, after teaching the course for the first time, I got very high applaud from Chair and Dean for my 2017 ARD review and Dr. Priestley also highly commended me. A very good research article was published by involving three PhD students from this course in the South African Journal of Statistics. Students also commented very highly in their evaluations. So, I was ordered (as a new faculty with less than 1.5 years of experiences) and given complete freedom for teaching the course. The materials, R programming code and Theoretical explanations given during the course period was phenomenal. Unfortunately, DRC targeted my TSM to deny my P&T and for this reason they put false allegation of course content changes. **At the end of the line 12, they admitted that I have done for the betterment of students.**

**TSM conclusion from DRC letter:**

Finally, in the DRC letter, they were unable to show one example that I used sub-standard teaching materials or compromised with academic integrity by giving good grade to the students to get good evaluations by teaching only few overlapping topics. No students ever wrote in their evaluations that Dr. Chowdhury covered only few topics and give A to each student. No student wrote in their evaluations that Dr. Chowdhury is nice person but do not have proper knowledge. DRC were unable to show one course taught by me that was finished by giving one project by quoting from my course syllabus or from student's comments. **There is a proof that two PhD level graduate courses were finished by covering only few overlapping topics in two semesters by one faculty (who denied my P&T). To minimize the student discontents, there was meeting about it between PhD students and PhD coordinator Dr. Sherrill Hayes. The information was passed to the faculty who taught those two courses. I got the information from a PhD student.** That faculty came to my office in early 2020 asked me to take responsibility to teach PhD level courses. That faculty further suggested me that I can prepare PhD exam and, in that way, I can supervise more PhD students. I agreed that I will take that responsibility ('never said no' when I was asked for), but she denied me from my well-deserved P&T. I kept my students busy by homework, project, midterm exam, final exam, surprise quiz. 100% SAS certification exam pass rate was attained because I said that if anyone passed the certification exam (his or her grade will jump one step ahead. Purposely, I made in class quizzes and exam hard so that they can rush for passing the exam to secure A in the class). I developed most useful python programming course from scratch (existence of python software was completely unknown to me before coming to KSU). Our Department offered that course for the first time and students form other Department of KSU got benefitted. I always kept the requests made by Chair to teach or develop new courses. It is very unfortunate that with Doctorate in Philosophy, three members of the DRC rejected my P&T very unfairly. Each of the DRC member is Philosopher. **Regrettable,** they disclosed confidential student (students were Programmed by a faculty with the help of others to write highly negative) evaluations in publicly available letter. In the history of P&T denial at KSU, no faculty got this type of insulting denial from P&T like I was. **Junior citizen learned truthfulness, honesty from senior citizen, but I have not learned any of these from the senior administrators who handled my P&T.**

**Twenty-three:** Page 6 & line 15, DRC showed their **biased and hateful attitude** by purposely not quoting complete sentence **from an external reviewer letter** about my promotion and tenure. They clearly sent message that there is no way Dr. Chowdhury would be given P&T at KSU and for this reason they **did not write Kennesaw State University**. Instead they put an **UNDERSCORE** instead of **Kennesaw State University.** If anyone wants to quote from another source, he/she must quote exactly,

but they did not. When I read this line (Page 6 and line 15), I was shocked by DRC members **hateful written action towards me.** This documented insult is done against me because I am Muslim, Asian, Underrepresented, and from south-east Asian Poor Country Bangladesh. If anyone read this line will understand how much **hatred** DRC members contains in their **heart and mind** to deny me from P&T.

**Twenty-four:** Page 6 & line 33, DRC said that my overall research direction and future plan is not clear, which is a great lie. I had 7 research articles published during 5-years period and from NSF grant proposal, I had more than 15 research topics (already 5 got published and 1 is accepted, 3 is under review after submitting my P&T portfolio), which are more than enough for my next 10 years overall research plan. Publication happened in last 2 and half years (after submission for my P&T) are enough to apply for Professor position. **However, DRC member Dr. Victor Kane is at Associate Professor Position for at least last 8 years, who never published one article in last 8 years but rejected my P&T.**

**RCA Conclusion:** My RCA workload was 47%. **But DRC wrote only around 42 lines for giving me meeting expectation at an Associate Professor level.** My TSM workload was 46%, but DRC criticized me entirely in 134 lines with only one exception line is **"It is significant that you have taught a variety of classes and student levels while at KSU."** Is it justified? Many research accomplishments of mine were not mentioned at all. **I was hired mainly as research faculty with more focus on Research as mentioned in previous Dean P&T support letter as well as in my 3rd year review letters by Dean and Chair.** In addition, graduate course teaching and mentorship to the graduate and undergraduate students were expected for P&T. All of these I successfully completed. I was not given any credit for having publications by engaging both undergraduate and graduate students in research. DRC did not mention at all that I was selected as one of the top 45 young research statisticians based on my research accomplishments by international biometric society. They did not mention about number of citations of my paper, and best paper for the month of May in 2016 and many more things they did not mention to name a few.

**Twenty-five:** Page 7 & line 21, DRC mentioned that there was low attendance in one of the Big Data Lecture Series presentation. Low attendance might happen for various reasons (faculty have busy schedule, students were busy with their exams, timing was before thanksgiving break or purposely faculty can avoid attending one talk so that manipulated information can be put in the ARD and consequently in DRC letter). However, I advertised exactly same way as I did in previous presentations. My service to reach out everyone was same so that maximum attendance can be obtained. This one incidence of low attendance in Big Data Lecture Series Talk is not an issue at all to write in DRC letter. If people do not come and attend to the talk, then what can I do except extensive advertisements?

**Twenty-six:** Page 7 & line 29, DRC said I should ask for additional service by incorporating advice from Dean, which I asked via email to Dr. Ni, but I was not given any additional service. Instead the service was openly assigned to another person in the Department meeting (Please read ARD rebuttal letter, 1st and 2nd rebuttal letter). I also have email proof. So, I had done my best to provide more services. When I noticed that I was not assigned new services, I provided voluntary services by spending money from my own pocket. But I did not get any applaud from DRC not from Dr. Ni. Neither of them ever mentioned my lot of voluntary services that I provided for KSU (please read my 12-page narrative).

**Twenty-seven:** Page 8 & line 2, DRC mentioned that **I may be providing high level services** but portfolio and narrative did not convey those services. My portfolio contains details of the services with hyperlink embedded with it. I provided more services than other people in the Department, **who got promotion and tenure before and after me.**

**PS Conclusion:** Very unfortunately, DRC did not mention in their letter about a service rating given to me by Dr. Lewis VanBrackle. Dr. VanBrackle Said in my ARD review that **"I am already providing**

**services at an Associate Professor Level",** which means that DRC intentionally did not quote any good comments from Chair and Dean in their letter to pass good message to next level P&T reviewers.

**Twenty-eight:** On page 8 & line 20, DRC created an "**unprofessional outcome**" section to purposely undermine my highly accomplished academic achievement, which is also a full of distorted information. I have following three points responses about **"unprofessional outcome"** section:

**Firstly,** 3rd year review process is done to advise tenure track faculty for his promotion and tenure in fifth year. Third year review letters for any tenure track faculty is full of advice and I am not different from them. I received those good advice cordially and tried to incorporate each of those advices in my remaining years. I completely incorporated all 3rd year advice and prepared my 5th year P&T portfolio. DRC was completely unable to show one example where I did not listen to their advice by quoting them from their 3rd letter or from ARD advice.

**Secondly,** before 2018 ARD review (Done under chair Dr. Ni at the beginning of 2019), I never had any redundancy issues about document preparation. Why did Dr. Ni write that redundancy comments in her 2018 ARD review was questionable? If a faculty taught one course with multiple sections, then she/he can copy and paste the same teaching philosophy on the multiple section on ARD, which I did for ARD 2015, ARD 2016 and ARD 2017 under the chairmanship of Dr. VanBrackle. But Dr. VanBrackle never wrote in my ARD review that I had redundancy issues in my documents. It is Dr. Ni who wrote this redundancy of information in my 2018 ARD review.

**Thirdly,** in my 2019 ARD review (Done under Chair Dr. Ni at the beginning of 2020), there were blank pages in my ARD documents created from online portal on which I had no control. Moreover, I contacted Dr. Ni about blank pages and she gave me permission via email to keep the ARD document with blank pages (please read 1st and 2nd rebuttal with Dr. Ni's permission email in 2019 ARD rebuttal). So, giving permission for doing one thing and then criticizing for doing that is a double standard policy of Dr. Ni and DRC (all of these things I put my 2019 ARD rebuttal letter, which DRC fails to mention) taken against me. When I put the email permission in my 2019 ARD rebuttal, Dean Dr. Bell did not raise blank page issue in her ARD approval. DRC knew about it but they just wanted to make my P&T portfolio bad and for this reason they adopted misleading approach to misinform next level of reviewers.

All the documents that I created and wrote (ARD, FPA, 3rd year narrative and P&T narrative) never had any grammatical or sentence fragmentation issues. My GRE verbal score was 87th percentile, which many native American cannot achieve (I took that GRE exam in USA and so there is no way of cheating). So, the creation of "Unprofessional Outcome" section in the DRC letter is full of falsehood and purposeful to unfairly deny my P&T.

**Twenty-nine:** On page 8, DRC created a section name **"unresponsive"** to undermine my P&T portfolio further. I was responsive to each piece of advice and request. For example, when I was asked to teach a new course or develop a new course, I immediately did that with sincerity. I sacrificed my family life, personal life, sleeping life (many times I went to dept at 3am in the morning) and research time by developing and teaching that many courses. I incorporated each advice given me either in 3rd review or in ARD review. I responded via ARD rebuttal letter and all of those were well documented. However, DRC never mentioned those in their letter. In the November, 2019 Department meeting, I openly (document in Dr. Kimberly interview with OIE report released in delay) asked to incorporate any suggestions to update my syllabus, but they did not listen. Instead they insulted me in a pre-planned and coordinated way. I politely respond their nonsense queries.

**Thirty:** On page 9, DRC created a **"Demeanor"** section to undermine my P&T portfolio again. For this little incidence, I made a documented apology to Dr. Ni with Dean Marla Bell in the CC but DRC did not mention that apology in their letter even though they knew about it. Also, DRC did not finish the complete sentence when they quote (they finished the sentence such as suppose, this is rude behavior)

from my 2019 ARD rebuttal letter, which means that they partially quote my 2019 ARD arguments. Similarly, DRC did not mention the email permission to keep 25-page blank document in my 2019 ARD.

Consideration of "Student evaluations" in P&T denial was not mentioned in any of the 3 guidelines. **As a human being how can I make every student happy whereas God (creator of Heaven and Earth) cannot make us happy throughout our entire lifetime? 82%** of my student evaluations are good and rest are neutral and negative. DRC never mentioned about many good evaluations but cherry picked only few to make the case of P&T denial. It is justified? Cherry picking few student evaluations is not justified for P&T denial and similarly Demeanor section in DRC letter is not justified for P&T denial because of a documented apology and because of partial quoting from my ARD rebuttal.

One of the three female students wrote **'creepy'** comment about me. DRC shamelessly quoted that comment in their P&T letter. As I mentioned in earlier, the student was programmed by Dr. Ni to terminate me from KSU. Is it justified? Isn't it a crime to provoke students against a faculty by KSU non-discrimination policy? She wrote almost two-page comments about many false things. If the student admits in the court that she was programmed by people of our Department, then Dr. Ni and others will receive punishments. Down the road, 10 years later, these students will not have good esteems about college professors. Anyway, 7-months long investigation nullified all of those false and bogus things written by those three white female students.

**Thirty-one:** One Page 9, they made a **"Gender Insensitivity"** section citing one student comments and ARD reviews of Chair and Dean. Dean did not quote any confidential student evaluation at her ARD review but said that **Dean was troubled by the student evaluations.** When Dean wrote the comments, investigation was not begun. The issues were artificially created by provoking three white female students to deny me from P&T and it was completely pre-plan by Dr. Ni with few other colleagues. Sadly, the DRC knew that it was on investigation by OIE. Before completion of the investigation, they **convicted** me with a gender issue. It is crime committed by DRC because one of the members of P&T committee was interviewed by OIE and Dr. Ni filed complaints to OIE. DRC dared to do this because I am underrepresented, Muslim in Faith, raised in poor country Bangladesh but accomplishing more works in all areas than others. **After release of OIE investigation report, Gender Issue becomes baseless, bogus, and invalid to deny my P&T.**

**DRC members and their short Bio**

**DRC member Dr. Nicole Ferguson** got P&T with very minimal requirements. She asked me not to teach any new classes and asked me to tell chair to hire new faculty. He never taught any summer classes whereas I taught each of the 6 summers with 14 courses and generate revenue for the University. She took salaries each month but did not develop courses or teach new courses and even advising other faculty not to teach new courses, which is harmful for our existing program and for better education of our next generation. She insulted me on November 2019 Department meeting about Python Programming Syllabus. She was not happy with my performance because Dean office pressured to the Chair to find existing faculty to teach new courses. Dr. Ferguson agreed to teach new graduate R programming courses and ended up badly (she brought guest lecturers for six classes). She did not teach any algorithm and did not teach any simulation to a graduate R programming course. Symon Kitimei took the courses after taking my undergraduate R programming course and passed that information to me. Next year, she was removed from teaching the courses because of serious incompetency.
**DRC member Dr. Victor Kane** has been Associate Professor since my arrival at KSU in August 2015. He never does research to get promotion to Professor at least for last 8 years. He kept complete silence on November 2019 department meeting when 5 people (2 senior lecturer: Susan and Michael, 3 Professors: Dr. Ni, Dr. Lawson and Dr. Ferguson) were insulting me about my syllabus even though syllabus was approved before and had very high student evaluations. After staying few minutes, he left the meeting.
**DRC member Dr. Joshep DaMiao** was the chair of the Math Department. He had an issue with a female faculty. After internal investigation, the female faculty filed lawsuit against him. He was relocated to

Statistics Department. However, my request to relocate another Department was not heard. He was the curriculum committee chair, who approved my syllabus in Fall 2019 to teach Python programming in Spring 2019. He was not present in the meeting at all.

**b. <u>Documented lies in Chair Review Letter:</u>**
Department Chair denied my P&T by **twenty-seven** lies, falsehood, inaccurate and misleading information in her letter as mentioned below.

**One:** On page 1 & line 18, Chair **lies** about my workload percentage by putting false **point average of workload percentage.** Chair purposely put more than 50% workload (52%) on TSM and then rated not meeting expectation on TSM by false and misleading information. The reason for putting more than 50% workload on TSM by DRC and Chair is to show that I did not meet maximum requirements of my workload. My accomplished 5-years TSM workload was 46%.

**Two:** On page 1 & line 21, Chair put false information about **document preparation.** My first three years (FPA:2015,2016,2017,2018 and ARD:2015,2016,2017) at KSU, there was no mention about document preparation in my ARD or FPA. Exactly same procedure was followed by me for year 2018. By incorporating advice, I prepared my documents for 2019. For example, If I teach two sections of one course, then I write teaching philosophy for one section and copied and pasted in the other section as they are the same course but different section (I did it for first 3 years of ARD with Dr. VanBrackle was the Department Chair). New Chair Dr. Ni assumed chairmanship from July 2018 and she did not like this procedure and reported the procedure in my 2018 ARD review as redundancy. She advised me to write "same as previous section" for each repeated section. I absolute accepted her advice and prepared my 2019 ARD by following her advice. She did not report in her 2019 ARD review that there is a redundancy. I already addressed blank page issue above.

**Three:** On page 1, Chair also put false allegation for **e-signature** on the ARD or FPA. There is actually no option of e-signature in the entire digital measure when I submitted my ARD and FPA. **If so, why did Chair never made comments about e-signature on my 2018 ARD and 2019 ARD? So, the e-signature comments in my P&T portfolio is ill-motivated. I heard about e-signature** for the first time in her P&T review letter. Faculty from our department and faculty from other departments of KSU did not put e-signature. Investigator can ask e-signature question about multiple KSU faculty to identify document falsehood.

**Four:** One page 1, Chair also mentioned about **Rating** on my ARD. This is great contradiction by Chair statement. **Chair rated me meeting expectation in my 4th year at TSM, RCA and PS,** she reported it in her P&T letter. Chair reported that I did not meet expectation on TSM and PS only in 2019 ARD **but meet expectation in RCA**. Former Chair (Dr. VanBrackle with email address <u>lvanbrac@kennesaw.edu</u> or <u>lewisvanbrackle@gmail.com</u>) and former Dean (Dr. Mark Anderson with email address Provost.Office@unco.edu) can be reached to confirm whether there was rating of meeting or exceeding expectation in ARD or not. In 3rd year review letters, Chair and Dean wrote that I was at a level of meeting expectation in all three areas as an Assistant Professor based on annual review. I also request investigator to read the support letters written by former chair and former Dean.

**Five:** On page 2 & line 1, Chair again mentioned about signature on ARD and FPA, which is documented false allegation. I answered these concerns previously with each of the documents (5 ARD, 6 FPA) and some of whom were submitted digitally, rest were submitted in paper format (details are in 1st and 2nd rebuttal letters).

**Six:** On page 2 & line 5, Chair claimed that there is a difficulty in finding supplementary documentation, which is a false allegation. Digital measure portfolio preparation training (which every faculty member must complete before starting portfolio submission) clearly mentioned that each supplementary document

must be hyperlinked so that point click can open the supporting documents. It is also mentioned in the video that all teaching evaluations must align with each section, which I did perfectly. Also, all invited talk and presentation were put together for the ease of finding. Without going further, I request investigator to read 2nd rebuttal letters. First class observation was happened in my first semester and for this reason, I added observation letter in that section and not in the summer 2017 section (when last observation takes place). In her letter (Lynda Galloway), she clearly mentioned about it.

**Seven:** In TSM section of Page 2, Chair mentioned: And the expectation for an **Associate Professor** includes **'continuing the expectation of assistant professor'**, which I consistently maintained (all 5 years meeting and exceeding expectation in RCA, 1st 4 years meeting expectation in TSM and PS). **After release of OIE investigation report, I actually met all requirements for all five years.** All requirements of TSM Table II of Department P&T guideline were met. I provided very detail information in the 2nd rebuttal letter, which was not uploaded in due time (24th of October 2020) by Dean Kojo. Also, in 3rd year review, Dean and Chair said I was meeting expectation in all areas in my from 2.5 years at KSU.

**Eight:** In the last paragraph of page 2, Chair raised questions about **pre-test and post-test.** Pre-test and post-test are conducted only to demonstrate that student knowledge on the subject matter went up after taking the course. By comparting average scores between pre-test and post-test, we tell that average scores of the group of the students went up after taking the course. However, we cannot say whether post-test score is significantly higher than the pre-test scores, which can be done by test of hypothesis and p value approach. Same approach was used by Dr. Ferguson and Dr. Ray, both of them received promotion and tenure. Average scores show the quantitative difference and p-value shows the statistically significant difference. I have done it by incorporating the advice and suggestions of Dean given to me in my 3rd year review and reported it my narrative. All metrics for evaluating my TSM were done at least one. So, pre-test and post-test scores only shows whether students had significant learning by taking the course or not. Since student groups are different (by their major, by their semester and also by what courses they already took, by their intellectual levels), so comparisons between students from different sections would not produce meaningful conclusion except one group has highest average post-test scores than other group or one group has highest pre-test scores than others.

**Nine:** In the second paragraph of page 3, Chair raised questions about **Learning Outcome Experiment** conducted by me on two different courses. I was introduced about this learning outcome experiment during a 2018 ARD meeting for the first time by Dr. Ni. I immediately conducted it and reported it in my 2019 ARD (my last ARD before P&T application) and also in my P&T narrative. Previously, Chair Dr. VanBrackle and Dean Dr. Anderson did not introduce me about learning outcome experiments, because when they read my student evaluations; saw 100% SAS certification pass rate; heard good complement about my teaching style from class observer Dr. Lynda Galloway; noticed 5 papers got published within 2 years, and learned undergraduate and graduate students' supervision with high quality research, they did not feel weakness in my teaching to ask me about learning outcome experiments. Moreover, I was hired as a research focused faculty as mentioned in a letter of Dean Dr. Anderson. I consistently met that research focused faculty requirements.

**Ten:** In the second paragraph of page 3, Chair raised question about **inappropriately worded in learning outcome question**. She suggested that my Learning outcome question should contain "Quantitative Variable" instead of only "Variable". If her suggestion is accepted, then answer of the question is almost given. So, this is completely irrelevant thing to mention in Chair's letter.

**Eleven:** In the third paragraph of page 3, Chair admitted that one cycle of teaching improvement was completed. I was not asked to complete another cycle of observation in any ARD reviews. In 3rd year review, DRC said that I should focus on other scholarly approach after complimenting one cycle of

observations by Dr. Galloway. However, I requested another professor late Dr. Lawson to observe my class in Spring 2020 and she said that she had to look at her calendar, but she never replied back.

**Twelve:** In the remaining 3rd and 4th paragraphs of page 3, Chair criticized my teaching intentionally based on cherry picking of only few student evaluations, which was very unfair and not acceptable. She cleverly said **some** students, which is absolutely false (She programmed only 2/3 students for my termination from KSU). If students from 2017 Courses evaluated me badly, then why Dr. VanBrackle did not alert me in my 2017 ARD review or 3rd year review? Why did the review committee not warn me in their third-year review about student evaluation? In 2018 ARD review, which was done under Chairmanship of Dr. Ni also did not mention about student evaluations. Reporting of the student evaluations began to start in my last year (2019) ARD and in P&T review letters.

**Thirteen:** In the first paragraph of page 4, Chair criticized why SAS certification pass rate dropped from 100% to 68%. Chair should know that after 100%, there is no way to improve. Either stay at the 100% or falls below 100%. **SAS exam pass rate depends on the quality of students and amount of time spent for preparation.** Exam materials consists of 24 chapters of a 800 pages book. So, raising the concern of pass rate drop is nothing but intentional to undermine my portfolio to the people in next level. Most importantly, in my 2017 ARD review, Chair VanBrackle did not criticize pass rate drop. **Very unfortunately,** after her assumption to chairmanship, she **removed mandatory SAS certification exam** from the course description (changes course alignment) by the request of **Dr. Gita Taasoobsiraji** from 2018 to 2020. Dr. Ni started compromising academic integrity of KSU after her assumption to Chairmanship.

**Fourteen:** In page 5 & lines 8 to 12, Chair agreed that I taught 23 sections of different graduate and undergraduate courses during my 5 years period in Fall and Spring Semesters. ***Now take a look at the mathematical computation of the TSM workload 46% in terms of 23 courses.*** 46% means teaching 4.6 courses on an average in one academic year (Fall and Spring). Because 46/10=4.6. There is 10 because there are 10 semesters in 5 academic years. Now, 4.6*5=23, which completely ***mis-matches with percentage of the workload computation mentioned in TSM (52%) by DRC and Chair***. However, in my entire five-year period of teaching at KSU, I was given only one course release in Spring 2020 for teaching a new course for non-science major students. Course release was given after my repeated request. I was never given any other course release in any semester. **Also, I was not made a course coordinator for any courses.** However, many other people in the department were made course coordinator after finishing one-year of their teaching and then each course coordinator got 1 course release. Anyway, that course release must not be added to my TSM workload because of new preparation for non-science major. Even if that course release (one extra section) would have been added to my TSM, it would mathematically 48% but never exceed 50%. Take a look at the math: 23+1 extra course will equal 24 sections. 4.8*5=24. So, TSM workload distribution by DRC and Chair is a complete lie.

**Fifteen:** On page 5 & line 16, Chair mentioned that **"Teaching various courses does not automatically mean proficiency in teaching."** Teaching proficiency depends on several metrics such as student evaluations, class room observations by professionals (own department, external department, and University Learning center etc.), changing and updating syllabi, bringing guest lecturer, conducting pre-test and post-test, doing learning outcome experiments, and developing new courses etc. I have completed each of these metrics to become proficient teacher and my student evaluations are extremely good, each of the class observer said highly about my teaching abilities. More graduate courses then undergraduate courses were taught by me. Equally efficient in theoretical statistics and computation statistics. Taught three programming courses by using R, Python and SAS. Student picked me as their mentors and supervisor after taking courses with me. I supervised bachelor, master and PhD students. So, I am the best proficient teacher in the Department who taught courses with very highly standard materials. Last one or two classes, I discussed and introduced advanced materials and for this reason only barely 1 or 2 students mentioned above level materials. I never compromised with academic integrity.

**Sixteen:** On page 5 & line 19, Chair said multiple students filed petition for grade change for course STAT7010, which is a documented lie. Only one student with graduate assistantship status applied for grade appeal and based on documents provided by me, his grade appeal was denied and the student was severely criticized by Chair Dr. Ni. Please read the grade_appeal document on EEOC portal. Later, the student lost his assistantship because of his failure to maintain GPA 3.00.

**Eighteen:** On page 5 & line 23, Chair said that the course materials for STAT4490 were in advanced level for undergraduate students. This special topic python programming course was developed by me for first time teaching in Spring 2019. The course syllabus was approved by Department and College Curriculum committee in Fall 2018. After first time teaching the course, the student evaluations were 3.74 out of 4. No students ever wrote anything about high level of course materials in their evaluations. However, in November, 2019 Department meeting Dr. Ni (Chair) purposely put the syllabus of that course in the meeting agenda and insulted me by three lecturers (Michael Franklin, Holy Deal, Susan Hardy) and two professors (Dr. Ferguson and Dr. Lawson) by raising questions such as why I taught simulation, text mining, cox model, design of experiments etc. Dr. Ferguson asked me the question Is there any learning outcome? None of these five people ever taught any Computational course before Fall 2019. This was a purposeful insult by a coordinated effort of the few faculties organized by Dr. Ni motivated by pure falsehood and jealousness of my accomplishments in both teaching and research. Three senior faculty members (Dr. VanBrackle, Dr. Kane and Dr. Gardner) quietly left the meeting without joining with Dr. Ni and others. Curriculum committee chair Dr. Joe DaMiao (also P&T committee members) was not present in the meeting because he approved the syllabus and he cannot insult me, which will be double standard. The syllabus was approved by the Chair and curriculum committee in Fall 2018 and then they insulted me for the same syllabus in Fall 2019 Department meeting, after I finished teaching it for the first time in previous semester Spring 2019.

**Nineteen:** On page 5, last two paragraphs, Chair put complete falsehood about misalignment of my two frequently taught courses STAT 1401 and STAT 8020. Multiple sections of these courses were taught before Chair Dr. Ni assumed her chairmanship. No comments about course misalignment were reported in the 2015, 2016, and 2017 ARD. For STAT 3125, I used R instead of EXCEL from the very beginning of Fall 2016, but when I was told by Dr. VanBrackle about using EXCEL first before using R, I immediately accepted his advice. This advice was given to me in Spring 2018 by the complaint of only one student. So, no course misalignment at all. Chapter 1 to Chapter 24 covers all topics mentioned in the STAT8020 course description and to specify course materials, I have mentioned these chapters in my STAT 8020 syllabus. Indeed, at least one section of the frequently teaching courses have student evaluations exceeded all benchmark teaching evaluations taught by other faculty. So, there was not any misalignment of course descriptions at all in STAT1401 and STAT8020.

**Twenty:** On page 6 and line 8, Chair said that I deviated from STAT 8240 course catalog by using R instead of SAS, which I taught in Spring 2020, **which is a complete hypocritic claim.** Chari Dr. Ni gave me written permission via email (permission_using_R_instead_of_SAS on EEOC portal) to teach this course with program director in the CC about using R instead of SAS. I requested Chair not to assign me new course to teach. Dr. Ferguson asked me not to teach any new course, which I conveyed via email to Chair Dr. Ni. I actually wanted to teach Time Series Course that I previously taught but, she refused and forced me to teach this course. When she forced me, then I agreed upon under one condition that I will use R instead of SAS. ***Chair Dr. Ni immediately agreed and sent an email about using R instead of SAS where the Health Management Analytics Course coordinator was in the CC. So, I was given written permission.*** I have attached that email in the 2nd rebuttal letter. **So, giving permission to teach the course by R instead of SAS and then criticizing me in P&T letter is hypocritic and ill-motivated. So, deviation of course catalog is not TRUE at all.**

**Twenty-one:** On page 6 and line 17, Chair mentioned more issues about course contents from my HW and syllabus, **which is very ridiculous.** In the first Homework, I asked students to learn the coding to delete missing values from a data frame. In the subsequent Homework, I did not ask student to work with complete data by deleting missing values. So, she did not look at the subsequent homework. Chair claimed that she had not seen any discussion about handling missing technique in the subsequent materials, because she did not go though all contents of the first Data mining lecture. In the first data mining lecture, I discussed how to input missing values on problems 40 to 50. Course coordinator Dr. Sneha highly appreciated about course contents. **The syllabus provided to me from previous year discusses logistic regression. I have added two more regressions which is very relevant. Instructor can add or reduce materials from the syllabus when instructor observed comfortness or difficulties among students.** So, there is nothing wrong to add extra materials in the course contents. **No students ever mentioned that I completed the course by covering only few overlapping topics like Dr. Ni did in her two Data Science PhD courses. PhD Student complained very seriously about it to the then PhD Director Dr. Hays. One PhD student passed that information to me.**

**Twenty-two:** On page 6, last paragraph, Chair Dr. Ni talked about Summer 2020 course of STAT 1401, which must not be included in P&T reviews because **Summer courses are outside of the Job contract as mentioned in the KSU position statement** and also in the computation of workload percentage. **Moreover, Summer 2020 is outside of the P&T period, which must not be brought at all for P&T denial.** Due to Covid-19 lockdown, KSU faculty senate approved a resolution to rate exceed expectation in all areas to all faculty. However, Dr Ni did not rate me meeting expectation in TSM, and I pointed this in 2020 ARD rebuttal letter. **Her vindictive nature was prevalent and very clear even after my P&T evaluation years was over.**

**Twenty-three:** On page 7 and part of page 8, Chair disparaged my teaching by cherry picking few confidential student evaluations in her letter, which violated all norms of P&T procedure. She even went back on first three years (2015, 2016, 2017) to report bad student evaluations, which she must not do because those years were evaluated in 3rd year review and rated meeting expectation at an Assistant Professor Level given by Chair and Dean. **Weak student and non-hard-working students would write bad evaluation and based on those student evaluations, rejecting P&T will indulge and start competition among faculty to teach or cover less materials or easy materials or ending up semester by one project and meeting once in every other week or overlapping materials.** Moreover, in any of the three guidelines, there is **no mention** that if 30% or 25% of all student evaluations in a five-year period are bad, then P&T will not be awarded. Cherry picking only few student evaluations, provoking students to write bad evaluation, and then denying P&T by documented falsehood are prevalent in the letters of DRC and Chair. **When opening false and bogus investigation of gender and race issue to OIE failed to terminate me from KSU,** the cherry picking few student evaluations remains only option to terminate me from my well-deserved P&T by the DRC and Chair.

**Twenty-four:** On page 8, Chair also mentioned class cancellation. I cancelled only one class during summer 2019 due to family emergency, which I provided with email documents from D2L to my 2019 ARD rebuttal letter to Dean Dr. Bell. However, Chair Dr. Ni lied her letter that I cancelled three summer classes without any proof. **I challenged that in my rebuttal letter that if three class cancellation can be proved I will accept any punishments from KSU, which neither DRC nor Chair mentioned in their P&T letter.** Senior Lecture Symon Kitimei took summer course STAT 4030 with me. Investigator can ask him for proof from his D2L email history to confirm whether I cancelled three summer courses or not. They purposely wrote many false things like the way three white female girls wrote many false things for my termination. **At the end when court or EEOC investigator will see all the documents, I expect P&T denial decision will be reversed and huge financial fines will be incurred by KSU.** I was mentally tortured and insulted for more than 3 years by before faculty, staff, students.

**Twenty-five:** On page 8, Chair stated that I was not in the class when there was an exam. That things happens in Fall 2017. The Exam was open book, open note and open to use internet. However, I was in the office and asked the students to email me or call my office. One student emailed me and another student called me and I immediately rushed to the exam room. Dr. Ni Cherry picked student comment by using magnifying glass and reported it in her letter. Moreover, in 2017 ARD review, Dr. VanBrackle did not mention about it in his ARD approval letter. Again, cherry picking one student evaluation and reporting it for P&T denial is not acceptable by any of three P&T guidelines.

**TSM conclusion:** TSM consists of **Teaching, Supervision** and **Mentoring.** I taught a significantly higher number of courses in a 5-year period (Total 11 courses, 6 of them are graduate courses, developed undergraduate and graduate courses, most frequently taught 4 courses have student evaluation exceeded all benchmark evaluations taught by other faculty and DRC and Chair never mentioned about it in their letter). Every summer I taught at least 2 courses to generate revenue for KSU. Other three faculty who got P&T before and after me did not teach that many courses during summer semester. Dr. Ferguson never taught any summer courses. All types of students (Bachelor, Master and PhD. Altogether 7, which is a significantly higher numbers) were mentored and supervised with peer reviewed publications. Supervision and mentoring led me to have Undergraduate Research Award. All metrics of Teaching improvement have been done at least once by incorporating suggestions from administrators. They (DRC and Chair) were unable to identify **one teaching improvement metric** that I did not try in their letters.

**Twenty-six:** In page 8 of RCA part, Chair Dr. Ni again mildly gave credit but did not forget to disparage me again. She rated my papers are at B-grade level (Tier 2) journal articles. She was well aware that Dr. Ferguson got P&T with no B-Grade level (Tier 2) journal article, Dr. Gene Ray got P&T with 1 B-grade journal article, and after me, Dr. Gita Taasoobshiraji got P&T without one B-Grade level journal article. Leveling my journal article at B-Grade indicates her vindictive nature towards me. Level-playing field should be made available to all. Level-playing field must not be based on race, gender, religion, nationality, personal judgement or false knowledge. She then put false **37% workload to my RCA, which is a document lie.** Actual RCA must be 47% (please see the calculation above). They wrote seven pages to disparage my TSM, which had 46% workload but only one and half page for my RCA, which is 47% of the workload. They advised me in my 3rd year review that my narrative must align with my workload percentage but they did not align with their percentage. Paper was under review in 2017, after reviewer comments, the paper needed more theoretical, application, and simulation results and for this reason, I did not mention it in the subsequent ARDs. Many faculties did this type of things and many papers remain unpublished.

**RCA conclusion:** I must deserve an outstanding and exceed expectation rating in Research because of number and quality of publications, number of citations, number of student supervision, number of invited talks from internationally recognized professional organization, and getting a selection among top 45 junior statisticians in 2017 from a R2 school like KSU. If 1 publication consider 10% research workload, then I accomplished 70% workload in RCA whereas Dr. Ferguson completed only 30% research workload as she had only 3 below B grade level journal articles.

**Twenty-seven:** In page 10 of PS part, Chair lied about my PS worked, which she claimed 11%. My actual workload was 7%, mentioned in Table 3. She also mentioned about low attendance in my Fall 2019 Big Data Lecture Series Talk both in her P&T review letter and also 2019 ARD letter. Low attendance at one presentation can happen in multiple ways. It could have been pre planned to report in ARD and P&T letter or it could have been due to near the Thanksgiving Break or very busy schedule of faculty and students. So, it must not be a matter to report on P&T letter to deny my P&T. Based on low attendance she rated that my PS did not sum up 10% workload in 2019 ARD.

c. **Documented lies in Dean Review Letter:**

Dean wrote a one-page review letter (page 163 of Combined Exhibit 1-13) and specifically undermined my P&T portfolio by mentioning that **I taught 11 undergraduate courses,** which is a complete misleading information written by a **high-level administrator. Dean completely ignored the six graduate courses that I taught in five years in his letter.** There is an important graduate faculty status based on consistently teaching of the graduate courses, which he did not mention. DRC and Chair also did not mention that I maintained graduate faculty status in all five years at KSU. **He did not give me appointment to meet. He did not upload my most important 2nd rebuttal letter (known as Response_P&T_Dr. Ni) to the Digital measure so that each member of the college committee can see it before making their decision.** Please read the screen short (2nd_Rebuttal_Letter_Not_uploaded) on EEOC portal. My 2nd rebuttal letter known as "Response_P&T_Dr. Ni" was not uploaded on 24th of October 2020, the day Dean uploaded his letter. I requested him multiple times but he never replied or uploaded my rebuttal letter to the digital measure at all (I have all email proofs). My teaching of the six graduate courses and consistently maintaining graduate faculty status was further nullified by the Dean's letter. If faculty does not get justice at one level, he/she has right to go next level. My repeated attempts did not penetrate his heart and mind to give me time for meeting. No member of the college committee was able to see the 2nd rebuttal letter as my 2nd rebuttal letter was uploaded after the decision of the college committee on November 20, 2020. When one new level of review is done, then previous level rebuttal letter with the new level review letter are uploaded together in digital measure and this was the norm. Dean Kojo did not follow that norm even after multiple request. Dean Kojo further undermined my achievement by aligning with the falsehood of DRC. He quoted from the "Unprofessional Outcome" section created by DRC in their letter and said I showed unprofessional behavior even though there were a lot of evidence that I was a good department citizen and most students said highly about my kindness, generosity, and respectfulness. DRC and Chair cherry picked few student evaluations and Dean blindly believed in it as they decided during my P&T process that **Dean will look strongly about the DRC and Chair letter for P&T.** My assumption is that Dean did not read my 2nd rebuttal letter on digital measure let alone upload it.

d. **Documented lies in College Committee Review Letter:**
College committee chair did not upload my 2nd rebuttal letter even after multiple requests. He said that he will make the 2nd rebuttal letter available to other members of the college committee. By reading those falsehood of DRC, Chair, Dean, and only few student comments, College committee chair wrote in his letter that **"I even do not meet expectation at an Assistant Professor level"** whereas I was meeting and exceeding expectation in 5 years in RCA, first 4 years in TSM and PS, and meeting expectation in 3rd year review. For college committee letter, please read 164 and 165 from Combined Exhibit 1-13.

**(8) Documented harassments done against me before, during, and after P&T process**

They have purposely done these insults and harassments on me in front of students, colleagues, staff, and people from my own country, who were unaware of my P&T denial until harassments happened. On July 1st, 2021 I filed complaints on OIE (Office of Institutional Equity), but OIE never release the report of harassments, because top administrators (Chair and Director) are involved in the harassments process.

a. In the August 2020 Department virtual Meeting, I was denied access to the Department meeting under the chairmanship of Dr. Ni. I repeatedly tried to join the meeting but could not. I sent multiple emails to Dr. Ni during the meeting time but she did not reply. However, Dr. Kane sent the meeting link during the meeting time to me which was the same as Dr. Ni provided. But the link did not help me to join the meeting. The meeting link was same, but I was blocked by Dr. Ni. By doing this, Dr. Ni insulted me in front of the all DSAS faculty and staff. After that incidence I talked with KSU IT service desk, and they said that there is a possibility that I was blocked by Dr. Ni. This insult happened during my P&T process.

b. In the September 2020 Department meeting, Dr. Ni together with Dr. Nicole Ferguson and Senior Lecturer Susan Hardy forced me to resume Big Data Lecture Series (BDLS) talk. Indeed, Susan said that our students were already missing a lot due to covid-19, so resumption of the BDLS talk will help them to learn. R Day (Organized by Dr. Ferguson) was the biggest departmental event, cancelled due to covid-19. However, after being pressured,

I decided to arrange two talks, one in October and another in November 2020. After the successful October event, the November event was scheduled to be held on November 12, 2020 at 4 pm. However, Susan Hardy without speaking with me or obtaining my permission opened a zoom link and all attendees including speaker Dr. Gita Taashoobshiraji joined her link. Nobody contacted me before the meeting. At 4:11 p.m., Susan sent me an email and asked me to join her link. Susan did not have my permission, nor did she consult with me before the talk. When I asked about this to Dr. Gita when she called me via team (screen_short_Gita on EEOC portal), she said she would have done this because of the direction of the higher authority. She had heard of a higher administrative official and for this reason she joined Susan's link. I can provide all document including the log in information. They blamed that the zoom link was not working, which is a false (Zoom link was created by the KSU's IT personnel). I can provide solid proof that the zoom link was working from log in information of three persons. Because of this artificially created event, I was rated not meeting expectation in service for my 2020 ARD by DR. Ni. This insult happened during my P&T process.

c. In the college committee meeting of 1st week of January 2021, DSAS (currently dissolved and renamed as SDSA-School of Data Science and Analytics) faculty were introduced by their names. However, I was not introduced at all. After introduction of three to four persons, alphabetical order had been changed and again reinstalled. However, my name was not called for introduction. When the last person was introduced, Dr. Sherrill Hays said now I am going to introduce our last person in the meeting. All members of the Department including faculty, staff, PhD students (who took course with me) and graduate assistant were introduced in the meeting except me. By doing this, I was insulted in front of the faculty, staff and students of the entire College (CCSE). In that college level meeting, there were two faculty members from my home country, Bangladesh whom I have person familiarity as only few faculties from Bangladesh work at KSU. I was seriously humiliated for this purposeful insult. The names of the Bangladeshi faculties are Dr. Shariar Hossain (still works at KSU) and Dr. Moktar Hossain (works at IRS). By doing this insult, Dr. Hayes informed to the people of my country that my P&T would be denied. Meeting was recorded, please ask for 'meeting recording' for Spring 2021 kick off meeting from College of Computer and Software Engineering of KSU. At the very beginning of the meeting, the Dean Jeff said that meeting has been recorded. This insult is purposely done to demonstrate that I am no longer a member of the Department even though my P&T was yet to be denied by provost and president. Please see the uploaded document on EEOC portal to testify people (List of People to testify). This insult happened during my P&T process.

d. In the November 2019 Department meeting, I was insulted by Dr. Ni and a few other faculty members (Prof Michael Franklin, Professor Susan Hardy, Dr. Ferguson, Late Dr. Lawson) about my Python Programming Syllabus. The Syllabus was approved in the Fall of 2018 by Department Curriculum Committee (Dr. Kimberly Gardner, Dr. Joe DaMaio and Prof. Michael Franklin) and the course was successfully taught in the Spring of 2019. However, in the November 2019 Department meeting, Dr. Ni and few others insulted me by saying that the syllabus was at high level. If the Syllabus was at high level, then why did the curriculum committee approve the syllabus for the first time? Students never complained about the high level of the syllabus in the course evaluation. Before and during the meeting, I repeatedly said via email and also openly in the meeting that any suggestions to change the syllabus will be incorporated but my words were not listened (please read two ARD rebuttal letters and also listen the meeting recordings, read the 2019 ARD rebuttals) instead five people continuously insulted me. In the document (OIE_investigation_report_P_and_T_denial) uploaded in the EEOC portal, Dr. Gardner said, "Dr. Chowdhury told openly in the meeting to incorporate any suggestion to syllabus, but they did not stop insulting him." In that meeting, I showed respect to each of the five faculty members (Dr. Ni admitted in the OIE_investigation_report) and very politely answered their insane questions. In my entire professional life, I never got such insult in my life. This insult was done before the beginning of the P&T process. Sammie Huskin took Python Programming course with me in Spring 2019. Investigator can interview him to know further details about the course contents, course syllabus or any unusual behavior from my side during class time. Sammie can be reached S4M734@gmail.com or 404-645-9329.

e. In the Fall of 2019, I arranged two BDLS talk and spent $320 from my pocket for the food. I sent at least 5 emails to Dr. Ni and Leann (Department Secretary) for the reimbursement, but my emails were not replied to and the money was not paid until I reported it to the Provost in a letter in December 2020 for unfairly denying my P&T. My reimbursement was given in March of 2021. Previously, all expenses were reimbursed almost immediately. This clearly indicated that Dr. Ni asked our department secretary not to reimburse me. This insult was done before and during P&T process via a staff (secretary of our department).

f. Dr. Ni Told to Dr. Kimberly Gardner that I had gender issue, which Dr. Gardner told me and I immediate told it to Dr. Donna Reddix. They (DRC and Chair) wrote gender issue in my 2019 ARD and P&T letter. However, after release (17/DEC/2020) of the OIE report, they all must stop blaming me about gender issue, but they did not. Even after the release of the OIE report, Dr. Ni passed false allegation of gender issue against me to Dr. Gardener. This is a crime, which was done after my P&T denial.

g. Falsehood, lies, inaccurate, misquote, misleading and twisted information are insults and harassments. Four letters of DRC, Chair, Dean and College committee are nothing but full of documented insult and harassments. Provoking students to write bad evaluations for termination is also insults and harassments. Publicizing confidential students' evaluations is insults and harassments as well.

h. An undergraduate student (Ryan Lowhorn) was doing research with me since early Spring of 2021. We had a paper accepted to a highly reputed peer reviewed journal with impact 4 (remember, he started research when he was sophomore). We are working with on multiple projects and two are papers are under review. He is recently accepted in a highly reputed PhD program in a top ranked University with 37K assistantship per year. His research was selected from a pool of undergraduate research students for presentation (altogether 7 or 8 were selected). Ryan gave me a lot of credit for mentoring him in his acknowledgments as well as in the mentoring section. **However, my name was completely deleted/removed (Ryan_mentor_name_removed on EEOC portal)** from my student research presentation whereas other mentors name with their students were not removed from the research presentation. This is intentionally done to insult me before my students and the information was passed from Department to the KSU office of Undergraduate Research. By doing this they informed my student that my P&T was denied. This insult was done after my P&T denial. Ryan can be reached rlowhorn1@gmail.com or rlowhorn@students.kennesaw.edu or 678 787 8740.

i. In Spring 2021 a white girl from STAT 8020 class sent me 53 email in 23 days. She wanted to meet with me to discuss her grade. While I asked her to meet in the presence of Director Dr. Hayes, she declined but want to meet with me privately, I told it to Dr. Sherrill Hayes. In Fall 2021, a black girl purposely showed erratic behavior during class time and submitted wrong project and I did not give her good credit for that project and she ended up with C. Her mother and grandmother called my cell and continuously disparaged me. In Spring 2020, two black girls showed very erratic behavior. One of them always came 10 minutes late in my class and asked question like is this the first topic for today's class? Another girl enrolled 2 weeks late in the class. She did not do the 3rd exam and project at all. But when I did not give her good grade, she email provost and president. These four girls were programmed to show disrespectful behavior, but I patiently handled them because I was sure that KSU was trying to find loophole to fire me by accusation that I am a racist.

(9) Provost and Dean did not form **new committee by following P&T guidelines.**

During the P&T process, if there is any anomaly found, a new P&T committee could be formed and candidate's portfolio could be reevaluated. This work could be done either by Dean or Provost. I requested for that, which was not done. Specially after the release of OIE report about false allegation of Gender and Race issue, I requested Provost to reconsider the wrong decision made intentionally four levels (DRC, Chair, Dean, CRC), but my request was turned down.

## Conclusion

**In any law-abiding nation, the Judicial branch must be independent of the Executive branch.** All people of that nation must have hope that they would receive a fair trial on their case if they go to the Judicial Branch. OIE is a judicial branch of KSU and must work impartially and independently to deliver their findings based on documents and investigations and not based on false knowledge. In Statistics, there are two types of errors known as **Type I error and Type II error**. Type II error is considered very severe. **Type II error is the error in which an innocent person is sentenced to death** whereas in Type I error is the error when a guilty person is freed from the prison. In my P&T review, **the DRC, Chair, Dean, and CRC** intentionally committed **type II error, which is a gross crime.** I went to OIE to receive justice for two complaints: (i) unfairly denying my P&T and (ii) documented harassments. Regrettably, I got retaliation and injustice from OIE as (i) OIE never released report of documented harassments done against me by colleagues at KSU (ii)

intentional delayed release of P&T denial report after expiration of my job contract. In the released report, OIE said the investigation is closed and no more complaints will be taken.

I therefore request EEOC of Atlanta to conduct a thorough investigation for unfairly denying my P&T and committing harassments and insults against me at several levels of KSU. I expect and hope that EEOC of Atlanta will come against the decisions given by the DRC, Chair Dr. Ni, Dean Dr. Kojo, and CRC based on documents provided by my P&T portfolio and not on the basis of lies, falsehood, inaccurate and misleading information from the letters of the DRC, Chair, Dean, CRC. I request EEOC official to take punitive measure against Ms. Brandi Williams for intentionally delaying investigation process. Finally, I request EEOC to take entire leadership of KSU to federal court, responsible for unfairly denying me from my well-deserved P&T and patronizing people for harassing me for more than three years. My academic employability has been destroyed by KSU because when I was interviewed to other universities, they asked me question like "Can we ask you uncomfortable question about your P&T situation at Kennesaw?" They further said we are asking this question because you had a lot of accomplishments in several areas while you are at KSU. Their another question was "you are tenure track Assistant Professor at KSU, then why are you trying to get another tenure track assistant professor? Atlanta suburban is a nice place to live was another indirect question.

Sincerely,

Dr. Mohammed Chowdhury,

M.S. in Quantitative & Computational Finance-2021, Georgia Tech,

Post-Doctoral Fellow in Biomedical Research, NIH,

Ph.D. in Statistics, GWU, Washington DC,

M.A. in Mathematical Statistics with Thesis, BSU, Indiana,

M.Sc. in Statistics with Thesis, University of Chittagong,

B.Sc. in Statistics (Minor in Mathematics and Economics), University of Chittagong,

Phone: 765-212-5120

1st Rebuttal Letter

KENNESAW STATE UNIVERSITY
COLLEGE OF SCIENCE AND MATHEMATICS

# Department of Statistics and Analytical Sciences

Dear P&T Committee Chair,
I am writing this letter in response to your evaluations of my portfolio for promotion and tenure from Tenure Track Assistant Professor to Tenured Associate Professor. In three areas known as TSM, RCA, and PS, you have rated me not meeting expectation in TSM, meeting expectation in RCA, and may be meeting expectation for PS. Overall, I am not meeting expectation for promotion and tenure.

In the Department P&T guideline, it is said that

*"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."*

So, I meet expectation on RCA. I also meet expectation on PS as you mentioned in your letter. So, I think, I will be given promotion and tenure on the basis of excellence in RCA and PS. Otherwise, final decision of denying my Promotion and Tenure will raise question of biasedness.

In the following, I am going to write my response about your evaluations of my portfolio. It is noteworthy to mention that my fifth-year narrative was reviewed by two faculty from our Department (Dr. VanBrackle, the former chair of our Department and Dr. Gardner, currently Associate Professor), one faculty from another department of KSU. Their email responses are added in following two boxes.

Email response from Dr. VanBrackle after reading my narrative:
**Lewis Vanbrackle** Tue, Aug 11, 4:02 PM

to me

Mohammed,
I read your narrative, and it is quite good. You seem to have linked to the documentation thoroughly. I did find one typo. On page 10 on the 7th line up from the bottom, you refer to the Georgia Teach faculty. I think it should be Georgia Tech faculty.
Overall, it appears very well done.
Good luck,
Lewis

| |
|---|
| Email response from Dr. Gardner:<br><br>Kimberly Gardner<br>Mon 8/10/2020 11:47 AM<br>To: Mohammed Chowdhury<br>Final_Narrative_P&T (Kimberly Gardner).docx<br>Hello Mohommed,<br><br>Your narrative reads beautifully. I attached the signed department guidelines document you have to upload to Digital Measures, in case you haven't downloaded it yet.<br><br>A few suggestions:<br>Check the KSU handbook guidelines (at the end of chapter 3 there is a checklist), I believe the page limit is 12. I also found the FAQs helpful for some of my questions: https://digitalmeasures.kennesaw.edu/activity-insight/PortfolioSubmissionFAQsV4.pdf<br>........ |

Now I will respond each concern that you have raised in your letter to deny my promotion and tenure as follow. I will also prove my excellence in TSM in the following arguments:

1. **ARD and FPA without signature:** From 2018, all ARD and FPA are documented and saved online via digital measures, which do not require signature. One KSU faculty confirmed me that he did not sign any ARD and FPA from 2018. All previous years ARD and FPA were signed. I have checked previous year ARD and FPA again and found that they were all signed.
2. **Third Year Review Letter:** I read all letters provided to me by third-year review committee, Chair of the DSAS and Dean CSM. I incorporated all of their suggestions in the fifth-year P&T narrative and portfolio. Again, I want say that after my third-year review, I integrated all the suggestions and advices given to me by Third-year review committee, Department Chair, and Dean of CSM to my fifth-year narrative and portfolio.
3. **My five-year goals:** In my 2016 and 2017 FPA, I wrote five-year goals of my teaching, research and services. At the end of fifth year, most of which were met. For example, (1) I had a plan to supervise two PhD student in every 5 years, I supervised 1 PhD student. Another PhD student dropped out after working with me for two years. The dropped-out student presented in two conferences, and then developed fascination on applied works instead of methodological works. (2) I had a plan to have 10 publications in 5 years; I have 7 peer reviewed publications; 5 papers are under review, and 3 are under construction. (3) I had a plan to develop couple of courses at undergraduate and graduate level. I developed and taught a graduate level Bayesian course and an undergraduate python programming course (which is very important and useful course for job hunting. In you P&T letter, you never mentioned about these two courses, which I developed). (4) I had a plan to submit grant proposal to internal and external agencies,

and I had submitted three. I taught every course I was asked for by my Department Chairs and provided all types of services I was asked for. I also asked to provided additional services. Anyone can check above claims from my 2016 and 2017 FPA.

4. **Dr. Lewis VanBrackle and Dr. Mark Anderson Letters:** Support letters from my two previous supervisors were not considered fully in P&T committee letter. Letter from Dr. VanBrackle[170] was not considered at all. They provided a lot of information in their letter about my accomplishments, but were largely ignored. These letters were added to my portfolio.
5. **Development of two courses and little history:** I developed and taught a graduate level Bayesian course. But in your P&T letter, it was not mentioned, recognized and applauded at all. In your letter, similar attitude was observed in Python programming course, which I developed during Fall 2018 when I was teaching two new courses (one at graduate level, one at undergraduate level), taking my first course at Georgia Tech, expecting our second baby, and supervising PhD student Dr. Bogdan Gadidov. During this extremely busy time and schedule, I systematically wrote Python code on six different topics so that our undergraduate students would have been benefited. In my first-time teaching of this course, I got very good student evaluations, which is 3.74 out 4. However, in your letter on my TSM, I did not get any recognitions about developing and teaching these two highly useful courses. Popularity of Python programming in industry is growing exponentially. Most industry jobs now require expertise on Python Programming. I put a lot of efforts to learn and develop this course. For developing this course and the teaching evaluations from the first-time teaching, I not only deserve applause, but also deserve reward. However, I did not get any.
6. **Contradiction in Teaching Philosophy:** In your letter you have mentioned that there is a contradiction on my teaching philosophy between SAS programming and Python and R programming course. My answer is that there is no contradiction in my teaching philosophy as I clearly mentioned in my narrative that there is different philosophy for undergraduate and graduate courses. The reasons are (1). Advanced SAS Programming is a graduate course but R Programming and Python Programming are undergraduate courses. (2) SAS is a compiler based but R and Python are interpreter based. (3) Python has been an object-oriented language since it existed and R is a functional language. However, SAS is primarily a procedural language. (4) There is a certification exam on SAS but there is no certification exam on R and Python. For the above reasons, in SAS course, I adopted cumulative quiz approach whereas for R programming and Python programming course, I adopted the approached of class exams and project. After teaching R and Python programming a few times, I have decided that home works and projects should be incorporated in the course instead of only class exam, which indicates the cyclical and scholarly reflective teaching approach.
7. **Comparison of SAS certification exam pass rate with other instrutors:** I requested Dr. Kimberly Gardner (who was responsible for keeping SAS certification exams record like pass rate for all instructor) to provide me the pass rate of SAS certification exam taught by other faculty members. My email was not responded. Here is the email in the following box:

| Mohammed Chowdhury |
|---|

| |
|---|
| Tue 3/17/2020 9:43 PM<br>To: Kimberly Gardner<br>Hi Kim,<br>Hope you are doing great. I taught advanced SAS for three years in a row (2015, 2016, 2017). Advanced SAS certification exam pass rate was 57%, 100% and 67% in those years. Do you have any information for 2018, 2019. If it is confidential, you do not need to share.<br>Thanks.<br>Mohammed Chowdhury. |

If I am not provided information, then how can I compare SAS certification pass rate among instructors? This email indicates about the time spent on preparing my P&T narrative.

8. **Quality and significance of Teaching and mentorship:** I have mentored and supervised 7 students. Due to the space limitation (12 pages, double space and one-inch margin), I could not write many stages of the mentorship and many stages of preparedness of manuscripts in the main narrative. But I have mentioned some of these in the RCA section and the documents associated with it. I never waste any space in my fifth-year narrative. In my third-year review letter, when I quoted lot of student comments, committee mentioned that I wasted space by mentioning those. A most important

| Course Number<br>Course Name<br>(# of times taught) | **Worst Evaluation** (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4<br>SCM average result | **Best Evaluation** (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4<br>SCM average result |
|---|---|---|
| STAT 3125<br>Biostatistics<br>(14) | Course Content (1.75, NA)<br>Teaching Effectiveness (1.75, NA)<br>(14.3%, Spring 2018)<br>SCM result Spring 2017 (3.58, 3.61) | Course Content (3.6, 4)<br>Teaching Effective (3.8, 4)<br>(56%, Fall 2019)<br>SCM result Spring 2017 (3.58, 3.61) |
| STAT 1107/1401<br>Basic Statistics<br>(7) | Course Content (2.00, NA)<br>Teaching Effectiveness (1.80, NA)<br>(14.7%, Spring 2016)<br>SCM result (3.49, 3.45) | Course Content (3.3, 3)<br>Teaching Effective (3, 3)<br>(47%, Summer 2020)<br>SCM result Spring 2017 (3.49, 3.45) |
| STAT 8020<br>Advanced SAS<br>Programming<br>(3) | Course Contents 1.83<br>Strength of the Instructor 1.00<br>(58.3%, Fall 2015)<br>SCM result (3.50, 3.45) | Course Contents 3.71<br>Strength of the Instructor 3.29<br>(58.3%, Fall 2016)<br>SCM result (3.50, 3.45)<br>In this year all students passed the Advanced SAS certification Exam |

document is the above table (my worst and best evaluation in the courses). It is not mentioned at all in your P&T letter, which indicates improvement and growth of my teaching over time. In my portfolio, it has numerical label of 7. Among most frequently taught courses (STAT 1401, STAT 3125 and STAT 8020), STAT 3125 and STAT 8020 exceed all benchmark of student evaluation at least in one section as given above.

However, nothing is cited from this document to give credit that my teaching has been improved over time. This table clearly demonstrate cyclical improvement of my teaching and also reflect my effective teaching methods. In my 2016 ARD and 2017 ARD, I was not advised to improve my teaching at all. In every spring (except 2018), I taught new courses and got little time for preparing my narrative for ARD and FPA. After teaching 11 unique courses, I am not given meeting expectation on TSM is just unfortunate. Moreover, if I have some lacking on my teaching based on only few student evaluations, there are three other metrics such as student learning outcome, pre-test and post-test, observations by colleagues, which clearly demonstrates my teaching effectiveness. Besides teaching, I have done a tremendous job in Supervision and Mentoring which is a part of TSM. In TSM, if 33.33% is for Teaching, 33.33% is for Supervision and 33.33% is for Mentoring, then I am excellent in Supervision (1 undergraduate student supervision and 1 PhD student supervision. PhD student worked with me just for 16 months. I have plenty of research ideas. Research ideas from NSF proposal is still untouched.) and excellent in Mentoring (5 graduate students were mentored) which constitute 66.66%. unfortunately, I am not given meeting expectation on TSM, which is not fair. I wrote 16 recommendation letters (more than 3 in each academic year) for their admission to different graduate programs, but I was not applauded. Any person, who is afraid of teaching any new courses are usually say that he/she does not have expertise on teaching that new course. However, this is not true for me. I never used PROC SQL in my graduate study, but I immediately said yes to Dr. VanBrackle when he asked me to teaching Advanced SAS Programming course. Similarly, I never used Python before, but for the betterment of our students, I learned, developed, and taught Python programming for our students for Spring 2019 and Spring 2020. Unfortunately, I did not get any applause. I would rather deserve an award from the department, college or university for developing and teaching a highly useful course, which has high industry demand.

9. **Learning outcome, more class observations and pre-test and post-test:** During my 2018 ARD meeting with Dr. Ni, she first introduced me learning outcome experiment from another professor. I immediately did this on STAT 1107 for spring 2019 and showed this to her. During the meeting, she also said that one learning outcome question may not be appropriate to apply on another group of students, because the quality of the students is different and also learning outcome from one group of students is not applicable, measurable and comparable to another group of students. After identifying this, I changed learning outcome question according to the syllabus. After November 2019 Department meeting, I requested late Dr. Lawson to come for my class observations. But she said she would decide after looking at her spring schedule, but she never replied and I could not find any other person because I was teaching very early morning (8am) and late evening (6pm hybrid class) at KSU center. Due to the space limitation, I could not provide more information on pre-test and post-test. However, if anyone wants to see those pre-test and post-test score, I will be very happy to provide. It is noteworthy to mention that average pre-test score was 35 and average post-test score was 65 in a scale of 100. I did not mention this because of space limitations.

10. **Course Materials on STAT 3125, STAT 1401/STAT 1107 and STAT 8220:** After getting complaint from one student in Spring 2018 on using R in teaching STAT 3125, I incorporated the suggestions given by Dr. VanBrackle and Dr. Ni. Both of them clearly said in my ARD and also via email that I am allowed to use R after using EXCEL. From Summer 2018 to till date, I used EXCEL first and then I used R. After my first time using of R in teaching STAT 3125 in Fall 2016, we had a meeting in Spring 2017 on whether we would use R or EXCEL for teaching STAT 3125. In that meeting, Nicole and I said we prefer R, Gene was indifferent and late Dr. Lawson (STAT 3125 course coordinator) did not ask us to be strict with EXCEL. From Fall 2021, all restriction on using any particular software will be removed from STAT 3125 as mentioned by Nicole in our last undergraduate curriculum meeting. It is also difficult to get approval from BOR to use any specific software in teaching courses mentioned by Linda and others in our Department Meeting. When I was asked to switch from R to EXCEL, I immediately switched (which clearly indicates my adaptability to the orders/advices given by higher authorities). There was a project on STAT 3125 in Fall 2016, Spring 2017, Summer 2017, Fall 2017, Spring 2018. After only one complaint, I removed the project as I never used EXCEL in analyzing data in Summer 2019 (1 section), Fall 2019 (2 sections) and Summer 2020 (1 section). Among 14 sections, 11 sections had project and 4 sections did not have any project). I have added project after reading the P&T letter to the current sections that I am teaching. For STAT 1107, I did not change any course materials from the course syllabus provided to me by course coordinator Dr. Linda Galloway. From the text book, which was marked by Dr. Linda Galloway, I followed those topics. In Spring 2019, I was asked not to cover Binomial Distribution via email and I did not ask any question on this topic in exam. For STAT 8220, which is Applied Time Series Analysis course for graduate student, Dr. Jennifer Priestley came to my office room and advised me to teach the course in theoretical approach so that our PhD student would get maximum benefits. I followed her advised. I was hired by Dr. Priestley and told me that my main emphasis will be on graduate level research and teaching. So, I listened to her. Moreover, in my 2017 ARD, which was approved by Dr. VanBrackle, there is no mention about alteration of the syllabus of course contents. Instead, Dr. Priestley and Dr. VanBrackle appreciated me for teaching that course in a high level. After teaching STAT 8220, I got the motivation to pursue QCF degree. Three students (Bogdan, Linh, and Yan) were mentored and supervised from this course.
11. **External Reviewers:** I was very impartial about selecting external reviewers. Please see the list of six people and their country of origin. External reviewers comment on my teaching and service were not mentioned in the P&T letter.
12. **Less than 10% of TSM narrative discusses improvement:** Teaching effectiveness as well as improvement were mentioned in an attached document known as Teaching_effectivenss[70]. In TSM section of my narrative, there are 120 lines and 62 of them discussed the effectiveness and improvements of my teaching. Dr. Linda Galloway's letter clearly mentioned my improvement and growth in teaching.
13. **One summer class cancellation:** I cancelled one summer class due to the family emergency, which does not mean that I will continue to do the class cancellation in the future. Moreover, there was no mention of class cancellation in student evaluations.

Also, previous chair and third-year review letter does not contain any information of class cancellation. Therefore, there is no justification for assuming that class cancellation will continue in the future.

14. **Opinion of one student in Summer 2020 STAT 1401:** When I declare second exam date, few students said that I should make the exam any time for only two hours so that if a student log in, she/he can finish it in two hours. Another student said that he wants instructor to be online. Following her suggestion, I made the exam on class time as the class/lecture was synchronized. The class video is on D2L. Please check if any rule is violated. Entire exam time, I was online.
15. **Lack of sustained Research Agenda:** I respectfully disagree with this. Because, I have 7 peer reviewed publications, five are under review (copy of which, I already added with my portfolio), 3 are under construction. I wrote NSF early career research proposal for funding, which has many research topics and I clearly mentioned about this in my narrative. My Bayesian research topics are still untouched, on which I will have a minimum of 5 methodological papers, and another 10 applied papers. My research revolved by collaboration with students, researchers and faculty across different disciplines. I also had an independent research publication. After all of these, if my research agenda is not sustainable for long time, then it is just unfortunate. To show significance of my research, I mentioned the number of citations of the paper, impact factor of the papers and downloads of the paper, but in your P&T letter, you did not mention it.
16. **Lack of documentation and articulation in service:** In the service part, I clearly mentioned about arrangement of one Big data lecture series event. Other events are mentioned in a word documents which was uploaded with my narrative. Two BDLS talks in October and November had low turn-out. However, Dr. Ni mentioned that I have sent repeated emails and asked the coordinators from Minor, Master's and PhD program to spread it to the students. It should be mentioned that there were lot of events at KSU in Octobers and November of 2019 and for this reason there were low turn-out. To understand more about my service, please read the document "Other Services" attached with my portfolio. In that document, each and every service were mentioned very clearly. I did not provide any list on the document "Other Services". For, 2020-2021 academic year, I sent an email to Dr. Ni on 25th August of 2020 that there will not be any BDLS talk in Fall 2020 due to Covid-19. Once Covid-19 is over, I will start BDLS in Spring 2021. On February 2020 Department meeting, where I was absent because of my children's school emergency (I forwarded an email to Dr. Ni), I submitted my plan on BDLS talk for March and April 2020. From that meeting, a suggestion came that I should postpone April 2020 BDLS talk as there are lot of activities at KSU during that time. I received only this suggestion and no other suggestions and advice from Department colleagues. I immediately accepted the suggestion. You commented that *"Your service tasks read more like a list of things done rather than a story of quality and significant events which fit into your professional agenda."* My answer is that please read the word document 'Other Services', on which I mentioned each services I had provided.
17. **Among 685 students 150 of them evaluated me:** Since August 2015, I have taught many courses taken by 685 students and 150 of them evaluated me in three sections such as

(i) course materials (ii) strength of the instructor and (iii) how the instructor can improve? I asked my students to evaluate my teaching only on Fall 2019 and Summer 2020. Spring 2020 student evaluations were cancelled due to covid-19. If I know earlier that student evaluation will be counted for P&T, I would definitely ask my students to evaluate me. However, few sections (at least two courses) from my most taught courses (STAT 1107[7 sections], STAT 3125[15 sections] and STAT 8020[3 sections]) exceed all benchmark of student evaluations compared to the average evaluation of my peers in previous years (please take a look at the above table). If my research meets expectations at an Associate Professor Level, then my TSM must meet expectation at Associate Professor level (7 student supervision, 16 recommendation letters written for students who took course with me). Dr. Priestley and Dr. VanBrackle multiple times said that Mohammed can teach any course. Dr. Ni has very deep confidence on my teaching; she again asked me to teach new course in Spring 2021. Dr. Ni told that "I need you to teach one of the two courses". I may be teaching a new graduate course 'Regression Analysis' in Spring 2021. Dr. Ni also asked me to teach Data mining PhD course so that I can work with PhD student and make questions for qualifying exam; she also asked me to develop applied machine learning course, and she asked me whether I can teach graduate level text mining course when I told her that I want to develop text mining course for our undergraduate students. I built a good faith among colleagues and students in DSAS and for these reasons, I was believed that I can teach any courses. Indeed, I am open to teach challenging courses will be very beneficial for our students.

18. **Good words, bad word and their odds from student evaluations:**

| Courses | Bad comment quoted from student evaluations | A lot of Good comments from student evaluations | Odd of bad comment vs good comments |
|---|---|---|---|
| STAT 7010 (Fall 2018) | Disrespectful<br><br>Explanation: Dr. Ni wrote a grade appeal letter against a student. Please read that letter. That student was also TA of DSAS. Many things I can say about 2-3 students of these course. One student emailed dr. Ni multiple times that he is overwhelmed with work from his job. He emailed me at least 5 times that he could not attend the class. Dr. Ni specifically mentioned me about that student. The name of the | Dr. Chowdhury is intelligent, knowledgeable, knows lot about the materials, understands the materials, very knowledgeable, always willing to help, shows up on time, friendly and fair. His strength is in the experience and knowledge of the content. | 1/11=.09<br><br>So, odd is very low between 1 bad word and 11 good words from this course. |

| | | | |
|---|---|---|---|
| | student is "Beau Schmookler" | | |
| STAT 4030 (Fall 2018) | Rude, bullying, belligerent, acerbic<br><br>This is first-time teaching. | This is the only course where most student ganged up after their first exam. They wanted me to drop their exam grade completely. However, I have given them two opportunities to make their grade up to 90%. I have all the emails. Dr. Ni knew all about these. I had an argument with Dr. Ni when she wrote about my teaching in my 2018 ARD. The students got 72 hours after my email on which I clarified what to study. In the email, I also said that I live very close to campus and if they want, I can give them office hours on weekend. I can show all the emails. For this reason, I was very strict on their first exam grade. If I am denied for P&T for this course, then it will not be justified. | No odd calculated. |
| STAT 4490 Spring 2019 | Hostile | Great instructor, Very knowledgeable, definitely an asset for KSU. rank him among top professors I had at KSU. I would take statistics with him 10 more times if I had the opportunity. ksu needs more python classes and he should be the go to professor!<br>He is really smart, he knows his math and stat, | 1/14=0.071<br><br>Odd is very low between 1 bad word and 14 good words |

| | | | |
|---|---|---|---|
| | | Knowledgeable, knows python and R very well, Knows Statistics very well, Organized, fair, enthusiastic, | |
| STAT 3125, spring 2018 | 'Rude' word was not found in this course evaluation | Successfully kept everyone attention even though it is an 8am class, energetic, responsive to the class, knowledgeable, passionate, | 1/5=0.2 Odd is very low between 1 bad word 5 good words. |

19. **Good words and their corresponding frequencies from different courses:**

| **Good words** | **Frequency** |
|---|---|
| **Knowledgeable** | **23 times** |
| **Smart** | **5 times** |
| **energetic** | **3 times** |
| **enthusiastic** | **6 times** |
| **nice** | **5 times** |
| **engaging** | **3 times** |
| **knows** | **11 times** |
| **great** | **15 times** |

If I take a liberal stand to the students in all times, I would have ended up with very high evaluations. I asked my students for evaluations only in Fall 2019 and Summer 2020. If I put efforts for student evaluation to make it up, it was possible for me to make most of my course evaluation at 3.5 or higher.

20. **Third-year letter:** In third-year letter, no mention of student evaluations. If student evaluations were mentioned in the third-year letter, I would have been more cautious about student evaluations.
21. **Many accomplishments were not even mentioned:** (i)Two courses were developed by me and these were not mentioned (ii) I was selected in a highly regarded junior biostatistician workshop (maybe, I am the only one from an R2 school) and it was not mentioned (iii) I am near completion of a Master degree from Georgia Tech, it was not mentioned (iv) By attending cloud computing workshop, I am eligible to develop and teach new courses on cloud computing, but it was not mentioned in the P&T letter. (v) One paper received 61 citations in 4.4 years, but was not mentioned.
22. **Statistical test on bad student evaluation:** There are around 450 comments made by 150 students out of 685 students who took courses with me. They commented on Course materials, Professor's strength and how Professor can improve in his teaching. Gender issue is raised from the comment of only one student in STAT 4030 in Fall 2019. The student said repeatedly I mentioned about her dress in her comments, which is

wrong. I never repeated it. It happened only two times and in front of the whole class. It was just for fun. If student felt uncomfortable (creepy-unpleasant situation), she must mention that openly in front of the other students. Instead, she came to my office by wearing the same dress couple of times. She came to my office 7.45 am before another class at 8am even though her class time was from 11am to 12.15pm. She emailed me about coming to my class on early morning and I did not reply to her, but found that she was in front of the room at 7.45am. I have formed groups for R day poster presentation and she worked for the group as well as she presented another poster by herself. For her individual project, she showed up to my office multiple times, but I never told her anything about her dress. If I am creepy, then why did she come to my office again and again. God saved me in the sense that I never said anything to her when she was alone with me in my office room. I never said anything to her during R day when I noticed that she was interested more in talking and presenting her works with me. Null hypothesis of proportion with P=.0001 (0.01%) for writing creepy comment about her Professor is given below:

prop.test(x=1, n=685, p=.0001)
1-sample proportions test with continuity correction
data: 1 out of 685, null probability 1e-04
X-squared = 2.7184, df = 1, p-value = 0.0992
alternative hypothesis: true p is not equal to 1e-04
95 percent confidence interval:
0.0000762093 0.0094259539
sample estimates of proportion: 0.001459854

The output from the above test of hypothesis clearly indicates that the null hypothesis of proportion P=0.0001 fail to reject at 5% level of significance, which also means zero to nine students might write this type of comments when 1000 students were taught at a 95% confidence level. So, this gender issue is statistically insignificant and none can validate the denial of my Promotion and Tenure based on the comment of only one student. Moreover, people have a basic instinct of avoiding creepy person, but she kept coming to my office again and again. If I am creepy, then (i) how can I have mentored and supervised 7 students? (ii) how can I have worked on different committee successfully? (iii) how can I have students and faculty stopped by my office for statistical support? (iv) how can I have emails from different persons for being their mentor of reading their thesis or dissertations?

Similar statistically insignificant results can be concluded from the comments of other students. 35 sections of the 11 unique courses have been taught by incorporating all suggestions and orders (indirect order such as I need you to teach this graduate course) from my chairs but I have been denied for Promotion and Tenure. Can you find any other faculty from our department who always agree with the chairs for teaching new courses? Three other graduate courses such as Applied Multivariate Analysis, Longitudinal Data Analysis and Financial Data Analysis (summer 2018) were cancelled

due to low enrollments. Student commented that I am Rude only two times among 685 students that I have taught in past five year. The rest of the words was mentioned by only one time. I have more good reviews than bad reviews even though I am very strict in class room teaching. My exam questions are also very standard and 10% to 20% are difficulty. Most bad reviews are coming from two sections of STAT 4030 (Fall 2018 and Fall 2019). If anyone reads all student evaluations, then they will understand about my overall teaching abilities. Some incidences with the students are noteworthy to mention: (1) If one student comes to the class late in most days and asks question on materials which I just covered, I can repeat those for one day or two days but not on each and every day. One day, if say that you came to the class late and asked questions on which I just discussed then where is my fault? (2) a graduate student (he was also TA of DSAS) was not coming to the class room during exam time, I had to call him from another student phone because I saw him in the lab. If he comments (I am disrespectful) on me then what should I do? (3) If female students' cheats (I have their cheating comments on D2L, which I just checked) and if I separated them and observed them multiple times by walking around them, and for doing this if one of them makes comment (I am hostile), then what should I do? (4) Most bad comments are coming from my R Programming Course on which students wanted a home works and project instead of class exams. However, I gave them lot of materials and asked the students that you practiced the materials three times, your exam questions will be from the provided materials and no new question will be in the exam. Only difference is the new data and new variables from the data.

I hope the chair of the DSAS of KSU will give me meeting expectation in all three areas such as TSM, RCA and PS.

**Sincerely,**

M Chowdhury 14|Sep|2020

**Mohammed Chowdhury, PhD**
**Assistant Professor, DSAS, CSM, KSU.**

**CC: Dr. Sherry Ni, Department Interim Chair.**

2nd Rebuttal letter

KENNESAW STATE UNIVERSITY

**Department of Statistics and Analytical Sciences**

Dear Dr. Ni,
Interim Chair,
Department of Statistics and Analytical Sciences,
Kennesaw State University, Kennesaw, GA.

Subject: My Response letter in regard to Dr. Ni's P&T letter.

I am writing this letter in response to Dr. Ni's letter on my Promotion and Tenure to Associate Professor in the Department of Statistics and Analytical Sciences at Kennesaw State University. In the Department P&T guideline, it is said that
***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."***
In my 2017 ARD, it is clearly said that I exceeded expectation in Research. It is also said in my 2017 ARD that I provided services at Associate Professor level. So, I meet the requirements of promotion and tenure to Associate Professor. In the 2016 and 2017 ARD, it is also mentioned very clearly that I adopted scholarly and reflective approaches in my teaching. In addition, all long-term goals mentioned in my FPAs are met. So, if my promotion and tenure is denied, it will be a violation of Department P&T guideline. Compared to three previously promoted and tenured associate professors (I have their portfolios and narrative), I accomplished more work in all three areas (TSM, RCA and PS) as mentioned in the following table:

| Names | Courses Taught | Number of Publications | services |
|---|---|---|---|
| 1st faculty | 6 | 3 publications. | Various services provided |
| 2nd faculty | 7 | 5 publications. | Various services provided |
| 3rd faculty | Do not know | Do not know | Various services provided |
| Myself | 11 | 7 publications with 71 citations. 2 applied papers. 4 methodological papers. 1 book review. Recently 1 got accepted. 1 conference proceedings paper in Finance. | I have provided a lot of services with many voluntary services. I Requested for more services but was not assigned under Dr. Ni's Chairmanship. Instead, in 2019 ARD, my service was rated not meeting 10% services expectations. |

In the following, I want to put my opinion about Dr. Ni's letter on my P&T.

1. **FPA 2015:** I joined at KSU in Fall 2015. It was signed by myself and Department Chair.
2. **ARD 2015:** It was signed by all parties (Myself, Chair and Dean). Rating was given
3. **FPA 2016:** It was signed by all parties (Myself, Chair and Dean).
4. **ARD 2016:** It was signed by all parties (Myself, Chair and Dean). My accomplishments were clearly recognized by the Dean. Rating was given
5. **FPA 2017:** It was signed by all parties (Myself, Chair and Dean). I wrote that I will submit grant proposal to NSF or NIH. I submitted a grant proposal to NSF. I wrote that I will develop graduate courses. I developed and teach graduate level Bayesian course. I also developed and taught undergraduate level python programming course.
6. **ARD 2017:** It was signed by all parties (Myself, Chair and Dean). I exceed expectation in research. I also exceed expectation in services. Dr. VanBrackle wrote "You service activities are just what we expect from an Associate Professor." Rating was given.
7. **FPA 2018:** It was signed by all parties (Myself, Chair and Dean)
8. **ARD 2018:** Digitally submitted and like many other KSU faculty, I also did not sign. However, if it is required by DSAS, I will sign all documents in the upcoming years. Rating was given
9. **FPA 2019:** Digitally submitted and like many other KSU faculty, I also did not sign. However, if it is required by DSAS, I will sign all documents in the upcoming years.
10. **ARD 2019:** Digitally submitted like many other of KSU faculty, I also did not sign. However, if it is required by DSAS, I will sign all documents in the upcoming years. Rating was given.
11. **FPA 2020:** Digitally submitted and like many others of KSU faculty, I also did not sign. However, if it is required by DSAS, I will sign all documents in the upcoming years.
12. **ARD 2018 and ARD 2019:** Dr. Ni never asked me to sign in FPA and ARD documents which were digitally submitted.
13. **Letters from Dr. VanBrackle and Dr. Anderson:** Dr. VanBrackle was the chair of the Department from Fall 2015 to June 2018. I was hired under his chairmanship. He wrote a letter on my accomplishments on TSM, RCA and PS. However, nothing is mentioned from Dr. VanBrackle letter by Dr. Ni as well as by P&T committee. Dr. Ni never mentioned anything from the letter of former Dean Dr. Anderson.
14. **Outstanding Early Career Award:** Both Dr. VanBrackle and Dr. Ni wrote letters for my early career award. Dr. VanBrackle wrote that "I strongly recommend early career award for Dr. Chowdhury in Spring 2019." However, Dr. wrote "If you have any question, feel free to contact me."
15. **Early application for Promotion and Tenure:** In Spring 2019, I was okayed marginally by Dr. VanBrackle to apply for early promotion and tenure. I told about this to Dr. Ni via email. However, I did not apply.
16. **I can teach courses on Multiple Disciplines:** I can teach courses in the following Master Degree or Graduate Degree Program such as (1) Master in Business Analytics (2) Master in Actuarial Sciences (3) Master in Quantitative and Computational Finance (4) Master in Statistics (5) Master in Health Management Informatics. In the near future, if KSU plans to open new master degree in quantitative fields as mentioned above, I will be a very valuable faculty member in terms of teaching existing courses and also for developing

new courses. I am equally good in programming as well as theoretical Statistics and Mathematics.

17. **Many things were not mentioned in P&T letters:** Many things were not mentioned by the P&T committee as well as by Dr. Ni in their letters. For example, (1) none mentioned about my cloud computing expertise (I obtained a good cloud computing certificate). Cloud computing (google GCP, Amazon AWS, Microsoft Azure) will be the ultimate platform for computation where different tools such as R, Python, SAS will be used. (2) My near completion of a Master degree in Quantitative and Computational Finance was not mentioned by P&T committee as well as Dr. Ni. (3) My book proposal (Writing a book on R and Python Programming) with Springer was not mentioned.
18. **Interpersonal Skill, Congeniality and Cordiality:** I supervised and mentored 7 students in past five year and it was possible because of my interpersonal skill, congeniality and cordiality. One student wrote I am the BEST STATISTICS PROFESSOR AT KSU. He would like to take statistics course with me 10 more times if he gets an opportunity. Because of my Amicable behavior, a lot of students stopped by my office for their statistical problems. Dr. VanBrackle[170] wrote that I am a very good citizen of the DSAS and always step in to help others. It was further confirmed by Dr. Ni's[160] 2017 letter of my voluntary service. Dean Dr. Anderson also said that I am a good person in a support letter.
19. **Dr. Ni's admiration about my Research for Outstanding Early Career Award:** In this letter she wrote all my papers were published in internationally recognized good statistically journals. I did not pay a penny for publication fee of these articles. Honestly speaking, if I know that applied paper will be considered for P&T, I can have more than 15 papers. Currently four applied papers are under review and 1 methodological paper is also under review. 1 applied paper has been accepted for publication. Now she said that my two papers are from PhD dissertation. Outside of my PhD dissertation, I have two more methodological papers which are subsequently related to the concept proposed in my PhD dissertations. I have attached her letter at the end of this letter. I have also attached a letter written by Dr. VanBrackle for giving me outstanding early career award.
20. **Dr. Ni's admiration about my Services:** Dr. Ni provided me a letter[160] for my third-year review and wrote that when there is any need for any voluntary services in the DSAS, Mohammed is always there to help. I have attached her letter with my original portfolio.
21. **Careless Preparation of NSF:** Another false accusation about document preparation by Dr. Ni. Hanover Research entirely oversaw the NSF early career proposal. It was reviewed multiple times by Amanda DesLauriers (Pre-ward Specialist, Office of Research of KSU) and a representative from Hanover Research before submission. None of reviewers ever commented about quality of the documents. However, Dr Ni said that it was a careless preparation. No faculty member from KSU ever received NSF early career research award. In 2018 NSF early career award, only 4.5 applicants received the NSF early career award ($400K- 400K) among 41 applicants, which is around 10%.
22. **Lack of required documents:** I have added all FPA, all ARD, all teaching evaluations, and all relevant materials with my portfolio. Students evaluations are attached to the respectively courses on digital measures. All FPA and ARD were signed except FPA 2015. ARD_2018, ARD_2019, FPA_2019 and FPA_2020 were digitally submitted and hence like many others, I did not sign.

23. **Organization of the materials:** In the training video of preparing P&T portfolio under digital measures, it is said that "documents can be added to anywhere in the digital measure. However, when linking documents to your narrative, use the correct number from your link document to your narrative." By keeping that in mind, I added few documents which are subject relevant. For example, Dr. Galloway first observed in 2015 and for this reason I added those letters in a course taught in Fall 2015. Similar approaches have been adopted for adding conference documents in the CSP conference folder. Overall, there should be any difficulty in finding linked documents as they all properly numbered and these numbers are properly linked to the narrative. Is there any evidence of mis-matching the linked numbers with the name of the documents?
24. **Ratings:** All ARD has ratings. (1). In my 2016 ARD, Department Chair said *"You adopted KSU's scholarly approach to teaching right away."* (2). In my 2017 ARD, Department Chair said *"You taught a lot of different courses this year, and you clearly have a reflective attitude toward your teaching."* In ARD 2017, *I exceed expectation in research*. For ARD 2017, Department Chair said *"Your service activities are just what we expect from an Associate Professor in his third year and with a heavy research component in his Faculty Performance Agreement."* (3) Dr. Ni took responsibility of DSAS chairmanship in July 2018 and I was meeting expectation for my ARD 2018. (4) I did not meet expectation in ARD 2019. In ARD 2019, I was meeting expectation in Research. From the comment of one student from STAT 4030, I was rated that I do not meet expectations in Teaching (It is noteworthy to mention that I developed and successfully taught most useful Python Programming in 2019. In my first-time teaching, student evaluation was 3.74 out of 4. High success rate in my python programming course was not considered when given me not meeting expectation rating in Teaching). In ARD 2019, I was completely unfairly rated "not meeting expectation" in my service for 2019. Indeed, I provided more services for our DSAS in academic year 2019 compared to 2016, 2017, 2018. In 2019, I provided voluntary services at NCUR 2019 by spending $8 for fuel cost and by staying 4 hours at KSU and 1.30 hours of driving. In addition, I also provided services to MSAS admission committee. My assigned service to the Department is to arrange "Big Data Lecture Series Talk."
25. **TSM Table II of the guideline for P&T:**
    **<u>Expectation one:</u>**
    ***Scholarly approach*** (All available scholarly approaches have been adopted in teaching courses. I conducted pre-test and post-test, conducted learning outcome experiments, brought outside speaker, used team-viewer to remotely log-in to the student computers, changed class-exam to take-home exam at the end of the 2 hours and 45 minutes of exam time, converted in-class exam to take home exam after observing students for 40 minutes in a two-hour exam, assigned projects etc. I was observed 3 times by Dr. Galloway. A senior Mathematics Lecturer took two courses with me and he wrote a letter about my teaching abilities. During the semester, he personally emailed me and I forwarded that email to Dr. Ni about my teaching abilities. During that time Dr. Ni told me that two students wrote heavily in favor of your teaching and two others wrote against your teaching on STAT 7010, so it is cancelled out. Putting all of the above together, I can say that I met expectation in scholarly, reflective and cyclical approaches in my teaching). Dr. VanBrackle clearly mentioned about my scholarly and reflective approaches in teaching on my 2016 and 2017 ARD.

**Expectation two:**

***Well-stated philosophy*** (I provide course materials, taught the class materials in multiple ways, provide regular and extended office hours, remotely log in to the student computer to fix the errors of R and Python programming code, took the students to the office room right after class, went to biological science lab to fix students R programming code when student personal computer was broken down, responded student emails, phone calls and text messages are immediately replied when I noticed them. So, I met expectation on this part also).

**Expectation three:**

***Be proficient in the delivery of at least two courses*** (I met this expectation as I taught 11 unique courses and I am asked by Dr. Ni to teach new course in Spring 2021. I might teach Regression Analysis, which will be a new course. Dr. VanBrackle, Dr. Priestley and Dr. Ni told me that I have the abilities to teach any courses. Indeed, Dr. Ni told me multiple times verbally and via email that "I need you to teach this course or department needs you to teach this course." I even made a request not to assign me any new course but I request were turned down. I have proved their claim by teaching 11 unique courses. This is a very rare event that a tenure track Assistant Professor taught 11 unique courses in a five-year period, 6 of which are at graduate level. I developed 1 undergraduate and 1 graduate course.).

**Expectation four:**

***Advise and Mentor Undergraduate and Graduate students*** (I met this expectation as I supervised 1 undergraduate, 1 PhD student and mentored 5 graduate students. One student (Dr. Jacob has a PhD in Economics), who did not take any course with me got my mentorship and supervision because Dr. Ni and Dr. Gita asked the student to contact me about his complicated research problems involving longitudinal data. I have the email from the students). These supervisions and mentoring yielded peer reviewed publications also. I wrote 16 recommendation letters for our students' admission to the Master and PhD programs, which is also a rare accomplishment. NC State University Analytics Master Program director emailed (which I forwarded to Dr. Ni and Dr. DeMaio) me about our undergraduate student Shelby Joji who took R and Python Programming course with me.

**Expectation five:**

***Updating Teaching Materials and Keep current:*** (I told students to my classes that when they will start a job, their company will give them a desk, chair and a computer. The company never buy for them TI 83 calculator. So, each course that I teach, statistical computations are taught by either using EXCEL or R or Python or SAS. For undergraduate courses, I taught the materials by using paper and pencil approach and by using statistical software. I mentioned this in my ARD multiple times. I also gave real-life examples of many application of various statistical methods, which are obvious from multiple student evaluations. This indicates that I met the expectation on this part also.) So, all five expectations were met by my teaching as a Tenure Track Assistant Professor. *Dr. VanBrackle comments on SCHOLARLY and REFLECTIVE approaches in my teaching on my 2016 and 2017 ARD further strengthen my claims.* Moreover, meeting expectation or exceed expectation were clearly mentioned in ARD15, ARD16, ARD17 and ARD18. Only not meeting expectation was given for my ARD19. I wrote rebuttal on this in my ARD response letter. I also wrote rebuttal response to Dr. Marla Bell and Dr. Ni via email. It is

noteworthy to mention that most universities assigned courses to their professors in the following format "three to six three-credit courses with no more than three to four preparations in each academic year." However, in past five years, (it is not my 30 years of teaching. It is just my five years of teaching) I have taken course preparation for 11 unique courses. Unfortunately, only few students' comments from my first-time teaching of courses are mentioned for denying my Promotion and Tenure.

26. **Cyclical Improvement:** Dr. Ni and P&T have admitted that *"the 3 visits by dr. Galloway on your classes is the only evidence of one completed cycle of improving teaching scholarly."* Senior Lecturer "Symon Kimitei" took two courses with me in Fall 2018 (STAT 7010: Mathematical Statistics) and Summer 2019 (STAT 4030: R programming). As a lecturer, Mr. Kimitei had the opportunity to observe me two complete semesters on two different courses (One graduate course and one undergraduate course. One is computational programming course and other one is a purely mathematical course.) I consider Mr. Kimitei letter is another evidence of improving my teaching. His letter is the strongest because of the following reasons. (i) He has the evidence about my teaching abilities on both undergraduate and graduate students. (ii) He has the evidences about how I teach computational and purely theoretical courses. (iii) He has the strong evidence of my entire teaching of two courses as he spent two semesters by attending my class lectures.

27. **Doodle poll:** I sent the following email (in the box below) on 24th of September. Still Dr. Ni mentioned about Doodle poll in her P&T letter which she uploaded on 25th of September. Her motive is very clear about harming and denying my P&T by all means. Doodle poll is not a mentionable item in her P&T letter.

> Mohammed Chowdhury
> Thu 9/24/2020 6:04 PM
> To: **statistics;** Sherrill Hayes
> Dear all,
> Hope you are doing great. Suggested by Nicole and Sherry to have a poll to determine the date and time for our Big Data Lecture Series Talk, I have created a poll in the following link. Please click on the link and put your opinion. This is for November BDLS talk where Gita will give a presentation.
> February and March of 2021, our BDLS speakers will be Linh Le and Bogdan.
> Anyone interested to speak on April 2021 on BDLS, please let me know. Thanks.
> https://doodle.com/poll/bqskagc46xhnep9x

28. **Adjusting Course materials:** I was given email permission to add the topics in the course contents that I taught in the graduate level. Please look at the box below:

29. **Limited Graduate Faculty:** Compared to other graduate faculty in DSAS, I was repeatedly asked to teach new graduate courses. Dr. Ni remembered very well that she asked me to teach graduate level text mining course; she asked me to develop graduate level applied machine learning course; she also asked me to teach PhD level Data Mining course so that I can make qualifying exam for the PhD students, and in that way I will have more chances to work closely work with PhD students. No other faculty in DSAS taught as many courses as I did in past five years (Previously promoted and tenured three faculty taught 5, 6 and 7 courses respectively. One graduate faculty taught only

one graduate course and that faculty openly mentioned about it in the DSAS meeting). Here is an email in the following box from Dr. Ni

> Sherry Ni
> Mon 7/22/2019 3:06 PM
> To:Mohammed Chowdhury
> Spring 2020 Statistics Course Offerings.docx
> 13 KB
> Mohammed,
> I recall that I promised to bring you back for the graduate courses. Are you interested in teaching Data Mining II? This section is usually small and with mainly Ph.D. students in it. It may be good to find you the next Ph.D. student. And I know you have worked on a "machine learning" course in the past. You may be able to use some of the concepts in this Data Mining II course. I usually cover Association Analysis, Principal Components, Variable Clustering, Partial Least Squares, LARS/LASSO, Text Mining, SVM, Random Forest, etc. But you can definitely adjust the list.
>
> Let me know whether you are interested or not. Thank you very much for your consideration.

30. **Four to Five Graduate Faculty is Enough to Run the Department:** To run our MSAS program smoothly, five graduate faculty are more than enough if each and every graduate faculty teach three courses in a two-year period. I am one of those faculty, who can teach four to five courses in every two years. Dr. VanBrackle and Dr. Priestley repeatedly said that Mohammed can teach any course when they noticed that I volunteer in teaching courses when I was asked. Again, my teaching standard is high and I cover lot of materials in each and every course that I taught. Dr. Ni also said in her letter for my outstanding early career award "Mohammed class needs lot of preparation and hard work but it yields higher successes", which I have attached herewith.
31. **Moved me away from STAT 7010:** Two students from the lab of late Dr. Lawson dropped the course in Fall 2018 after two classes. They said if I will teach the course, then they would not graduate. Dr. Lawson convinced Dr. Ni (purely my assumptions. My apology if I am wrong) that I should not be allowed to teach the course at least for Fall 2019. To convince me, Dr. Ni told me that if students will not graduate, then it will bring bad reputations for our department and for our MSAS program. When I showed interest to teach STAT 7010 in Fall 2019, Dr. Ni told me that I will be teaching this course again from Fall 2020. But in Fall 2020, I was not assigned to teach the course. I taught very poorly STAT 8020 in Fall 2015, but I was not moved away for teaching the course in Fall 2016 by Dr. VanBrackle. Student comments from the first-time teaching of a course is not enough to judge a faculty's teaching abilities on that course. Yes, I admit that when I teach a course, I try to cover a lot of materials. In the future, I might cut and adjust the materials to an optimum level.
32. **Python Programming Course:** I clearly mentioned in various platforms (ARD of 2018, Emails among Curriculum Committee Members, and also in the November 2019 DSAS meeting) about removing high level materials from the course contents of R programming and Python programming. Both P&T committee and Dr. Ni attacked my

teaching by citing from few student evaluations but unable to show any quote where student said the course contents were in high level. They also unable to show any proof that I decline to change the course contents. After two times of teaching the highly valuable and demandable course, Dr. Ni never included it in the course curriculum. This highly demandable and useful programming language is almost a requirement for getting a data analyst and junior data scientist jobs. I therefore, again ask and request to the curriculum committee to include this course in our undergraduate minor curriculum.

33. **Only one Student Petitioned and Not Multiple Students:** This claim is not true at all. it is just only one student who submitted grade-change petition. That student was a TA in DSAS. That student got 28 out of 200 in the final exam. You denied his petition by saying that "Student like you are responsible for bringing down the average grade." I have attached your letter herewith. After Dr. Ni's harsh letter, the student did not pursue his grade-change appeal anymore.
34. **Worst and Best Students Evaluations of the Three courses:** I created this table to show that the courses that I taught more frequently have at least one section where my student evaluation exceeded all benchmark of average evaluations of the other faculty in past five years. This table clearly indicates my matured teaching in undergraduate and graduate level. Moreover, I never asked my students to evaluate my course in exchange of bonus points or giving the donuts during class time. If I knew that student evaluations are so important for promotion and tenure in advance, I would have asked my students for evaluations from every section that I taught without giving me anything like bonus points, donuts, and candy during the time of their evaluations.
35. **68% SAS Certification Pass Rate in Fall 2017:** This SAS certification exam is very difficult and pass rate differ from student groups to student groups. I clearly mentioned this in my portfolio with an attachment which mentioned the reason for drop in SAS certification pass rate in 2017 from 100% to 68%. After my last-time teaching of this course in Fall 2017, mandatory participation of SAS certification exam was removed from the syllabus under the chairmanship of Dr. Ni.
36. **Bad comments are taken from first-time teaching of the course:** All bad comments taken from the courses that I taught for the first time (STAT 7010 in Fall 2018, STAT 4030 in Fall 4030, STAT 8020 in Fall 2015). No comments were made on my Fall 2015 teaching of STAT 8020 in my ARD by Dr. VanBrackle as well as in my third-year letter by the P&T committee. Dr. Ni unfairly brought it up in her P&T letter in the fifth year. Is it justified? Dr. VanBrackle and Dr. Ni said that a professor reaches to a comfort zone of teaching after offering the course three times in a row. But I was judge from student evaluation of the courses that I taught only first time.
37. **Unproficiency in Teaching:** Dr. Ni wrote in her P&T letter that I am not proficient in teaching courses and for this reason she assigned new courses to teach. Let me give some counter examples: (1) Dr. Ray and Dr. Ni both asked me to develop and teach PhD level Statistical Inference Course. (2) Dr. Ni asked me to teach PhD level text mining course (When I asked her to develop and teach undergraduate text mining course. There is an item on agenda on November 19, 2019 DSAS meeting about developing text mining course for our undergraduate students) when an external faculty horribly taught text mining course for our PhD students and Master's students of Computer Science. (3) Dr. Priestley and Dr. VanBrackle repeatedly said that Mohammed can teach any course. (4). Dr. Priestly stopped by my office and asked me to teach Time Series in Theoretical

approach, and I did it for the benefit of our Data Science PhD students and I immediately incorporated her advice. (5) Dr. Ni asked me via email (In the above Box) to teach PhD level Data Mining Course for Data Mining PhD students. Please investigate the reasons. I do not want to tell anything more. (6) In my 2016 and 2017 ARD, Dr. VanBrackle clearly mentioned that I am adopting scholarly approach in my teaching. (5) I took a lot of courses when I was a Master and PhD student at Ball State University and George Washington University. (7) In every university, Professor usually take 3 to 4 preparations of courses, but in a five-year period, I have taken 11 unique preparations. I did this, because I enjoy learning new things and I also enjoy teaching very much. So, I want to conclude by saying that I am extremely proficient in teaching course because I enjoy teaching.

38. **Class Cancellation:** Due to family emergency, I cancelled one summer class in 2019. However, Dr. Ni wrote in my 2019 ARD that I missed three summer classes without showing any document. Dr. Ni never mentioned about class cancellation to me directly. Instead, she directly mentioned about class cancellation on my 2019 ARD response. In response to Dr. Ni's false allegation, I wrote that I missed only one Summer class. So, how did Dr. Ni write without any document that I missed three summer class? Dr. Ni never warn me via email or verbally about class cancellation. My wife was in the Hospital; we are expecting 2nd baby on 7th of December 2018; I taught final class on 3rd December, and then again took the final exam on 12th of December of 2018. No student ever mentioned about my class cancellation in their teaching evaluations. However, I admit that I made an error by justifying class cancellation referring to the class cancellations of other universities where I took courses. In the future, class cancellation will be reported properly. Class will be cancelled only in case of extreme emergency.
39. **Missing Values problems in HMI 8410 Course:** First homework was on data mining, data manipulation and data analysis. Deleting rows that has missing values is a data manipulation technique. I asked the student to show the code how to get rid of the missing values from a data frame. No Statistical test of hypothesis or statistical modeling questions were asked to do after deleting rows that have missing values. HW2 is for test of hypothesis, HW 4, HW 5 and HW 6 are for statistical modelling. All of the remaining homework (HW2, HW4, HW5 and HW6) used the complete data. However, Dr. Ni did not read all of the homework questions or maybe She needs misguide the readers and for this reason she pointed out something totally irrelevant in her P&T letter.
40. **HMI 8420 Course:** I was given permission to the R to teach the course by email and now I am criticized by Dr. Ni's P&T letter. Following box contains emails from Dr. Ni. Poisson Regression is a part of the GLM family. In the syllabus that Dr. Ni created 10 years ago, has logistic regression. Logistic regression is also in GLM family. Only difference is in the link function. So, it is not at all advanced level. "Cox Regression" or "Time to event data for modelling" is very useful now a days. Though it was discovered by COX in 1972 for medical application, now-a-days it has many business applications. For example, time to bankruptcy data now uses Cox regression to find significant covariates. As the course was offered under Business School, so I discussed this. HMI director Dr. Swetha told me multiple times that student never complained about my teaching to her. Plenty of time was given to each and every student. Specially by remotely log-in to their computer to run the R code. Last lecture, I taught the students how to do the homework 1 and homework 2 by using Python. Before that, I took verbal and email permission from Dr.

Swetha. When I asked Dr. Swetha about teaching Python programming to do the first two home works, she was so happy and said that students have to learn Python in next semester.If they learn it earlier that will be great. After giving permission and then criticizing is not a sign of a good administrator. If she forced me during the semester, I can move to SAS but during the semester when she clearly knew about my using of R, she did not mention anything.

Mohammed Chowdhury
Mon 8/12/2019 11:58 AM
To:Sherry Ni

Sherry,
Thank you so much for the syllabus. I will teach data mining course for MSHMI students. I will use your notes and lectures. I would prefer to use R software. Thanks.

DR. Ni's Response

Sherry Ni
Mon 8/12/2019 12:09 PM
To:Mohammed Chowdhury

Thank you! I will let the MSHMI program director know. I will add you in my Data Mining section in D2L as an instructor later. When do you want to offer the Python course? Right now I have 3:30pm all scheduled. So anytime other than 3:30pm would be ok in general...

41. **On the basis of few students' comments P&T cannot be denied:** P&T committee and Department Chair mentioned few bad comments (150 students evaluated me out of 685 students that I taught) of course evaluations in their letters. Neither the P&T committee nor the Department Chair mentioned one good comment on my teaching abilities from the student evaluations of all sections. Also, there is an evidence that a word from one student comment is taken instead of full sentence of the student comment. Is it a fair evaluation of my teaching? Few bad comments come from 3 to 4 sections out of all 35 sections that I have taught. Now, let us read the following good comments. Good comments are systematically put from Fall 2015 to Summer 2020. I have more than 80% good comments than bad comments even though I never asked my students to evaluation my teaching except Fall 2019 and Summer 2020. Honestly speaking, I do not teach courses for getting very good students. I only teach courses so that our students will be benefited in terms of gaining knowledge. If I asked my students do their evaluations in all other sections, good comments could exceed 90%.

## All good comments from the 125 students is given below in italic font

*Dr. Chowdhury's passion for probability and inference made the subject interesting. I also think that his assignments, while few and far between, were certainly indicative of what we learned in class.*

*Very knowledgeable of material but should try to simplify some more for the non-math majors.*

*knowledgeable. clear explanations (when asked specific questions).*

*Very enthusiastic. Involved students in learning. Random quizzes were effective in learning the material, especially when he did an example before the quiz. We did not do many quizzes the second half of the semester, and I think that did not allow us to learn the latter half of the material as well as the former.*

*It's obvious that he knows a lot about the subject, and is extremely enthusiastic about it. He doesn't just lecture, he tries his best to feel out the students in the room and help them improve where they need it.*

*Notes are online, concepts explained with examples. Compares different approaches for solving a problem to each other.*

*Dr. Chowdhury was very helpful in providing course materials to study for the SAS exam.*

*He knows his material.*

*knowledgeable about subject, grades tests quickly*

*He seems to genuinely care for his students.*

*The instructor is very knowledgeable on statistics.*

*He's funny.. Kind of.*

*The only good thing I can say about the instructor is he offered office hours.*

*Great knowledge of the subject.*

*Professor Chowdhury is very enthusiastic about his job and really enjoys helping his students learn R to help them in the future. He is also willing to help his students whenever they have trouble. He uses the Project as a sort of cushion to help catch students who do not do well on the midterm or the final.*

*Getting to class on time.*

*Providing course content taught in class on D2L for further review.*

*His method of presenting was entertaining and engaging*

*Seemed very knowledgeable on course content.*

*I do not have anything to offer describing this professors' strengths.*

*He was present most of the time.*

*He provides us with numerous information that's very helpful for the exams and the project.*

*Extremely Helpful in the real world*

*Well done!*

*Knowledge of statistics*

*Knowledge of subject*

*Dr. Chowdhury was able to show a few examples of real-life application at the end of the course. He was very knowledgeable.*

*Challenging material*

*simulations were good activities as part of class*

*He really understands and is helpful with helping us learn the statistical software, R.*

*Knowledge of the subject*

*Very knowledgeable on his subject*

*Professor Mohammed had great ideas about the future of statistics and the R software.*

*he's funny and sometimes approachable*

*Dr. Chowdhury is very passionate about statistics.*

*The course went over material that was above a normal statistics class, and advanced into upper level stats.*

*The content was good, I never took stats in high school so it was good for an introduction.*

*Interesting*

*I was surprised Intro to Stats was not a prerequisite for this course, but we did review a lot of basic statistics material. In addition to learning about statistics, I learned how to analyze data using R software*

*which I think I will definitely find useful in the future.*

*The most useful knowledge and skills learned for me were the ones I learned using R.*

*He was very knowledgeable on the subject and made sure to teach the entirety of the class time. He took all the questions we had and was open to students coming in for office hours.*

*He was funny.*

*Very knowledgeable of the content*

*Professor Chowdhury is a fantastic instructor. He is funny and energetic. He is knowledgeable about statistics and the software program R which he taught us how to use to analyze massive quantities of data. I*

*think it is important that he brought this software to us because it is used around the world and can make analyzing data sets so simple. The project was a good way to practice the software, and review for the final.*

*He is good at keeping the class attentive. He teaches everything by hand and by R, which I found very helpful. His accent was obvious but I thought he did a good job of being coherent to us native english speakers.*

*This is an 8:00am undergraduate class and the instructor successfully kept everyone's attention. He was very energetic, and responsive to class questions. Some of the students were, for lack of a better word, winey, and some of them mocked his accent. He managed this well.*

*None*

*Knowledgeable and passionate about R which makes the course understandable.*

*He is very knowledgeable about the subject.2 or 3 times during the semester he told us info about the statistics work market.*

*He showed up to class on time.*

*Dr. Chowdhury knows what he is talking about and is very passionate about the subjects that he holds forth on.*

*Very knowledgable in R and seems very passionate.*

*He knows the content and feels that everyone should learn more than the course standards.*

*He teaches interesting information and challenges his students.*

*Dr. CHowdhury gave us a lot of different material throughout the class.*

*He was knowledgeable of the code provided and was willing to help students with questions.*

*Giving out notes and content (if it was always correct and worked it would be better)*

*Dr. Chowdhury knows a lot about the course content*

*Dr. Chowdhury is very very intelligent. He knows a lot about data analytics*

*Dr. Chowdhury understands the material.*

*He is very knowledgable in statistics and is always willing to help.*

*Dr. Chowdhury challenged students to learn the content and get out of their comfort zones.*

*He has high expectations and demands students adapt to his teaching style and testing.*

*These are actually positive in terms of getting students in line. His strength is in the experience and knowledge of the content.*

*Dr. Chowdhury shows up on time.*

*Dr. Chowdhury was friendly and fair.*

*I loved the course. I think that the material was excellent (1st time teaching Python, which I developed).*

*Great instructor. Very knowledgeable person in his field. He is definitely an asset for KSU. This my second time taking him. I would rank him among top professors I had at KSU. I would take statistics with him 10 more times if I had the opportunity. KSU NEEDS MORE PYTHON CLASSES AND HE SHOULD BE THE GO TO PROFESSOR!*

*There was a ton of material for this class. I really liked how it didn't focus solely on data analysis, but that it explored other fields as well. I think that learning python is one of the best skills a statistics student could learn and Dr. Chowdhury did a great job supplying many different problems in various areas of analytics.*

*He's really smart. He knows his math and stats.*

*Knowledgeable, Knows python and R very well, Knows Statistics very well, Organized, fair, was willing to go over problem again and again until students understood, Improved my understanding of statistics and programming in python and R .*

*I think Dr. Chowdhury really wants the student to learn. He is always enthusiastic in class to go over new material and code. I think that he does a great job really letting the student know there are no limitations to python coding and that it can be applied in so many ways.*

*I think he really cares for his students and pushes us to succeed. I believe if he changes some of his classroom behaviors and demeanor, then he would be a great educator.*

*I think that the exams should be outlined a little better and not change so much. Other than that, for the first time teaching the course he did a good job adapting to the class and making appropriate changes.*

*Professor Chowdhury's improvement in teaching is not applicable.*

*He is very passionate about math and stops to make sure that every one is getting it frequently. As he teaches it I understand it and can follow along. I also appreciate that attending the class made learning the concepts easier.*

*When a person is late and they ask questions about something he said earlier in the class he'll go back over the content, this makes me feel like the class takes longer and that perhaps he had more he wanted to teach but can't due to time constrictions.*

*Professor Chowdhury was very effective in checking with students during lecture: whether we were understanding the material, if we had any questions or concerns, if we needed something explained again or in a different way.*

*Always willing to help and answer questions. Wanted his students to succeed.*

*Professor Chowdhury does not need Improvement in his Teaching (NA)*

*This course provides a great foundation in R & logical problem solving.*

*The course introduced us to some of the statistical analysis methods using R. The course is clearly packaged with a lot of information that a statistician needs in order to have a fundamental background in R.*

*Gives us every resource to do well in the class.*

*Dr. Chowdhury is a very knowledgeable instructor. He is caring and goes out of his way to share as much knowledge as possible with his students. He is well versed with statistical theory and applications of these theoretical statistical concepts.*

*His R programming expertise was very useful in helping me learn the material really well.*

*Nothing at the moment for his teaching improvement. Keep it up! So far so good.*

*The course is one of the more information–dense courses I've ever taken and resulted in me learning a great deal of usable skills in R. Additionally the mandatory participation in R day is an invaluable experience*

*The content of this course is appropriate for learning how to program in R but it is very confusing.*

*i do not feel as if i Understand R any better. I know some code, but not how to write it myself, so maybe in the future have the class focus on how to write R code, not just what it is.*

*This course covers useful material*

*The Course of programming in R has enlightened my skills and prepared me for a new career.*

*I learned of new things I could do within the program.*

*He would reschedule due dates if we were having trouble with assignments*

*Dr. Chowdhury does a good job explaining the class structure and sticking to the schedule. He also makes sure to stop and answer any and all questions that students may have.*

*He has a decent understanding of programming in R.*

*is passionate and relates well to students. He also has a lot of knowledge about r*

*He is very good when it comes to his knowledge of the program.*

*The professor did a good job making sure we had all the code and material necessary.*

*Dr. Chowdhury is extremely knowledgeable in his field.*

*Dr. Chowdhury makes the course material easy to understand, and his is very open to students asking any questions. Pleasure to be in his class. Looking forward to taking more classes with him.*

*He always made himself available via office hours, email, or phone.*

*Due to the level of knowledge Dr. Chowdhury has in this field, I do not find much room of improvement. He was always able to help us, or if he did not have an answer immediately, he would seek one.*

*Great professor loves teaching this subject very attentive*

*difficult but is passable*

*The course content will be very useful in my professional career.*

*The content was very straight forward*

*The course content seemed fine, it made sense and seemed to all fit together well.*

*the course content has been helpful in other classes.*

*Four exams with thorough review before each one*

*course content was very informational and well explained*

*Does show multiple ways on how to do the problems, Cares about the students in the class always wants us to do our best.*

*teaching, explaining, and being consistent*

*He is very knowledgable about the subject and can be very helpful when questions are asked*

*His tests and notes were very easy to follow*

*He is very knowledgeable of the material and gives many ways to solve problems based on what we are most comfortable with, and tries to answer questions as best he can.*

*Great professor, good at explaining content so that it makes sense.*

*Making sure you know the material before you leave class Making questions easy*

*He was efficient in breaking down the difficult material*

*He quickly responded to each email*

*He valued our success and wanted to also give helpful life advice*

*Dr. Chowdhury is persistent in going over examples of problems and he is charismatic which makes lecture enjoyable.*

*Amazing teacher, made sure he got everything done and explained everything thoroughly, made sure all his students understood and could carry it over to the test*

*can't think of any improvement in his teaching*

*very interesting, and useful.*

*Was not clear what made "Bio"stats different from regular stats.*

*The content of the course was interesting and taught me skills that will be useful in the field, as it taught me to use excel and "R" in an effective way.*

*course content was helpful for testing results found in lab. i found it beneficial to my science major*

*Course is slightly difficult if you do not apply yourself or attend lectures.*

*It is very dense, missing one class can put you very behind if you do not use classmates for help.*

*The course was very informational and taught me how to use programming that is valuable in the real world.*

*I learned about the program "R code" in this course. Many of the formulas such as Permutation and Combinations, regression and Chi square tests were new and contributed to my knowledge.*

*The content felt very useful but the way that it was presented did not make it feel applicable.*

*Course taught me how to use new programs that could be useful for grad school. Peers have told it is useful for other classes I will be taking at KSU*

*The course content was very interesting. I found it very informative for my future career and work.*

*Very good teacher, tries to make sure you understand what he is going over.*

*He told you exactly what you needed to know for each exam*

*Wants us to succeed, always responds to questions, is quite accommodating.*

*Professor Chowdhury was a great professor and made sure to go over everything multiple times and asked if we had a solid understanding of the content before moving on to the next topic.*

*dr chowdhury is SO nice and SO enthusiastic. I think the best thing about him is how passionate he is about statistics and just helping you with life in general. Statistics is not the most interesting subject to me but he made it interesting with his passion and instruction*

*Straight–forward in teaching the proper material and providing information for us to succeed on exams.*

*He made sure if anyone had questions they felt comfortable to ask at anytime.*

*The professor was very engaging both in making the class fun and communicating to his students the material. There was never a time when I was staring at the clock. Everyday the professor brought energy to the class regardless of any prior circumstances. I have taken statistics classes before, but this one proved to me how useful statistics was in the real world and its applicability.*

*Professor Chowdhury shows the many ways to solve the problem using both R and excel. He is proficient in biostatistics and clears up any confusion a student may have.*

*His desire for you to understand the content out weighed almost any other aspect that I could think of discussing. As a student I feel it it is more rare than not that you encounter a professor who truly wants you to understand the material. That maybe because we hardly have professors who care whether we learn or not.*

*Professor knows what he is talking about. Has a deep understanding of the material to answer question related and not related. Was very helpful to students needing more explanation. Took his time to teach the material at a rate that students could understand, while completing all material for the semester. Has good reviews that are extremely helpful. Gives different option on how to answer questions.*

*Professor Chowdury has been an excellent professor throughout this semester. He is very inspiring and helpful to his students. I, one day, will like to be just like him.*

*Professor Chowdhury is excellent at providing useful analogies. He also is very caring, he will stop to make sure we all are on the same page quite often. He clearly knows what he is talking about. There are no questions I have heard asked that he cannot answer.*

*cant say anything about improvement, very good teacher.*

*I have no complaints :)*

*N/A for his teaching improvement.*

*N/A for his teaching improvement.*

*Professor Chowdhury could improve with some of his explanations. However, he is a decent professor and teaches the material well.*

*There is not much that professor Chowdhury needs improving. He is very understandable and is well at speaking English.*

*Very little to say here. I can understand that for some students his accent may be tough to understand, but he can't really help that. Perhaps a little bit of work on his communication skills.*

*The content was familiar because I took AP Statistics in high school. I feel like the content that I learned would be useful if I went into a financial career.*

*Content seemed appropriate for the course.*

*The course was strictly Statistics and helpful for any student who is needing to complete the course.*

*The information pertained to the course.*

*Through connect math and blackboard class meetings the material was presented clearly.*

*NO thank you*

*He used very good examples to help us understand definitions. He did a very good job of explaining the basics and really making sure that we understood the math behind the electrics. He also was good about putting the lectures up on D2L if someone missed the class.*

*Explains and shows content in great detail.*

*he always posted what we needed in order to succeed in his class*

*He is very smart and knows what he is talking about.*

*Mr. Chowdhury understands statistics well. He is able to show students how to manually find answers and also use technology to find answers.*

*great examples, cares*

*The course content was really helpful in increasing my knowledge about statistics.*

*Good content*

*The course is about the basic concepts in statistics and it also teaches you how to use programs such as excel and r.*

*Course went well enjoyed the class*

*The course content is very interesting and applicable to real world problems. I enjoyed the course content!*

*A lot of content in a short period but easy to understand.*

*The content was always relevant and easy to understand*

*This course was fairly easy for me. The only issue I had was the long and tedious lectures. Perhaps next time include some fun visuals or videos to keep me focused and attentive.*

*I learned valuable skills in not only statistics topics but also on how to use programs like Microsoft Excel more fluently.*

*He gives very detailed examples of questions that will be on the exam and makes sure that we understand the material to be successful in the class.*

*Did very well with online teaching and as a teacher he helped me further my success at KSU and my program.*

*He is very good at explaining concepts. When is notices we do not understand, he is willing to repeat and further explain the concept.*

*Did a good job being helpful despite the circumstances of an online class*

*The instructor was very good at presenting the materials and explained the materials very well too in a way that was easily understood. I also like the fact that the instructor use very practical problems to real world applications and showed us what is going as he related it to the materials that he is teaching us.*

*The instructor was also very approachable in the event students have questions or concerns.*

*Being on time and making sure our question are met.*

*He explained everything in great detail. He always checked in with the students to make sure that we understood the material. He was quick to answer email. There was never a time when I felt confused about the class material or the class structure. Every time there was a change, he would always announce it plenty in advance. There was never any problems with how the class was run. I really enjoyed the vast number of examples and the depth of the explanations.*

*He is a good teacher and explains topics well*

*He explains the confusing concepts in easy and familiar terms that helps me to interpret the text.*

*For every topic, he thoroughly went over examples of each type of question we would see on the exam and if possible showing the different ways to solve them/ how to solve them using different programs.*

*Nothing to improve on but just adding test and assignment criteria/grading scale on rubric.*

*Explain more how to use both programs (R program and EXCEL) effectively.*

*N/A*

*For the time I do not see where the instructor might improve as I believe I was satisfied with the ways the instructor taught us especially by the way he presented the materials and the type of examples he provided and how he related that to real world situation so we can see how to apply what we are using as well so I think the instructor did an excellent job teaching us online this semester.*

*Sincerely,*

M.Chowdhury,
05/OCT/2020

*Mohammed Chowdhury,*
*Assistant Professor Statistics*
*Department of Statistics and Anlytical Sciences*
*Kennesaw State University, GA.*

cc: Kojo Mensa-Wilmot,
Dean of College of Science and Mathematics

Support letter

KENNESAW STATE UNIVERSITY
COLLEGE OF SCIENCE AND MATHEMATICS

April 17, 2019

I am writing in support of Mohammed Chowdhury's nomination for the Outstanding Early Career Award for the College of Science and Mathematics. I was Mohammed's Department Chair for the first four years of his employment at KSU, so I came to know all aspects of his work well. In addition, I worked with him on a couple of research projects that led to publications. We have taught some of the same courses and many of the same students, so we have often discussed teaching and learning.

In Mohammed's first semester we asked him to teach Stat 8020, Advanced Programming in SAS, a course he had, of course, never taught before. He worked hard preparing for the course, taught it well, and at the end of the course, ten of the twelve students passed the Advanced SAS Certification Exam. Considering that the usual pass rate for this exam is around 50%, Mohammed achieved an excellent result, especially for his first time teaching the course. Mohammed has continued to teach Stat 8020, eventually achieving an overall pass rate of more than 75% for the Advanced SAS Certification Exam, with one semester reaching the unusual level of 100%.

In his second semester at KSU, Mohammed was asked to teach Stat 1107, our department's only General Education course. Mohammed had little experience with such an introductory course, and he approached me asking for some guidance. He worked with Dr. Linda Galloway, the Stat 1107 course coordinator, to improve his teaching in the course, and was able to improve his teaching skills and become much more comfortable and competent in the course.

In his five years at KSU, Mohammed has taught ten different undergraduate and graduate Statistics courses. He is a mainstay in the Stat 3125, Biostatistics, course, and he has offered Special Topics courses that have attracted a lot of interest from both graduate and undergraduate students. Mohammed taught a graduate-level Bayesian Statistics course and an undergraduate Python course. Both courses were well-received by the students and proved to be useful to them for their projects at both R Day and Analytics Day.

Mohammed has been involved in research with students in the Ph.D. program in Analytics and Data Science. He is supervising one student's dissertation research, and because I am a member of that student's committee, I have been able to see Mohammed's work up close. He provides enough guidance to give the student some direction, but stays out of the student's way, allowing him to make progress on his own. In addition, Mohammed is working with three other Ph.D. students on research projects that should soon lead to publishable results.

Mohammed has been quite productive with five peer-reviewed publications to his credit in his first five years. I worked with him on a couple of research projects, and he has excellent ideas in his research. His work is a nice mixture of developing new methodology along with providing applications of that methodology to concrete examples. Mohammed's work has become well-known, and he has been invited to make presentations at prestigious international conferences.

Mohammed has been busy in service to the department and to the profession. He is active in professional meetings and in reviewing articles for two journals. Mohammed has led the Big Data Lecture Series for the past two years, and he has served on various departmental committees. In a department as small as ours, we greatly appreciate his service efforts.

In summary, Mohammed has been productive from the first day he joined our department. He has worked hard at becoming a good teacher; he has developed a sustainable research program that involves other faculty members and graduate students, and he plays an active role in departmental and professional service. I highly recommend him to you for the Outstanding Early Career Award of the College of Science and Mathematics.

Sincerely,

Lewis VanBrackle

Lewis VanBrackle, Ph.D.
Professor of Statistics

Letter to Provost

KENNESAW STATE UNIVERSITY

Date: 12/23/2020

Dr. Kathy Schwaig
Provost and Senior Vice President for Academic Affairs
Kennesaw State University

**Subject: Sharing concerns on P&T reviews from DSAS Department**

Dear Dr. Schwaig,
I am writing this letter for your urgent attention regarding my Promotion and Tenure in DSAS at KSU. I joined KSU as a Tenure Track Assistant Professor of Statistics in DSAS from a National Search in Fall 2015. Dr. Priestley (Search committee chair) mentioned to me that from a pool of 70 applicants, I was selected for the position. She also told me that I would be involved heavily with the new Data Science PhD program (where I already supervised and mentored PhD students and taught graduate courses since 2015).

My first four years of ARD review have been satisfactory towards P&T (2015, 2016, 2017, 2018) – I was meeting or exceeding expectation in Research and Creative Activity (RCA), Teaching, Supervision and Mentoring (TSM), and Professional Service (PS). I was evaluated by former Department Chair – Dr. VanBrackle. However, since Fall 2018, Dr. Sherry Ni became the interim Chair, I suddenly find lots of issues with TSM in my 2019 ARD which she indicated not meeting expectation by cherry picking from two students' comments, and overlooking the much greater effort done on TSM, and most recently in my 5th year P&T review, again stated not meeting expectation in TSM. It's extremely unfortunate that the P&T members have been misguided and influenced to declare not meeting TSM (while I was meeting them for the first four year, under a different department Chair), and regrettably the new CSM Dean sided without thoroughly looking my effort I have put for KSU for past 5 years. I like to seek an immediate remedy of this situation as this not only raises a lack of trust to put among DSAS senior colleagues and administration, but also makes me think administrators are using guidelines randomly when denying P&T.

Below I like to establish why I meet P&T criteria.

***In the Department P&T guideline, it is said that***

***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and /or Tenure."***

**TSM:** Since Fall 2015, I taught 11 unique courses in DSAS program (6 at the graduate level and 5 at the undergraduate level). I developed and taught two new courses such as Python Programming and Theoretical and computational Bayesian courses. Compared to my peers (3 previously promoted and tenured faculty at DSAS) at KSU, my volume of course teaching is almost double. 685 students took my courses, 150 of them evaluated me (I ask only two sections in Fall 2019 and Summer 2020 to evaluate me. I never taught courses for getting better student evaluations. Most of the students said I covered lot of materials in course that I taught). 82% of those evaluations were positive and rest are neutral or negative (second rebuttal letter). I supervised and mentored 7 students including Masters and PhD students. Wrote 16 recommendation letters.

**RCA:** I have produced 8 (double publications compared to my peers) peer reviewed publications in highly competitive venues and they received more than 70 citations in the past four years. I did not pay a penny for these publications. In 2017, American Statistical Association selected 45 early career Statistics faculty from USA. I am the only one selected from an R2 ranked school like KSU. KSU awarded me undergraduate research mentorship award. There are many more achievements in my RCA to name a few.

**PS:** I provided all the services whenever assigned to me in addition to many voluntary services. I even requested more services, but were not assigned and instead in 2019 ARD, the Interim Chair, Dr. Sherry Ni rather wrote that my service does not meet 10% requirements, which is not understandable to me and it clearly demonstrated her negative attitude and biasedness against a faculty member who is from Bangladeshi origin, and planting the seed of a coordinated long-term plan to wipe out a faculty member's career at KSU DSAS.

P&T letters from Department P&T Committee (DRC), Chair, Dean and College Committee (CC) said that I met expectation in RCA at Associate Professor level. The DRC said I may be meeting expectation in service (maybe I am providing service in higher level than mentioned in my narrative) at Associate Professor level. However, they cherry picked few student's evaluation on two particular sections, and did not consider the entire volume of course teaching and the larger number of positive evaluations I have rather received.

My three external reviewers are highly regarded statistician and very well known in USA and abroad for their research publications. Only one of them from my country and rest of them are not from my country and they knew me because of my high-level research, research presentations and two awards that I got from American Statistical Association when I was a PhD student. They heavily recommended for my promotion and tenure.

Therefore, denying my P&T is a direct violation of ***Department P&T guideline*** and extremely unfair to a hard-working faculty member.

If I send emails to the all 35 sections that I taught about student evaluations and asked them to send you email, your email inbox will be inundated from students emails.

In all my FPA and ARD except in 2019 ARD, I was meeting expectation, exceed expectation in TSM, RCA and PS. Unfortunately, in my 2019 ARD (when the Interim Chair, Dr. Sherry Ni evaluated), I was rated as not meeting expectation in teaching on the basis of only one student evaluation. OIE (office of institutional equity) investigated about student's complain and did not find any evidence of violating KSU's policies on sexual misconduct or on racism. That particular student also mentioned that I am a creepy person, which DRC mentioned in their P&T letter. How can a creepy person supervise 7 students and none of them complained? How can a creepy person immediately accommodate all requests of Chairs for teaching new courses? How can a creepy person serve on different committee and no warning was given or admonition was given? How can creepy person write 16 recommendation letters for students? If I am creepy, then why the same student came to my office again and again (7:45AM in the morning, came to my office in short dress, and many more things to mention a few. I detailed those in OIE response)?

At the end of the fifth year, most of the goals mentioned in my FPA are met. In my many ARDs Dr. VanBrackle (first Department Chair who evaluated me) clearly mentioned that I met expectations and exceed expectations by adopting scholarly approaches in TSM, RCA and PS.

In Statistics, there are two types of errors known as **Type I error and Type II error**. **Type II error is the error on which an innocent person is sentenced to death** whereas in Type I error a guilty person is freed from prison. In my P&T review, DRC, CHAIR, DEAN and CC intentionally committed type II error.

**Judge always deliver decision on the basis of documents and not on the basis of knowledge.** However, in my P&T case, I have noticed that all responsible members and committee gave decision on the basis of pre-determined knowledge and they lied. ARD and FPA were not signed is a direct lie. They are jealous because I accomplished more in TSM, RCA and PS compared to my colleagues (Dr. Ferguson, Dr. Ray and Dr. Gardner) and raised the bar of TSM, RCA and PS. Dr. Nicole Ferguson told me not to teach any new course in Spring 2019 because Dean office told why Mohammed is teaching so many courses and others are not. In every USA universities, faculty who are enjoying graduate faculty status are teaching two to three graduate courses. They are also jealous why students liked me more than others.

I consulted with many faculties across various Universities in USA. They said Provost are the highest authority (guardian) of the university and provost read all the documents. They suggested me to write a final letter to the Provost for remedy. I hope you will read all my documents attached with my P&T portfolio as follows:

1. ARD and FPA
2. Fifth year narrative
3. DRC letter
4. My first rebuttal letter
5. Chair letter (My teaching does not meet even at the Assistant Professor Level. Dr. Ni wrote in her letter.)

6. My second rebuttal letter
7. Dean's letter (Dean intentionally mentioned in his letter that I taught only 11 undergraduate courses. I taught more graduate courses than undergraduate courses. He is fellow of American Academy of Science. He hastily prepared his letter. Dated 12th of October and uploaded 24th of October. Dean did not give me time for meeting. Dean did not upload my second rebuttal letter to Digital measure and College committee chair also did not upload my letter and instead said I will make sure that the letter will be read by all members of the college committee.)

When I first mentioned about this incidence to Dr. Jennifer Priestley, she said you are an important faculty of KSU. If DSAS does not like you, we will put you in another Department. Do not resign. You have two little daughters; you will be without health insurance. God bless Dr. Priestley for good advice.

I like to further point harassments and insult on me by Dr. Ni:

1. In November 19th Department meeting, I was harassed by Professor Susan Hardy, Professor Michael Frank, Dr. Nicole Ferguson and Dr. Ni about my Python programming course. Their main allegations are that syllabus is in high level. Curriculum committee approved the syllabus and I taught it one time and no student complained about the high level of the syllabus, but Dr. Ni arranged them to insult me even though I said I will remove any part from the syllabus if you consider high-level at the start of the meeting.
2. For outstanding early career award, please read the letter written by Dr. VanBrackle. I was not recommended by Dr. Ni.
3. Students were instigated against me to write bad evaluations so that I can be removed from KSU.
4. In Spring 2020 Python Programming course, a student always made controversial comments in the class room by raising his left foot on the table by sitting in the front row, talking about Gay and Israel. He tried to drag me in his discussion. The student came to the class at least 10 minutes earlier when he found me alone spoke about gay and Israel most of the time. I guess and suspect that it was Dr. Ni's politics to eliminate me from KSU.
5. In my python programming course time, another class was offered and all students from R programming course were asked not to take my course. I have a document about it. I have mentioned this in details in my ARD review of 2019.
6. Python programming course was not included in the curriculum even though it was approved by the curriculum committee.
7. On the basis of only one student evaluation, I was rated not meeting expectation in teaching on my final year of promotion and tenure.
8. I was denied to attend first department meeting on August 2020. I have all documents. I have shown this to the IT department.
9. In Spring 2020, I taught a course for MS Health Management Informatics (HMI) program (HMI 8420) where dr. Ni gave me written permission to use R instead of SAS. However, she criticized it in her letter to my P&T review.

10. I arranged big data lecture series for the DSAS. On November 2020 meeting, Susan created a zoom link and all participants attended in her zoom link including presenters. I was in my zoom link but nobody showed up. 10 minutes after the scheduled start time of the meeting, Susan asked me via email to log in her zoom link. I was insulted by a coordinated effort before all.
11. Sherry wrote I am not congenial person in my 2019 ARD evaluations, which is a false accusation.
12. I missed one summer class, but Dr. Ni mentioned I missed 3 summer classes. I responded this in my 2019 ARD review. She never gave me written or verbal warning about missing classes before writing it in my ARD
13. I emailed more than 3 times to our secretary Leann to reimburse my Big Data Lecture Series food cost, however I was not paid yet and my email was not responded.
14. He wrote me an email in which she said a student complained to the Provost office that I am seriously incompetent in teaching courses at KSU. The Provost office consulted her about this and she is embarrassed about it. She actually asked the student to contact the provost office.
15. In HMI 8420 course in Spring 2020, Dr Ni wanted to put a teaching Assistant in the course by disguise. I have an email about it. But I declined.
16. Dr. Ni Put Professor Susan Hardy to audit my R programming class by saying that Susan will teach the course in Fall 2020. But Susan got some information from the class and by mixing with falsehood Susan filed an anonymous complaint about me to OIE that I violated KSU non-discriminatory policies, which OIE rejected.
17. In 2019, my salary was increased just $1000, which is a significantly lower. In 2018 academic year, I taught two new courses, developed one new course and supervised one PhD student.
18. After submission of the P&T portfolio, Dr. Ni said in a Department meeting that she is exhausted by having meeting with the P&T committee. She did undue influences on the P&T committee.
19. All my ARD and FPA were signed, but she sided with the DRC that my documents were not signed.
20. Dr. Ni discouraged me in November 2019 Department meeting not to run short course on “side by side learning of R and Python Programming” at KSU whereas the same short I ran at highly regarded American Statistical Conference with the highest number of attendees. I mentioned this in my 2019 ARD review.
21. Dr. Ni was so much interested in looking into student evaluation from only one class, which is STAT 4030 in Fall 2019. She showed interest to come to that class for giving students extended hours so that they can evaluate me. It was mentioned in my 2019 ARD with email document.

As the last point of hope, I am reaching you today with the hope that you would be looking the systematic elimination effort of a faculty member, and prevent it. With all the negative experience and incidents from Dr. Ni and her associated colleagues, I am afraid if I stay to continue my career as a professor with DSAS, it will be not only attracting more issues, but also will affect my health and well-being. I am open to consider moving to another suitable

department within CCSE (e.g., IT), Finance, Management Informatics or with joint appointment with multiple Departments. KSU had a record that faculty were moved out from one Department to another. IT department has BS and MS in analytics, where I could be a good fit. I am near completion of a Master degree in finance from Georgia Tech, so I can also work in the Finance Department. Transition to another Department will allow me to conduct high-level research, quality teaching and Professional services.

Finally, if you kindly let me know your decision by 4th of January, 2021 whether I will be given Promotion and Tenure to Associate Professor to another Department at KSU, then it will be easier for me to stop looking job at another place. Thanks for your attention.

Sincerely

Dr. Mohammed Chowdhury
Assistant Professor of DSAS
Kennesaw State University

Letter to President

SKANDALAKIS
LAW GROUP, LLC

*"Built on Relationships, Strengthened by Success"*

2440 Sandy Plains Rd.
Building 22, Suite 100
Marietta, GA 30066
Office (770) 693-8715
Fax (770) 693-8142
mitch@skandalakislawgroup.com

May 24, 2021

Pamela Whitten, Ph.D.
President
Kennesaw State University
Kennesaw Hall
Room 5600
MD0101
585 Cobb Avenue NW
Kennesaw, Ga. 30144-5591

RE: Dr. Mohammed Chowdhury's Promotion and Tenure in the School of Data Science.

The undersigned has been retained by Dr. Mohammed Chowdhury with regard to his denial of Promotion and Tenure. As you know, Dr. Chowdhury was hired in 2015 as the result of a national search from a pool of more than 70 applicants (Dr. Priestley was the chair of the hiring committee).

As you also know, in his first four years, Dr. Chowdhury **met and exceed expectations** in all three areas (TSM, RCA and PS). It wasn't until Dr. Xuelei (Sherry) Ni, became the Chairman of the Department of Statistics and Analytical Sciences that Dr. Chowdhury suddenly did not meet expectations. While meeting or exceeding expectations in his first four years, he authored seven (7) manuscripts published in peer-reviewed professional journals, which is an excellent publication record. Moreover, as recognized by Professor Emeritus of Statistics, Lewis VanBrackle (former Chair of the Department of Statistics and Analytical Sciences), Dr. Chowdhury is:

- A good departmental citizen
- A hard worker
- Willing to pitch in and help wherever he could
- Helped on R Day
- Volunteered to coordinate the Big Data Lecture series
- Served on search committees
- Served on the review committee for applicants to the Master of Science in Applied Statistics program

- Taught eleven (11) different undergraduate and graduate statistics courses while at KSU, ranging from Elementary Statistics through undergraduate Biostatistics, to undergraduate -level R and Python courses and graduate – level Advanced SAS, Time Series and Mathematical Statistics courses. He also developed and taught a graduate-level computational and theoretical Bayesian analysis course.
- Additionally, Dr. Chowdhury supervised and mentored one of the first Ph.D. students in the interdisciplinary Analytics and Data Science program.[1] The student was granted his Ph.D. in the Summer of 2019, only the second graduate of the program.
- He published, as stated above, 7 articles while at KSU.
- In addition to research, he wrote two proposals for the College of Science and Mathematics summer stimulus grants and one Early Career NSF grant proposal, and collaborated with colleagues from other departments and their NIH grant proposals.

Recently, 2 research article got published where Dr. Chowdhury is a coauthor, 1 is under 2nd round of review, 3 more are under first round of review, and 1 is under construction with an undergraduate student Ryan Lowhorn. He reviewed Statistical Papers from statistical journals. He was the session chairs on statistical conferences. Interestingly, he is again assigned to teach a new course in Fall 2021.

So please explain to me how this talented man, who has done so much for this University, is suddenly unfit for promotion and tenure? I have read the portfolios of two previously promoted and tenured faculties. Dr. Chowdhury's accomplishment is almost double in all three years compared to previously promoted and tenured faculty.

Dr. Chowdhury submitted his portfolio for promotion and tenure in August 13th, 2020. Promotion and Tenure are given on the basis of three areas known as TSM (Teaching, Supervision and Mentoring), RCA (Research and Creative Activity), and PS (Professional Service). Dr. Chowdhury exceed expectation in RCA and so, we would not address RCA in this letter. Department P&T Guideline clearly state that

***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."***

Tenure and promotion process is lengthy and it requires satisfactory progress in each year. Five Annual Review Documents (ARD), five Annual Faculty Performance Agreement (FPA) and their corresponding ratings (given by department chair and dean) are considered for promotion and tenure. Dr. Chowdhury met expectation and exceed expectation in first four years in all three areas (TSM, RCA and PS).

In his fifth year, Dr. **Xuelei (Sherry) Ni** (who became chair in Fall 2018) rated him as not meeting expectations in his TSM on the basis of a course evaluation from **only one student**. The student's course evaluation stated that on the basis of her evaluation, Dr. Chowdhury should

[1] Lewis VanBrackle served on the student's committee, and he attested to Dr. Chowdhury;s mentoring ability and deep knowledge of the field. He was the chair for 3 years.

be fired from KSU. In response, Dr. Chowdhury repeatedly asked in his ARD rebuttal letters to investigate the matter when Dr. Ni rated not meeting expectation.

For 7 month, the Office of Institutional Equity (OIE) investigated the matter and did not find any error from Dr. Chowdhury's side. **Interestingly, Dr. Chowdhury was not given any warnings or writeups for his behaviors during his entire five years at KSU.** Dr. Ni also rated him as not meeting expectations on Dr. Chowdhury's service whereas the same types of service provided in the previous years by Dr. Chowdhury received meets expectation in Professional Services (In one ARD comment, Dr. VanBrackle wrote that Dr. Chowdhury is providing services at Associate Professor level). Moreover, Dr. Chowdhury asked Dr. Ni to assign more services and show interest on a particular service, but Dr. Ni never assigned new services and instead, in the Department meeting, that particular service was openly distributed to another faculty member (email document are available to provide immediately).

Dr. Chowdhury's denial of Promotion and Tenure by the Department Review Committee (DRC) and by Dr. Ni is in violation of the Department Guidelines. Again, interestingly, DRC and The Department Chair, Dr. Ni mentioned in their letters that Dr. Chowdhury met expectation in RCA for promotion and tenure, which, by itself, is enough to get promotion and tenure. DRC said Dr. Chowdhury may be meeting expectation in PS.

While violating KSU's guidelines on promotion and tenure, DRC and Dr. Ni denied Dr. Chowdhury's Promotion and Tenure on the basis of course evaluations by only four or five students. In their letters (Ni and DRC), they never mentioned any of the good evaluations or comments made by the students about Dr. Chowdhury's teaching abilities. Instead, they cherry picked all negative student comments to deny Dr. Chowdhury's Promotion and Tenure. Indeed, **stunningly, 82%** of the course evaluations by students are positive and the rest are negative or neutral. Neither DRC and nor Dr. Ni mentioned highly effective teaching methods adopted by Dr. Chowdhury in their letters. Dr. Chowdhury only asked to his students for evaluations in four semesters (Fall 2019, Summer 2020, Fall 2020 and Spring 2021. Spring 2020 evaluations were cancelled because of Covid). In these four semesters, Dr. Chowdhury taught 11 sections of 4 unique courses. 2 sections have student rating 4 out of 4, 7 sections have rating between 3.5 and 3.8 in a scale of 4, 1 section has rating between 3 and 3.5, 1 section has rating 2 and 3. Both Dr. Ni and DRC also falsely claimed that ARD documents are not signed.

Amazingly, Dr. Chowdhury taught **11 unique courses and 685 students took his courses during his five years of teaching (Fall 2015 to Summer 2020).** In one academic year, all students passed the advanced SAS certification exam after taking SAS programming course STAT 8020 with Dr. Chowdhury. The former Chairman and former Dean highly appreciated Dr. Chowdhury for this achievement. Dr. Chowdhury's most frequently taught courses are STAT 1107, STAT 3125 and STAT 8020. Dr. Chowdhury clearly mentioned in his portfolio that his teaching in at least one section from each of the above courses exceeds all bench mark of the student evaluations taught by others.

In addition to the aforementioned facts that warrant his promotion and tenure, Dr. Chowdhury has demonstrated his excellence in teaching, his dedication to KSU and his *exceeding* expectations as follows:

1. He taught 11 unique courses (6 of them graduate courses) whereas previously promoted and tenured faculty taught just 5 or 6 courses. **This is one of the criteria of TSM mentioned in the P&T guideline, which Dr. Chowdhury met by exceeding expectations.**
2. He developed two very important and useful courses (Graduate level theoretical and computation Bayesian Statistics course and highly useful Advanced Undergraduate Python Programming course). **This is one of the criteria of TSM mentioned in the P&T guideline.**
3. He taught courses under a variety of instructional settings (classroom, hybrid and online synchronized). **This is one of the criteria of TSM mentioned in the P&T guideline.**
4. He taught courses with multiple methods (paper and pencil approach as well as EXCEL, R, Python, SAS and MySQL). **This is one of the criteria of TSM mentioned in the P&T guideline.** Students mentioned about this in their course evaluation.
5. He supervised and mentored undergraduate, Master and PhD students (8 students in all). **The University gave Dr. Chowdhury an award for undergraduate student supervision. This is one of the criteria of TSM mentioned in P&T guideline.**
6. His course materials were highly praised by faculty members of the Department. Dr. Ni's email clearly indicates the appreciation about the standard of the course materials. **This is one of the criteria of TSM mentioned in P&T guideline.**
7. He conducted pre-test and post-test for student assessment about the learning outcome. **This is one of the criteria of TSM mentioned in P&T guideline.**
8. He conducted specific learning outcome experiment in STAT 1107, which was documented in the ARD. **This is one of the criteria of TSM mentioned in P&T guideline.**
9. He created a sample exam and unique courses materials, and these materials were shared with Dr. Gene Ray, Dr. Gita Tasoobshiraji, Dr. Austin Brown, and Professor Shelby Taylor. **This is one of the criteria of TSM mentioned in P&T guideline.**
10. He supervised and mentored 8 students. One of them graduated with a PhD. For mentoring an undergraduate student, he received an award from KSU. **This is one of the criteria of TSM mentioned in P&T guideline.**
11. Dr. Chowdhury's students received admission for PhD and Masters in various universities. NC State University recognized Dr. Chowdhury for writing a recommendation letter for a student who completed a Master degree in analytics from NC state university and is currently working as a Data Scientist in Landing Tree. He forwarded that letter to Dr. Joe DeMaio and Dr. Ni, which was ignored. **This is one of the criteria of TSM mentioned in P&T guideline.**
12. He received a lot of solicited and unsolicited letters from students. **This is one of the criteria of TSM mentioned in P&T guideline.**
13. Dr. Linda Galloway observed Dr. Chowdhury 3 times in class room teaching and wrote very strong about his teaching abilities. **This is one of the criteria of TSM mentioned in P&T guideline.**
14. He wrote recommendation letters for around 25 students.

15. Senior Lecturer of Mathematics Department, Symon Kimitei, took two courses (one graduate and one undergraduate) with Dr. Chowdhury and wrote very highly about his teaching abilities. He also personally wrote a letter to Dr. Ni about the high quality teaching of Dr. Chowdhury on Mathematical Statistics.

So, all the criteria for TSM mentioned in the P&T guideline are **completely met** by Dr. Chowdhury. Indeed, in comparison to previously promoted and tenured Associate professors, he exceeds expectation in TSM. Dr. Priestley and Dr. VanBrackle (Previous Chair) always stated that Dr. Chowdhury can teach any course. Dr. Ni wrote email in Spring 2019 and asked Dr. Chowdhury "I need you to teach this course". In Spring 2021, Dr. Chowdhury was asked to teach a new graduate course by Dr. Ni. But Dr. Chowdhury humbly denied because Dr. Nicole Furguson asked Dr. Chowdhury not to teach any new course. Dr. Chowdhury mentioned this to Dr. Ni via email. Dr. VanBrackle and Dr. Mark Anderson (Previous Dean) wrote recommendation letters for Dr. Chowdhury's Promotion and Tenure. All three external reviewers (Please take a look who they are and from what country they are from) wrote very highly about Dr. Chowdhury's promotion and tenure. These external letter writers are very famous for their research works all over the world. In 2017, American Statistical Association (ASA) selected 45 junior statistician/biostatistician from USA, CANADA and EUROPE. Dr. Chowdhury is the only one exception, who was selected from R2 an institute like KSU.

In addition to teaching pure Mathematical Statistics and Computational & Theoretical Bayesian Statistics, Dr. Chowdhury may be the only faculty (top 1%) **in the world** who taught three programming courses by using R, Python and SAS. Only few academic persons in the world can be found who have a skill set in all three programming languages. If students asked questions to Dr. Chowdhury why should we believe you about the percentage of data falls under symmetric and skewed curve? Dr. Chowdhury immediately run simulation and convince the students. This demonstrates Dr. Chowdhury's high level of understanding of theory and application of statistics. His Python and R course materials are so sophisticated that his short course in "Side by side learning of R and Python Programming" at the ASA Conference received the highest number of attendees. Thousands of booklet for this conference was mailed across all over the world where name of KSU were mentioned because of Dr. Chowdhury's short course. Dr. Chowdhury familiarize KSU all over the world. During the time of short course, Dr. Chowdhury's KSU website was viewed from different parts of the world. Dr. Chowdhury brought glory for KSU during his five years.

In addition to everything else he accomplished, it should be noted that Dr. Chowdhury graduated with a Master's Degree in Quantitative and Computational Finance from the Georgia Institute of Technology in May 2021.

The bottom line is that Dr. Chowdhury's promotion and tenure was denied unfairly. For reasons unknown, **except for blatant discrimination**, he was targeted for failure by Dr. Ni. Dr. Ni systematically organized other faculty in the Department against Dr. Chowdhury, she

cherry picked a few bad student reviews, while ignoring the vast majority of positive student reviews, and she ginned up a bogus investigation against him to destroy his career. Moreover, she violated policies and procedures by denying him promotion and tenure that he clearly qualified for.

Rather than taking a deeper dive in the overwhelming facts that bear out his right to be promoted, you participated in the violation by dismissing his hard work, talent and career with a five sentence letter.

To avoid a long, drawn out lawsuit over KSU's violation of their own policies and procedures regarding promotion and tenure, this gross miscarriage of justice must be immediately rectified.

One solution is to relocate him to another department based upon a precedence established by KSU. Dr. Joe DaMaio was relocated to the Statistics Department from the Mathematics Department. Dr. Ying Xie was relocated to the IT Department from Computer Science Department. Dr. Chowdhury has previously requested that he be relocated to the Finance Department or the Department of Information and Systems Security or Computer Science Department or IT Department or Mathematics Department. Of course any relocation must be accompanied with promotion and tenure to Associate Professor.

So, we therefore, request that you reconsider Dr. Chowdhury's portfolio and give him the promotion and tenure (that he earned and deserves, through his hard work and dedication to KSU) to Associate Professor in any of the Departments mentioned above. Considering all of the foregoing undisputed facts warranting his promotion and tenure under established policies and procedures, you should be protecting Dr. Chowdhury, rather than dismissing him.

Sincerely,

Mitch J. Skandalakis

Good morning Ms. Walker,
I have read College and Department P&T Guidelines thoroughly. I also have read all the letters involving Dr. Chowdhury's P&T. I want to end this email by briefly mentioning only 4 things.

1. P&T is given on the basis of four criteria (TSM, RCA, PS and External letters). Dr. Chowdhury met criteria for RCA, PS and External letter as mentioned by the letters of the several committees. In TSM (Teaching, Supervision and Mentoring), Dr. Chowdhury exceeded all expectations by supervision and mentoring 7/8 Students with good quality publications. But his P&T is denied on the basis of Teaching, which is only one part of the TSM three parts. Dr. Chowdhury exceeded all expectations of teaching because he is the only faculty (May be in the entire list of KSU faculty), who taught 11 unique courses (six of them are graduate levels and 2 courses-1 undergraduate and 1 graduate course he developed). Can KSU name one faculty from his department who accomplished teaching that many courses? At least one section of his most frequently taught three courses exceeded all benchmarks of student evaluation that were taught by other faculty. It is unfair that none of the good student evaluations was mentioned by any of the committee. For example, in his first-time teaching Python Programming (He developed the course), the student evaluation was 3.74 on a scale of 4. Almost all students wrote about high quality of course materials and high quality of teaching. However, DRC picked only one bad word (Hostile) from only one student evaluation, but did not mention any good evaluation from the same course. So, his portfolio was not fairly evaluated by DRC.

2. DRC openly lied about the document signature. Dr. Chowdhury submitted 11 documents (6 FPA-Faculty Performance Agreement and 5 ARD-Annual Review Document). 5 of these documents were submitted digitally since 2018 (ARD 2018, ARD 2019, FPA 2018, FPA 2019 and FPA 2020) and no signatures are required (Dr. Chowdhury is confirmed by many KSU faculty that they did not sign it and he was not asked to sign those documents by any administrators). Rest of the documents were signed by himself, the Chair and the Dean. FPA 2015 is completely irrelevant because he started working at KSU in August 2015. That FPA is not required to submit for the P&T portfolio. However, in that FPA, Chair and Dr. Chowdhury signed. But DRC mentioned that only 3/11=27.27% percent of the documents were signed. KSU must not have different policies for employees. As Dr. Chowdhury's Attorney, I have seen that all ARD and FPA of Dr. Chowdhury's P&T portfolio are signed. This is just one of the many lies. We have mentioned a number of lies, wrong, inaccurate and misleading information mentioned by DRC, Chair and Dean via two letters to EEO.

3. I sent a letter to KSU president Dr. Pamela Whitten on the 24th of May, 2021 about discrimination made against Dr. Chowdhury's P&T by several committees. I received a simple answer (from Ms. Nwakaego Nkumeh Walker, Vice President & Chief Legal Affairs Officer) that did not contradict any of the information that I provided to Dr. Whitten. The answer was that the decision stands. In the letter Ms. Walker claimed that at each level (DRC, Chair, Dean and CRC) of **independent review**, a determination was made that Dr. Chowdhury's performance did not merit promotion and tenure.

*However, an email with an attachment (10/12/2020) from Dr. Joe DeMaio (college committee member of DSAS and also one of the three member of DRC) contradicts with the claim of independent evaluations.* I am quoting as follows from that attachment.

***"Faculty evaluation should come from chairs not dean because they are closer to know what is going on. For T&P reviews, will look strongly at the chair and DRC letters.***

So, independent evaluations were not done at each level. Dean and CRC blindly followed the falsehood of DRC and Chair, which Dr. Chowdhury mentioned in his rebuttal letters. If there is an independent evaluation, then they should upload his 2nd rebuttal letter on digital measures. But they did not. Dean did not give Dr. Chowdhury time for meeting. Dean did not reply to his emails. CRC chair did not reply to his email and did not upload his 2nd rebuttal letter on digital measures.

4. I ask you to read Dr. Chowdhury's 1st rebuttal letter, 2nd rebuttal letter, letter to the provost, letter to the president, two letters to send to the EEO, and two 2019 ARD rebuttal letters.

We ask the KSU legal team to advise the president to reconsider Dr. Chowdhury's P&T. Otherwise, on 2nd week of August, 2021 we see each other at court.

Letter to OIE

KENNESAW STATE
UNIVERSITY

**Submitted Via EMAIL at** eeo@kennesaw.edu

Date: 01/July/2021
Donna Davis Reddix, JD
Director of Institutional Equity and Title IX Coordinator
Office of Institutional Equity (Kennesaw Campus)
440 Bartow Avenue NW, Mail Drop 2702
English Building, Suite 202
Kennesaw, GA 30144
Phone: (470) 578-6057
E-mail: eeo@kennesaw.edu

RE: Unfairly Denying Dr. Chowdhury's Promotion and Tenure and Violating of KSU non-discrimination policies.

Dear Ms. Reddix:

I am writing this letter for your attention regarding the university's denying my Promotion and Tenure (P&T) in the SDC (School of Data Science, previously Department of Statistics and Analytical Sciences-DSAS).

The following committees unfairly targeted me by putting wrong, false, inaccurate, and misleading information in their letters to deny me promotion and tenure: P&T Department Review Committee (THE DRC), Department Chair (Dr. Ni), College Dean (Dr. Kojo) and College Review Committee (CRC) unfairly targeted Dr. Chowdhury. In the process of denying me tenure, all of the above reviewers bluntly and willfully violated Department P&T guidelines, which state:

***"Promotion and/or Tenure are expected to produce scholarship in either TSM or RCA. Scholarship of PS alone is not sufficient to meet this criterion for Promotion and/or Tenure."***

All letters from THE DRC, Chair, Dean, and CRC agree that I meet expectations in Associate Professor level in RCA (Research and Creative Activity). THE DRC also said that I may be meeting expectation in PS (Professional Service) at an Associate Professor level. Chair and CRC also agreed with THE DRC that I meet expectation in PS. However, they (THE DRC, Chair, Dean and CRC) denied me P&T intentionally on TSM (Teaching, Supervision and Mentoring) by alleging false, wrong, inaccurate and misleading information.

*Dr. VanBrackle (former Chair of the Department) rated me very highly about my quality and significance in three areas known as TSM, RCA and PS in 2015, 2016 and 2017 ARD (Annual Review Document). About TSM, Dr. VanBrackle wrote that I adopted scholarly, reflective and cyclical approach in my teaching. On RCA, Dr. VanBrackle rated me "exceeded expectation." In Professional Services, Dr. VanBrackle wrote that I was already serving at an associate professor level.*

THE DRC, Dr. Ni, Dean and CRC intentionally neglected to mention any of these ratings in their letters for my P&T. However, they (THE DRC, Dr. Ni and Dean) did place false, inaccurate, wrong and misleading information on my performance on TSM (Teaching, Supervision and Mentoring) to deny Dr. Chowdhury's P&T.

*It is noteworthy to mention that I did outstanding job in 2 (Supervision and Mentoring) of the 3 parts of TSM by supervising and mentoring 8 students. None of the four previously promoted and tenured faculty supervisors or mentors had as many students as I had (I was given undergraduate research award). All of these students choose me as their advisors after taking courses with me, which indicates high quality and significance of my teaching. High quality of mentoring and supervision are only possible when a person consistently maintains high quality of teaching.*

# False, inaccurate, wrong and misleading information in their letters are as follows:

**Evaluations from THE DRC and Department Chair:**
THE DRC and Dr. Ni's main concerns for denying Dr. Chowdhury's P&T are:

(i) Demeanor
(ii) Gender Insensitivity
(iii) Student Evaluations
(iv) Contradiction in Teaching Philosophy
(v) Learning Outcome Questions
(vi) Signature on ARD and FPA
(vii) Creepy Behavior
(viii) Class Cancellation
(ix) Grade Appeal
(x) NSF Grant Proposal
(xi) Missing value in R programming coding
(xii) Symon Kimitei's letter
(xiii) Document Preparation

**(i) Demeanor:** I told Dr. Ni that she was insulting me before students and one day students will insult her. This incidence happened when Dr. Ni wrote against my teaching abilities for my first-time teaching of the R programming course. This incidence must not be considered for promotion and tenure denial specially when it happened in a 1 to 1 meeting with Sherry in her

office and nobody heard about it. Moreover, I apologized to Dr. Ni via email and CC'd Dr. Marla Bell (Dean of CSM) on July/07/2020. This matter should not be counted as I should be able to express myself with a colleague.

*Unfortunately, without quoting the complete paragraph, THE DRC partially cites this incidence from my 2019 ARD rebuttal letters (please read my two 2019 ARD rebuttal letters). Mentioning this demeanor in a P&T letter by THE DRC is not only misleading, but also retaliatory, specially when they knew about a documented apology.*

**(ii) Gender Insensitivity**: This was proven to be bogus and completely false after the OIE (Office of Institutional Equity) released their 7 months long investigation report. The investigation was conducted to find whether I violated any KSU non-discriminatory policy or sexual misconduct policy. **Following the investigation, OIE did not gave me any warning or write up. Similarly, in my six years at KSU, I never received any warnings for anything.** If anyone reads my 2019 ARD (Annual Review Document) rebuttal letters thoroughly, then they will easily understand the erratic behavior of the two female students, one of whom was single mom and openly discussed her status multiple times in the class to draw attention to herself. She said that she is a single mom with two kids, with a full-time job, while pursuing her degree. This single mom texted and contacted me multiple times, even after semester ended, and provided me with her Gmail address, and wrote the f word in a text. I never responded. The other student wrote in her course evaluation that I must be terminated from KSU based on her evaluations. She also wrote many false things in her evaluation. The acts of these two students should be considered as anomalies as most evaluations were positive.

*So, after the release of OIE report, this Gender insensitivity issue became baseless and is no longer valid to deny my P&T. I never touched a female student, nor did I shake hands with any female student, text or send an inappropriate email. I never made indecent comments inside or outside of classes. I've never backbited any faculty members, or spoke with a raised voice with any colleagues. I never had any arguments in the committee meeting or department meeting, and I never raised my voice when service assignment was openly distributed to another faculty instead of me.*

**(iii) Student Evaluation:** My promotion and tenure denial cannot be justified by the cherry picking of a few student comments (4 to 5 students) ***from 11 courses*** that I taught. Altogether, 685 students took courses with me and 155 students evaluated me. Most of the bad comments came after Dr. Ni assumed her chairmanship. In the third-year review letter, the THE DRC, Chair and Dean never mentioned any bad comments from student evaluations to alert me as to an issue. 82% of my teaching evaluations are positive or neutral and a small fraction are negative or neutral. Moreover, at least one section of my most frequently taught 3 courses exceed all benchmarks of course evaluations taught by other faculty. It is unfair that I can be terminated based upon a few negative student evaluations.

*Unfortunately, none of the above committees ever mentioned any good comments from student evaluations in their letters for my P&T. This indicates a bias and unfair evaluation of my teaching part of TSM. THE DRC also did not give any credit to me for developing and teaching two very important courses. One course, python programming, has a huge demand in the*

*industry, which I developed from scratch. Other courses were graduate level computational and theoretical Bayesian Statistics. I **ran a couple of statistical analyses and tests on student evaluations of the courses that I taught, which showed how statistically insignificant of the few students' evaluation were in my second rebuttal letter.** However, the Dean and CRC did not take those into account in their letters. One student wrote "I am an asset of KSU." Many students wrote "I am the best Statistics Professor." So, quoting only few bad comments from student evaluations (many of these students were programmed to write against Dr. Chowdhury's teaching abilities) of the courses that I taught is wrong, inaccurate, and misleading. The highly effective teachings of the courses are documented in the following table for 3 most frequently taught courses.*

| Course Number<br>Course Name<br>(# of times taught) | **Worst Evaluation** (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4<br>SCM average result | **Best Evaluation** (Mean, Median)<br>(% of student evaluated, Year)<br>Evaluation are in a scale of 4 SCM average result |
|---|---|---|
| STAT 3125<br>Biostatistics<br>(14) | Course Content (1.75, NA) Teaching Effectiveness (1.75, NA) (14.3%, Spring 2018)<br>SCM result Spring 2017 (3.58, 3.61) | Course Content (3.6, 4) Teaching Effective (3.8, 4) (56%, Fall 2019)<br>SCM result Spring 2017 (3.58, 3.61) |
| STAT 1107/1401<br>Basic Statistics<br>(7) | Course Content (2.00, NA) Teaching Effectiveness (1.80, NA) (14.7%, Spring 2016)<br>SCM result (3.49, 3.45) | Course Content (3.3, 3) Teaching Effective (3, 3) (47%, Summer 2020)<br>SCM result Spring 2017 (3.49, 3.45) |
| STAT 8020<br>Advanced SAS Programming<br>(3) | Course Contents 1.83<br>Strength of the Instructor 1.00 (58.3%, Fall 2015)<br>SCM result (3.50, 3.45) | Course Contents 3.71<br>Strength of the Instructor 3.29 (58.3%, Fall 2016)<br>SCM result (3.50, 3.45)<br>In this year all students passed the Advanced SAS certification Exam |

**(iv) Contradiction in Teaching Philosophy:** The THE DRC wrongly stated in their letter that I contradicted my teaching philosophy. For references, they compared one graduate course (STAT 8020) with two undergraduate courses (STAT 4030 and STAT 4490). In the first rebuttal letter, I argued that teaching philosophy must be different for courses taught at undergraduate and graduate levels. *So, the intention of the THE DRC's P&T letter became very clear because they wanted to find errors in my dossier, and, for doing so, they adopted falsehoods in their letter.* ***How can the teaching philosophy be the same for graduate and undergraduate courses?***

**(v) Learning Outcome Question:**

a. **1st Learning Outcome Question:** The THE DRC wrongly said in their letter that Dr. Chowdhury's learning outcome question was poorly worded at best and they claimed that I did not mention ***'continuous'*** variable in the learning outcome question. They should know that there are two types of variables such as Quantitative and Qualitative- each of which has sub categories. Quantitative variable is of two types such as discrete and continuous. Histogram and Boxplot are constructed for Quantitative variables and not only for ***continuous*** variables, which the THE DRC claimed (two of them have PhD in Statistics and one have PhD in Mathematics). If I mentioned **'continuous'** variable in the learning outcome question, then the question will be wrong (DRC is suggesting wrong

word in the learning outcome question), because histogram and boxplot can also be constructed for discrete quantitative variables. For example, Boxplot and Histogram can also be constructed for Poisson Variable, Binomial Variable, Negative Binomial Variable, which are discrete quantitative variable. On the other hand, if I specify quantitative variable in the question, then the answer is given (students know the answer). So, THE DRC wrongly argued that the learning outcome question was poorly worded. *THE DRC's main purpose was to find errors in my dossier and for doing so, they made many gross errors. If Statisticians outside of KSU knew about it, they will laugh at three THE DRC members and they all concluded that my P&T portfolio was not fairly evaluated and rated.*

b. **2nd Learning Outcome Question:** THE DRC and Dr. Ni wrongly stated the second learning outcome question on Basic Principle of Counting (BPC). Their question is why did I choose this topic as a learning outcome question? They purposefully forgot that BPC is a very basic counting method, which counts the total number of ways by simply multiplying different categories (This counting method is way easier than permutation and combination counting methods). All undergraduate statistics books that discuss probability have this topic at the very beginning of the counting methods. In the STAT 1401 text book (Essential Statistics), it is mentioned on page 178 (very beginning of the counting method). This learning outcome document was presented in my ARD document and **no question was raised during that discussion.** *Unfortunately, they raised unnecessary concerns about learning outcome questions because they targeted my teaching part of TSM in order to deny my P&T.*

**(vi) Signature of ARD and FPA:** The THE DRC stated in their letter that most of Dr. Chowdhury's ARD and FPA were not signed by the Chair of the Department and Dean of the College. This is not only misleading but false. This false statement also puts blame on the work integrity of Chair and Dean (Dr. VanBrackle and Dr. Anderson), who loved me very much. If the Chair and Dean did not sign, then this is not my fault. All ARD and FPA were signed. Please see my 1st and 2nd rebuttal letters and also check all ARD and FPA whether they were signed or not. From 2018, all ARD and FPA are submitted digitally and no signature is required. I confirmed this by talking with many faculty members at KSU. They have not signed their ARD and FPA digitally since 2018.

*Unfortunately, the THE DRC and Dr. Ni also said that I did not digitally sign my ARD and FPA since 2018. KSU cannot have one policy for me and another policy for other faculty members including DSAS/SDS faculty members. Moreover, I was not asked to sign those documents via email by the Department Chair or Dean since 2018. In 2020 ARD and for 2021 FPA, I was not asked again to sign these documents digitally, and they (Chair and Dean) did not mention any of these things in their ARD letters.*

**(vii) Creepy:** One student (girl) wrote in her evaluation that 'I am creepy'. That student showed up to Dr. Chowdhury's office during many unusual times (7:45 AM in the morning of December when morning darkness was prevailing and classes were not started. She also showed up very late in the evening. I asked the student to do the group project like the other students were doing. But she repeatedly declined and rather choose to do two projects; an individual project, and a

group project. For her individual project, she showed up to my office multiple times. She (Tali Higgins) touched her knee twice with Dr. Chowdhury's knee until I pulled it back. Unfortunately, and shamelessly, THE DRC mentioned 'creepy comment' of this student in their letter even though they had thoroughly read Dr. Chowdhury's two 2019 ARD rebuttal letters. THE DRC intention became clear by quoting this word in their letter. Dr. Ni repeatedly asked me to come to this class only for student evaluations so that ample amount of time could be given for student evaluations. On the basis of one student evaluation, Dr. Ni rated 'not meet expectation' in Dr. Chowdhury's TSM.

*Unfortunately, three THE DRC members with PhD in Statistics/Mathematics purposefully forgot the definition of 'outliers'- a statistical terminology. No scientist considers outliers in their crucial decision making. P&T is a very crucial matter for Dr. Chowdhury's academic future. So, outliers (creepy comment from only one student) must not be considered for Dr. Chowdhury's promotion and tenure denial. If I am creepy, it would have been mentioned by other students and colleagues in their evaluations and comments. How can a creepy person supervise and mentor 8 students? Usually, chaos, mishap and unusual things happen when individuals interact closely (3 female students were closely mentored and supervised). None of the 8 students supervised and mentored by me ever complained about my manner. I wrote 16 recommendation letters for students. Students would not ask me to write recommendation letters if I was found to be creepy. Dean Dr. Anderson and Chair Dr. VanBrackle would not have written strong letters of recommendation for my P&T if I was considered creepy. They both observed me for at least 3 years. The first sentence of Dr. VanBrackle support letter contains "Mohammed is a good departmental citizen." Moreover, I served on many committees at KSU, which included many voluntary services, but nobody ever mentioned that I was creepy. I attended all Department's meeting and no creepy behavior was ever observed. I worked on committees with Dr. Joe DeMaio, Dr. Nicole Ferguson, Dr. Ray, Dr. Ni, Dr. Lawson, Dr. Priestley, Dr. Linda Galloway and with Prof Michael but nobody reported any bad behavior. Quoting the 'creepy' comment form only one student evaluation in the P&T letter of THE DRC is misleading and grossly unfair.*
*A small list of good words together with frequencies from student evaluations are as follows:*

| *Good Words from Student Evaluations* | *Frequency* |
|---|---|
| *Knowledgeable* | *23* |
| *Smart* | *5* |
| *energetic* | *3* |
| *enthusiastic* | *6* |
| *nice* | *5* |
| *engaging* | *3* |
| *knows* | *11* |
| *great* | *15* |

**(viii) Class cancellation:** In the summer of 2019, I cancelled only one class due to a family emergency, which was well documented in my 2019 ARD rebuttal letters. However, Dr. Ni mentioned in her 2019 ARD letter that I missed 3 summer classes without any proof. I argued by providing proof from D2L emails that I missed only one class. However, THE DRC sided with

Dr. Ni's falsehood even though they had seen the proof of class cancellation from my 2019 ARD rebuttal letters.

*So, Dr. Ni falsely claimed without any proof that three summer classes were cancelled. This is another retaliatory act of Dr. Ni. No students ever mentioned in their evaluation that I cancelled classes few times, let alone frequently. Moreover, if Dr. Ni had a good intension to correct Dr. Chowdhury, she should have given warnings about class cancellation to me via email or verbally before writing it in her ARD letter, but she never did it. She walked into my cancelled class (mentioned in her letter), but did not walked into my office room to report it. Instead, she put false information directly in her 2019 ARD letter and misinformed the dean. So, three class cancellation allegations in THE DRC letter are a blunt lie to misled the committee even though the THE DRC read my two 2019 ARD rebuttal letters. Senior Lecturer of Mathematics Department Symon Kimitei was the student of the R Programming class that I taught during Summer 2019. KSU can check his D2L email about my class cancelation. He also took STAT 7010 course that I taught in Fall 2018. KSU can ask him about class cancellation.*

**(ix) Multiple Students Grade Appeal:** Only one student appealed for grade change in Fall 2018 for the STAT 7010 course, which is a Mathematical Statistics Course. The student grade appeal was denied by Dr. Ni on the basis of documents provided by me. Dr. Ni severely criticized the student for his very poor performances in all exams, especially in the final exam. In the final exam, the student received 14% points (overall grade of that student after huge curving was 58%). Dr. Ni wrote in the grade appeal letter that **"Students like you are directly responsible for lowering the class average."** I had to call the student to take the final exam and he arrived in the exam room 20 minutes after the start of the exam. He was also the TA of DSAS.

*Unfortunately, Dr. Ni wrote in her P&T letter that multiple students appealed for grade change. This is a blatantly false accusation to mislead higher administrative official to deny Dr. Chowdhury's P&T. All proof can be provided immediately. It was just only one student who appealed for a grade change and his grade change appeal was denied.*

**(x) NSF Grant Proposal:** The NSF early career proposal was reviewed thoroughly by a KSU representative and a representative from Hanover Research, who oversaw the entire project development for seven months. Before final submission, at least it's abstract was read by Chairman Dr. VanBrackle and Dean Dr. Anderson. Dean Anderson highly appreciated this grant submission to Dr. Ni and then Dr. Ni passed this information to me.

*Unfortunately, Dr. Ni wrote in her letter that Dr. Chowdhury's NSF proposal was another document of careless preparation. By writing this in her P&T letter, she criticized the KSU grant representative, Hanover research institute and other high officials. In 2018, out of 41 applicants, only 4.5 persons received NSF early career award. In KSU's entire history nobody received NSF early career awards. Submission of this grant proposal opened new research opportunities for Dr. Chowdhury. Going forward, Data Science PhD students (15 different research topics) will benefit from this grant submission. So, this is another attempt by Dr. Ni to misguide the higher official by putting false information in her P&T letter.*

**(xi) Missing Value in R Programming Code:** I taught Data Mining STAT 8240 course in Spring 2020 for mainly HMI (Health Management Informatics) students. Previously, other faculty taught this course and they got one additional salary. However, for my case, I taught this course and Department received $10000 from HMI program. However, in the first Homework, I taught the student the R programming code to delete the missing value. But in the subsequently Homework, I never asked them to delete missing value for statistical modeling. But Dr. Ni wrongly stated in her letter that I have taught them wrong data analysis and modeling approach by completely deleting missing values.

*Dr. Ni never looked at the subsequent homework that I assigned. I taught them the R programming code on how to delete missing values, but Dr. Ni claimed in her P&T letter that I taught them statistical modeling by considering only complete data (by deleting missing values). This is a false accusation by Dr. Ni in order to misled higher administrative officials.*

**(xii) Symon Kimitei's letter:** Symon is a senior lecturer of Mathematics Department of KSU. He will start his PhD in Data Science under the School of Data Science at KSU from Fall 2021. He took two courses as a student that I taught. He observed my teaching of R programming course and high-level Mathematical Statistics course for two different semesters and wrote a very strong letter in favor of my teaching abilities. However, DRC and Ni did not like this letter.

*Dr. Linda Galloway observed me for three times only in three classes and wrote heavily in favor teaching abilities. On the other hand, Symon observed me for two semesters and wrote about my teaching abilities, which is more reliable than only 3 observations by Linda Galloway. But DRC and Dr. Ni criticized the letter written by Symon. They (Dr. Ni and DRC) raised a concern that letter written by Symon is not anonymous (P&T guideline clearly states that solicited and unsolicited letters from students are welcome). So, DRC and Dr. Ni violated the P&T guideline by writing against the letter written by Symon Kimitei. They should know that the letter from Dr. Linda Galloway was also not anonymous, it was taken very highly. The purpose is of Dr. Ni and DRC is clear. They wanted to downgrade my TSM and for this reason, they wrote against everything in my TSM.*

**(xiii) Document Preparation:** Dr. Ni gave written permission via email to me to keep blank pages within the 2019 ARD document (generated via online portal of digital measure, on which I had no control). I can show the proof. Later, Dr. Ni criticized me about the document preparation (Please see 2019 ARD response letters) in her 2019 ARD letter. For the first three years, there were no complaints of document preparation and no complain of redundancy under the chairmanship of Dr. VanBrackle. If I teach three sections of a course, and copies and pastes the same teaching philosophy for each section, then Dr. Ni considered it as redundancy. Under the chairmanship of Dr. VanBrackle, the same approach was adopted, but concerns of redundance were not raised. There was not one grammatical error or sentence fragmentation problems in my documents (all types of documents such as ARD, FPA, Narratives etc.). If there is one grammatical problem, it must be mentioned either by THE DRC or by Dr. Ni in their letters. But they could not. It is noteworthy to mention that my GRE verbal scores were in the 87th percentile, which many native English-speaking students cannot attain.

*Dr. Ni gave written permission to me to keep blank pages within the document and then criticized me for keeping blank pages in the document. Unfortunately, the THE DRC had read all about these in my two ARD rebuttal letters, but they sided with Ni. This is yet another act of Dr. Ni and THE DRC to completely misguide higher officials.*

**Second Rebuttal letter:**
I wrote my first rebuttal letter after receiving the THE DRC letter and then I wrote the second rebuttal letter after getting Dr. Ni's review letter.

*On October 24, Dean Dr. Kojo uploaded his letter about my P&T. In his letter, he intentionally mentioned that I taught 11 undergraduate courses, which is very wrong, misleading, inaccurate and false information for the college committee members. College committee members believe Dean Kojo more than me because of Dr. Kojo's higher authority. I taught 6 graduate courses, which Dr. Kojo did not mention purposefully. Teaching that many graduate courses require extra ordinary expertise and skillset. No other faculty taught that many graduate courses as I did. Few faculties even do not have graduate faculty status. So, Dr. Kojo intentionally misled all college committee members. I also taught 5 undergraduate courses. In my five-years at KSU, I taught 11 unique courses. I am teaching a new course in Fall 2021.*

*After Dean Kojo uploaded his letter, I requested that Dr. Kojo upload my 2nd rebuttal letter (rebuttal letter against Chair letter) on 10th of October, 2020. Dean Kojo did not reply and neither Dr. Ni. They also did not upload my 2nd rebuttal letter. Again, I requested Dean Kojo to upload my 2nd rebuttal letter on 1st of November, 2020, but Dean Kojo did not respond and did not upload Dr. Chowdhury's 2nd rebuttal letter. Again, I asked (third time) Dean Dr. Kojo to upload my 2nd rebuttal letter on 11th November of 2020 so that college committee members can read, but Dean Kojo did not respond and did not upload. Usually, when one administrator uploads his letter, he also uploads rebuttal letter. After three unsuccessful attempts to get 2nd rebuttal letter to be uploaded so that all college committee members can see, I asked Dr. Ron Matson (Senior Vice President of Academic Affairs) about this. However, Dr. Matson did not reply and the 2nd rebuttal letter was not uploaded. I then contacted Meghan Burke (manager of Online portal) on 31st of October, 2020 and asked her to upload his 2nd rebuttal letter, but she said she was not authorized to do so. She provided information to me about college committee chair Dr. Jeremy Gulley. I contacted Dr. Gulley on November 1 of 2020 and he replied that he would make 2nd rebuttal letter available to the college committee members. I again requested Dr. Gulley to upload 2nd rebuttal letters on 2nd of November so that each member of the college committee can see it. But Dr. Jeremy Gulley did not reply and did not upload the 2nd rebuttal letter on the online portal. On November 20th, the college committee uploaded their letter. According to the digital measures, my 2nd rebuttal letter was uploaded on November 20. So, all college committee members were deprived of seeing and reading my 2nd rebuttal letter for a month-long period.*

*My second rebuttal letter contained all point-by-point information that stand solidly against Dr. Ni's P&T letter and the DRC's P&T letter. Unfortunately, it was not made available to the all-college committee members on the 24th of October, the day Dean Kojo uploaded his letter. I have all email records and screen shots from digital measures. So, the intension was clear to hide Dr. Chowdhury's 2nd rebuttal letter from all CRC members.*

**Evaluation by Dr. Ni:**
Dr. Ni went over each and every student evaluation and cherry-picked only few bad student evaluations, and quoted them to deny my P&T. She never cited or quoted one good student evaluation like the DRC in her letter.

**More Wrong and Misleading information by above committee:**

1. **10% of TSM:** The DRC wrongly stated in their letter that I used less than 10% of TSM narrative for growth and improvement in teaching of TSM. *In my first rebuttal letter, I said 62 of the 120 lines of TSM were discussed about growth and improvement in teaching, which is more than 50% of the TSM narrative. So, false information was included by the THE DRC in their P&T letter. My 5th year narrative was thoroughly read by Dr. Kimberly Gardner and Dr. Lewis VanBrackle. Both of them highly appreciated it. It was also read by a 3rd faculty member from another Department of KSU. A 4th faculty member from another university also read my 5th year narrative. All of them were surprised by seeing so many accomplishments in my narrative during a five-year period.*

2. **Only Teaching part of TSM:** The DRC entirely disparaged my teaching abilities on the TSM part in their letter. The *DRC never mentioned that I developed two courses, let alone giving me credit for teaching that many diverse courses with very good teaching evaluations. They barely mentioned about supervision and mentoring of 8 students that I did in my five-year period. I should be considered as* ***gold medalist*** *in teaching because all of my mentored students came under my supervision after taking courses with me.*

3. **Growth in Teaching:** The DRC wrongly said in their letter that I did not adopt scholarly and cyclical approaches of growth in my teaching. *Dr. VanBrackle clearly said in his ARD comment that I adopted and implemented scholarly approach in my teaching, which THE DRC and Dr. Ni purposefully failed to mention. Dr. Linda Galloway's three observations clearly indicated that I adopted cyclical approach for my growth in teaching. Where does the Department P&T guideline or in the College P&T guideline mention that one cyclical approach for growth in teaching by observations of a colleague is not enough to secure promotion and tenure? None of the ARD letters ever asked me to do a 2nd round of cyclical observations by another departmental colleague.*

4. **EXCEL and R:** The DRC wrongly mentioned in their letter that I used R in teaching STAT 3125. *I was given written permission and verbal permission and also in ARD comment by Dr. VanBrackle and Dr. Ni that I could use R software after using EXCEL in teaching STAT 3125 course. I adopted this approach since the Summer 2018. Many students wrote in their comment that I teach courses in multiple ways such as (i) paper and pencil approach (ii) EXCEL approach and (iii) R approach. Both the DRC and Dr. Ni neglected to mention this in their letters because they did not like the good student evaluations. Can the DRC show any comment from students since the Summer 2018 that they complained about using R? So, the THE DRC misguided higher authorities by putting false information about using R in teaching STAT 3125 course.*

5. **Page Limit: The** DRC is well aware that there is a page limitation for the P&T narrative, which is 12 pages and double margin. *Due to the space limitation, I just presented the p*

*values of pre-test and post-test in my narrative to show that students' knowledge increased significantly after taking the course with me. P-values were also reported for the pre-test and post-test experiments conducted by Dr. Ferguson and Dr. Ray in their P&T narrative. However, I was criticized by THE DRC and Dr. Ni.*

6. **Syllabus Alteration:** The DRC intentionally said that Dr Chowdhury altered the syllabus of STAT 8220 (Applied Time Series Analysis) even though they knew that Dr. Priestley stopped by my office and asked me to teach the course in a theoretical approach so that Data Science PhD students would be benefited. *I was highly appreciated by Dr. Priestley, Dr. VanBrackle and by the students. Please talk with Dr. Priestley, Dr. Linh Le (Assistant Professor at KSU) to know more about this course. I never altered the syllabus unless I was ordered to do so by Dr. Priestley. The THE DRC knew about this, but they just like to put false allegation of syllabus alteration to my portfolio, and for this reason, they reported it in their P&T letter.*

7. **More Service assignment:** The DRC said in their letter that I should ask for more services by citing ARD comments from two Deans. *This is a false allegation. I asked Dr. Ni to assign more services, but Dr. Ni did not assign any additional service load to me and, instead, Dr. Ni wrote in her 2019 ARD letter that Dr. Chowdhury's service did not meet 10% service requirements. In previous years, the same services were provided and 10% service requirements were met. Dr. Ni also wrote in her 2019 ARD letter that I should be '**congenial**' to provide more services, which was a retaliatory action of Dr. Ni. In the 2019 ARD meeting Dr. Ni also suggested me to provide more voluntary services like the way Professor Susan Hardy provided. Dr. Ni told me that Professor Hardy does not have any service assignment.*

8. **Uploading Dean's Letter:** The DRC wrongly said that I did not upload dean Dr. Bell's 2019 ARD review letter. *Dr. Bell wrote her review directly in digital measure in HTML format and did not upload any pdf file. So, I did not have option to download except directly reading the letter from digital measure. So, this is another false accusation that THE DRC wrote in their letter to make my portfolio appear worst to higher authorities.*

9. **Different Format of Courses:** The *DRC did not mention in their letter that I taught face to face, hybrid and online synchronized courses at all levels. I also requested Dr. Ni to let me teach asynchronized courses, but I was not permitted by Dr. Ni.*

10. **Different stages of Preparation:** *I clearly mentioned in my fifth-year narrative about different stages of preparation and a creation of research article that was published in KSU journal of Undergraduate Research by incorporating suggestions from 3rd year letters. However, the DRC did not recognize that by reading my portfolio. Instead, they just copied and pasted from their third-year letter that the review committee wrote in 2017. The Third-year review was done to give advice to all tenure track faculty. I took all of their advice and incorporated them in my fifth-year portfolio. Many faculties got promotion and tenure under the chairmanship of Dr. VanBrackle and he highly appreciated my 5th year narrative. However, the DRC was unable to rate 5th year narrative properly, because they had a hidden agenda to deny my P&T.*

11. **Third-Year Letter:** The third-year review letter is considered a guideline for preparing the fifth-year narrative (mentioned at the very beginning of the third-year letter). *I incorporated all advice and suggestions from all third-year letters for preparing my fifth-year narrative. However, the DRC never mentioned in their letter what suggestions were not incorporated from third-year letter to Dr. Chowdhury's fifth year narrative. If anyone read the suggestions and advice given to me from third-year review letters and then read my fifth-year narrative, each and every one will agree that I accommodated all suggestions and advice from the 3rd year review letters to my fifth-year narrative. The DRC and Dr. Ni repeatedly mentioned in their letters about my third-year letters. In the third-year letters written by THE DRC, Chair and Dean never mentioned any comments from student evaluations. Also, in three ARD reviews (2015, 2016 and 2017), Chair (Dr. VanBrackle) and Dean (Dr. Anderson) never mentioned any comments from student evaluation in their letters. However, Dr. Ni violated all norms by putting few student comments in her P&T letter from the courses I taught in 2015, 2016 and 2017. Quoting students comments from courses before 3rd year review on which Chair, Dean and 3rd year review committee did not quote and mention is a violation of P&T norms done by Dr. Ni. This also clearly indicates how vindictive and retaliatory Dr. Ni is. THE DRC also did not mention any student evaluations in their letter from courses that Dr. Chowdhury taught before 3rd year review.*
12. **Email permission:** *Dr. Ni gave email permission to me to teach STAT 8240 by using R software for Spring 2020 instead of SAS. In her P&T letter, she criticized me for violating course catalog for using R instead of SAS. This behavior clearly indicates how retaliatory, faulty-finding, self-contradictory and vindictive Dr. Ni is.*
13. **SAS Certification Pass Rate:** THE DRC and Dr. Ni wrote in their letters that I did not compare SAS certification pass rate with another professor who taught it before. *I repeatedly asked for information about SAS certification pass rate from Department but the information was not provided to me and my email was not responded to. So, how can I compare the SAS certification pass rate among professors? This is another false accusation by Dr. Ni to deny my P&T. Please see 2nd rebuttal letter.*

14. **Different Parts of TSM:** Dr. Ni falsely said in her letter that I did not meet any TSM characteristics except supervision and mentoring. *I argued in my 2nd rebuttal letter that I indeed met all of the TSM criteria. I described step-step explanation of each and every criterion of TSM that I met in my 2nd rebuttal letters. Please read my 2nd rebuttal letter, which was not uploaded in the digital measures after repeated requests in due time.*

15. **Low Attendance:** *I arranged BDLS talks since the fall 2017. In the Fall 2019, there were two BDLS talks in which the number of attendees were low. Previously, in all BDLS talks, number of attendees were high. I followed the same procedure for all BDLS talks. First, an email is sent the day a talk is scheduled. Another email is sent one week before the talk and a final and third email is sent in the morning of the talk. To avoid overfeeding of the colleague's inbox, I did not send more emails. Suddenly, there were low attendees only in two talks in October and November of 2019. It was reported on my ARD document as well as P&T document by Dr. Ni to establish that I do not have good organizing skills. It was pre-planned to have low attendees in two BDLS talk so that it could be reported in ARD and P&T letter. This is done create bad impression to higher authorities by Dr. Ni.*

*16.* **Drop-in SAS Certification Pass Rate:** Dr. Ni mentioned in her P&T letter about SAS certification pass rate drop in Fall 2017. *Dr. Ni forgot that student's quality varies from class to class and so the SAS certification pass rate. Everybody understands this simple math. Moreover, in 2017 ARD review, Dr. VanBrackle and Dean Dr. Anderson did not mention anything about the drop of the SAS certification pass rate. After Dr. Ni's assumption to the chairmanship, she purposefully removed the students' mandatory participation of the SAS certification exam. In 2015, 2016 and 2017, all students took the Advanced SAS certification exam when I taught this course and pass rate was 57%, 100%, and 68 % respectively.*

17. **High Level Syllabus:** Dr. Ni mentioned in her P&T letter that syllabus of Python Programming was in high level by mentioning the November 2019 Department meeting. This is the same syllabus approval that the *curriculum committee and chair approved in the Fall 2018 for first-time teaching of the course in Spring 2019. No student complained about the high level of the syllabus in their course evaluations. Then for the second-time teaching, why did few faculty members (programmed by Dr. Ni) and Dr. Ni raise concerns about the high level of the syllabus? Also, why did curriculum committee approve the syllabus for the first time? Dr. Ni and the DRC tried their best to find errors from my submitted dossier and mentioned them in their P&T letters to deny my P&T. At the beginning of the meeting, I clearly said, if some topics are high-level, I can remove them, but few faculties never stopped there. Professor Franklin said in the meeting that I had to teach more topics on design of experiments such as two-way and three-way anova in addition to one-way anova (which I covered). He also suggested to me to cover more from text mining (please listen the audio of the meeting). In one-way, they are attacking me for high-level of syllabus and in the other-way Prof. Michael is asking me to cover more topics, which is a complete double standard approach to me. Prof Michael was a curriculum committee member and he did not oppose anything in the syllabus when it was first approved.*

*18.* **Exam Proctoring**: Dr. Ni said in her letter that I did not proctor the exam, which is false and misleading information. *All programming courses (R, Python and SAS) class exams were open book, open note, open to use internet. I was always present in the class (how many students complained in their course evaluation that I was not present during exam time). In one R programming exam, after distributing the exam to the students, I came to the office for picking up his cell phone so that he can log in to D2L and email by using duo. Prof Susan (whose office is located in the front of my office) noticed that (she was auditing my course) She asked Why "don't you proctor your exam? I replied that I came to pick up my cell phone. However, she passed this information to Dr. Ni and Dr. Ni reported it in her letter. After assumption to her chairmanship, Dr. Ni's main responsibilities seemed to find my errors. If there is no errors from my side, she created many artificial traps so that I could be caught and be deported/expelled from KSU.*

19. **CETL Help:** THE DRC and Dr. Ni said I did not seek help from CTEL, which is another wrong information. *Right after ARD meeting with Dr. Ni in March 2020, University was locked down for covid. However, I have contacted to CETL in February of 2021 and they agreed to observe my class in the Fall 2021. Dr. Sherrill Hayes and Dr. Ni knew about it as they were on the email list. When Dr. VanBrackle and Dean Anderson were administrators,*

*they did not send me to CETL. Artificial incidences were created, and I was advised to go to the CETL so that they can create more issues about me. I did not decline in any document that I am not interested to seek help from CETL about my teaching improvement.*

20. **Sub-standard and High-Level Teaching:** Dr. Ni shamelessly said in her letter that my teaching does not meet even an Assistant Professor level, let alone an Associate Professor level. Dr. Ni's statement clearly indicates that my teaching is sub-standard. *However, when her PhD level course contents were severely criticized because she covered only a few topics with a lot of overlapping for two PhD level courses by the PhD students, she asked me via email to teach one of those courses and also told me that I would have a very high chance to supervise more PhD students. In that email Dr. Ni told me that I would have the freedom to teach whatever materials I wanted. In the email, Dr. Ni also said it is all yours, which gave permission to violate course curriculum. So, Dr. Ni automatically admitted in that email that I had high skillsets and expertise for teaching advanced level PhD courses. Emails from Dr. Ni clearly indicated that I meet the expectation in TSM at an Associate Professor level. Otherwise, Dr. Ni had contradictory statement about my teaching abilities. Her lackluster performance in teaching PhD level courses was reported to the Department PhD Research Review committee, where PhD students were also present. In the Department PhD research review meeting, PhD students reported this to Dr. Sherrill Hayes. I was hired from a pool of 70 applicants from a national search. I have proven that I am an excellent and outstanding teacher and educator. I mentored and supervised 8 students and most of them came under my mentorship after taking courses with me. Before finishing the fourth year, I was strongly recommended by Dr. VanBrackle for early career award in a two-pages letter. Dr. VanBrackle also marginally approved me for early application of P&T. I have that email. Dr. Ni also wrote in mild sentences for early career award for me.*

**Long-time Commitment:** KSU faculty guide said about tenure and promotion as follow:
***"The awarding of tenure is a highly important decision through which the University incurs a major commitment to the individual faculty member well into the future. Years of service or successful annual reviews alone are not sufficient to qualify for tenure. It should only be granted to those faculty members whose achievements demonstrate the quality and significance expected of an Associate Professor and who demonstrate potential for long-term effectiveness at the University. Tenure requires prior or simultaneous promotion to the rank of Associate Professor."***

In reference to the above quote from KSU faculty guidelines, I showed high quality and significance in my teaching, research and service as mentioned below.

**Research:**
*I have a sustainable research agenda as mentioned by former chair Dr. VanBrackle in his ARD comments, his support letter for my promotion and tenure, and also in his support letter for my early career award. After submitting a portfolio for promotion and tenure, I already had two published papers in the last 1 year. My third paper (5th methodological paper during sixth year at KSU) is accepted on July/01/ 2021 in the South African Statistical Journal, which is also the first paper from Bogdan Gadidov's PhD dissertation. My fourth paper with two MSAS students is accepted in the Journal of Adolescent Health (Impact factor 4) with minor revision on June/30/2021. My fifth paper is under review in the Czech Journal of Demography (one of the coauthor from my undergraduate institution). My sixth paper on covid-19 incidence, prevalence*

*and deaths of Mexico is under final round of revisions before submission. This paper is jointly written with a KSU undergraduate student Ryan Lowhorn. My seventh paper (2nd methodological paper from Bogdan Gadidov PhD dissertation and 6th methodological paper during my time at KSU) is also 85% complete and is in near submission stage. My eighth paper on fertility and fecundability from Demographic and Health Survey data for married couple is 90% ready. All copies of these papers can be immediately provided upon request. In the previous five years, I had 7 publications which received more than 75 citations. So, I have sustained a long-term research agenda, which meets the requirement of KSU's long-term research effectiveness.*

**Teaching:**
*I showed tremendous proficiency in teaching as I taught a diverse number of undergraduate and graduate courses. In the previous five years (Fall 2015 to Summer 2020) I not only taught existing courses, but also developed one graduate and one undergraduate courses. The Graduate course is "Computational and Theoretical Bayesian Statistics", which is highly useful when classical (frequentist methods) methods are not able to find the approximate statistical results. I also developed a highly useful Python programming course for undergraduate students. Industry jobs have high demand for graduates with expertise in Python. For developing undergraduate students' coding skills, I developed this course so that KSU students would have greater and easier access to the job market. I never learned it when I was a graduate student. I minimized my family time for the betterment of KSU students. I have a very high level of proficiency in programming by using R, Python and SAS. I taught R programming course, python programming course and Advanced SAS programming course (may be the top 1% among all Statisticians in the world). I also showed high level of proficiency by teaching undergraduate and graduate Mathematical Statistics courses. Dr. VanBrackle and Dr. Priestley always said that I can teach any course. PhD level Text Mining course was taught by an adjunct faculty from Home Depot. He cancelled couple of classes and only few homework projects were assigned. I showed interest to develop an undergraduate text mining course to DR. Ni (Please see 2019 November meeting agenda). By seeing my interest Dr. Ni asked whether I could teach PhD level Text mining course that adjunct faculty from Home Depot taught. I said, yes but you (Dr. Ni) have to give me at least one semester of time to prepare. Dr. Ni also asked me to develop applied Machine Learning course for our graduate students (MSAS students) and I said yes, I will develop the course. In addition, I never said no to any Chairman when I was asked to teach a course. Dr. Ferguson asked me not to teach any new courses but I did not listen to her and I chose to listen Dr. Ni to teach STAT 8240 in Spring 2020.*

*Finally, please take a look at all of my student evaluations. I always took a hard stand towards students, so that students can learn. I also try to cover a lot of materials in courses that I taught (please see all student evaluations). I am also a teaching new undergraduate course in Fall 2021. So, I meet the long-term effectiveness in TSM to remain active in teaching and developing courses for our students at KSU.*

**Services:**
*I provided all types of services I was asked for in addition to many voluntary services. I attended all R-day events, all department meeting, admission committee meeting, and search committee meeting. During those meeting, I never had any incidence with anyone in the Department. Dr.*

*VanBrackle in his ARD review clearly said that I already provided services at an Associate Professor level. For providing one voluntary service (Undergraduate Research Symposium), I drove 70 miles (both ways) from my home to KSU in the weekend. I did this voluntary service because I love KSU from the depth of my heart (KSU can check how many faculties from our department did that). So, I meet the long-term effective in Service for KSU.*

The above statements about my abilities on teaching, research and service clearly indicate that I would have long-term effectiveness at KSU. In addition, I never had any incidence in the past six years at KSU except only one minor incidence with Dr. Ni.

In comparison to previously promoted and tenured Associate Professors (Dr. Ray, Dr. Ferguson, Dr. Gardener), I accomplished almost double in all three areas. I had the portfolio of Dr. Ray and Dr. Ferguson. I also asked Dr. Kimberly about her portfolio, she said that she did not have it. Please read the following table.

| Name of the Faculty | Number of Courses Taught | Number of Publications | Service | Decision |
|---|---|---|---|---|
| Dr. Ray | 7 (3 or 4 graduate courses).<br>No PhD supervision | 5 (1 methodological and 4 applied).<br>**23 citations.** | | Got P&T |
| Dr. Ferguson | 6 (2 graduate courses)<br>No PhD supervision | 3 (No methodological paper. All 3 are applied papers). Minimum number of papers required for P&T is 3.<br>**27 citations.** | | Got P&T |
| Dr. Gardner (narrative was not given) | She taught only one graduate course and she said it in the Department Meeting.<br>No PhD supervision | Dr. Ray told me in search committee meeting that the published papers were not good. (I was not given portfolio) | | Got P&T |
| Dr. Chowdhury | 11 (6 grad & 5 undergrad courses. 2 courses developed).<br>1 PhD supervision. 7 mentoring. | 7 (4 methodological, 2 applied and 1 book review).<br>**71 citations.** | I provided more services than others. | Denied P&T |

**Many traps were set up to fire me and to put me in jail:**

1. In the Spring of 2020 in the Python Programming class, a student showed very weird behavior in the class. His laptop had a flag of Israel. He used to come to the class 10 to 15 minutes earlier so that he could find me alone. I had to go to the class earlier because of preparing the computers and projector. When he found me alone, he spoke about gay friends in Atlanta and about pros and cons of Israel. His intent appeared to be to drag me into a discussion and depict me as an antisemitic person, as well as an anti-gay person. He also raised his left leg on his table couple of times showing his feet towards my face. I reported this incidence first-time in a letter to Provost in December 2020. In April 2021, the student contacted me to write for a recommendation letter for him and also told me that the employer would contact me only via email. I replied to that student that I would write a recommendation letter for him.
2. Professor Susan asked me in early October of 2019 (when half of the syllabus was complete) that Dr. Ni asked her to sit in on my R programming class so that Professor Susan could teach the course in Fall 2020. But the purpose was different. Susan was not assigned to teach the course in Fall 2020. The rest of the story and history were mentioned in the OIE investigation. Similarly, after teaching the first class of STAT 8240 in Spring 2020, Nicholas Bounamia (part time instructor, who does not have PhD)

emailed me to include him in D2L (by adding him in the D2L) so that he could help only one student for his homework. The purpose and motive were the same as Dr. Ni had with Prof. Susan Hardy. Both Prof Susan Hardy and Prof Nicholas Bounamia were programmed by Ni. During the chairmanship of Dr. VanBrackle, nothing like this happened.

3. In the 2019 ARD meeting, Dr. Ni repeatedly insulted me for the first 20 minutes so that I could lose my temper and Dr. Ni could designate me as a short-tempered person.

These are only few of the many retaliatory and vindictive actions that Dr. Ni took against me that I exposed in this letter. These few exposed retaliatory actions clearly indicate how much back door politics (lies, falsehood, misleading, inaccurate, wrong information about me) that were passed to Higher Authorities, all organized by Dr. Ni to deny me P&T.

In the entire history of KSU, it would be impossible to find any chairman like Dr. Ni who made one after another attempt to fire or to smear a professor by falsely trying to depict him as sex offender, antisemitic, racist, short-tempered, non-congenial etc. How can a chairman continuously target a most hard-working talented faculty member from KSU?

**Violation of Non-discrimination policies and Insult to Dr. Chowdhury:**

I was insulted in the following Department and College level meeting.

1. In the August 2020 Department Meeting, I was denied access to the Department meeting under the chairmanship of Dr. Ni. I repeatedly tried to join the meeting but could not. I sent multiple emails to Dr. Ni during the meeting time but she did not reply. However, Dr. Kane sent the meeting link during the meeting time to me which was the same as Dr. Ni provided. But the link did not help me to join the meeting. The meeting link was same, but I was blocked by Dr. Ni. By doing this, Dr. Ni insulted me in front of the all DSAS faculty and staff. After that incidence I talked with KSU IT service desk, and they said that there is a possibility that I was blocked by Dr. Ni.
2. In the September 2020 Department meeting, Dr. Ni together with Dr. Nicole Ferguson and Professor Susan Hardy forced me resume a big data lecture series (BDLS) talk. Indeed, Susan said that our students were already missing a lot due to covid-19, so resumption of the BDLS talk will help them to learn. R Day (Organized by Dr. Ferguson) is the biggest departmental event, which was cancelled due to covid-19. However, after being pressured, I decided to arrange two talks, one in October and another one in November. After the successful October event, the November event was scheduled to be held on November 12 at 4 pm. However, Susan Hardy without speaking with me or obtaining my permission opened a zoom link and all attendees including speaker Dr. Gita Taashoobshiraji joined her link. Nobody contacted me before the meeting. At 4:11 p.m., Susan sent me an email and asked me to join her link. Susan did not have my permission, nor did she consult with me before the talk. When I asked about this to Dr. Gita when she called me via team, she said she would have heard a higher administrative official and for this reason she joined Susan's link. I can provide all document including the log in information. They blamed me for the zoom link was not working, which is a false (Zoom link was created by the CSM IT personnel). I can provide solid proof that the zoom link was working from log in information of three persons. Because of this artificially created

chaotic event, I was rated not meeting expectation in service for my 2020 ARD by DR. Ni.

3. In January 2021, the college committee meeting where DSAS (currently dissolved and renamed as SDS-School of Data Science) faculty were introduced by their names, I was not introduced. After two- or three-persons introduction, alphabetical order had been changed and again reinstalled. However, my name was not called for introduction. When the last person was introduced, Dr. Sherrill Hays said now I am going to introduce our last person in the meeting. By doing this, I was insulted in front of the entire College (CCSE). In that college meeting, there were two faculty members from my home country, Bangladesh. I was seriously humiliated. Their names are Dr. Shariar Hossain and Dr. Moktar Hossain. Please collect the meeting recordings and also listen to the meeting recording. At the very beginning of the meeting, the Dean Jeff said out meeting has been recorded.
4. In the November 2019 Department meeting, I was insulted by Dr. Ni and a few other faculty members (Prof Michael Franklin, Professor Susan Hardy, Dr. Ferguson, Late Dr. Lawson) about my Python Programming Syllabus. The Syllabus was approved in the Fall of 2018 by Department Curriculum Committee (Dr. Kimberly Gardner, Dr. Joe DaMaio and Prof. Michael Franklin) and the course was successfully taught in the Spring of 2019. However, in the November 2019 meeting, Dr. Ni and few others insulted me by saying that the syllabus was in high level. Students never complained about the high level of the syllabus in the course evaluation. If the Syllabus was high level, then why did the curriculum committee approve the syllabus for the first time? Before and during the meeting, I repeatedly said via email and also openly in the meeting that any suggestions to change the syllabus will be incorporated but my words were not adhered to (please read two ARD rebuttal letters and also listen the meeting recordings).
5. In the Fall of 2019, I arranged two BDLS talk and spent $320 from my pocket for the food. I sent at least 5 emails to Dr. Ni and Leann (Department Secretary) for the reimbursement, but my emails were not replied to and the money was not paid until I reported it to the Provost in a letter in December 2020. My reimbursement was given in March of 2021. Previously, all expenses were reimbursed almost immediately. This clearly indicated that Dr. Ni asked our department secretary not to reimburse me.

In any law-abiding nation, the Judicial branch must be independent of the Executive branch. All people of that nation must have hope that they would be given a fair trial on their case if they go to the Judicial Branch. OIE is a judicial branch of KSU and will work impartially and independently to deliver their findings and decisions from investigations. In Statistics, there are two types of errors known as **Type I error and Type II error**. **Type II error is the error in which an innocent person is sentenced to death** whereas in a Type I error, a guilty person is freed from prison. In my P&T review, the DRC, Dr. Ni, Dean Dr. Kojo, and CRC intentionally committed a type II error. I hope OIE will come against the decisions given by the DRC, Dr. Ni, Dean Dr. Kojo, and CRC about my P&T on the basis of documents provided by my in my P&T portfolio and not on the basis of false, wrong, misleading, inaccurate information from the letters of the DRC, Dr. Ni, Dean Kojo and CRC.

My attorney sent a letter to KSU president Dr. Pamela Whitten on the 24th of May, 2021 about discrimination made against my P&T. He received a simple answer (from Ms. Nwakaego

Nkumeh Walker, Vice President & Chief Legal Affairs Officer) that did not contradict any of the information that he provided to Dr. Whitten. The answer was that the decision stands. In the letter Ms. Walker claimed that at each level (DRC, Chair, Dean and CRC) of independent review, a determination was made that Dr. Chowdhury's performance did not merit promotion and tenure. However, an email with an attachment (10/12/2020) from Dr. Joe DeMaio (college committee member of DSAS and also one of the three member of DRC) contradicts with the claim of independent evaluations.

> *"Faculty evaluation should come from chairs not dean because they are closer to know what is going on. For T&P reviews, will look strongly at the chair and DRC letters.*

So, independent evaluations were not done at each level. Dean and CRC followed the falsehood of DRC and Chair, which I mentioned in my rebuttal letters. If there is an independent evaluation, then they should upload my 2nd rebuttal letter on digital measures. But they did not. Dean did not give me time for meeting. Dean did not reply to emails. CRC chair did not reply to my email and did not upload my letter on digital measures.

I received my final year contract letter from KSU, which indicates that KSU's higher authority is still staying in the wrong to deny me my P&T.

I finished my sixth year in May 2021. I had a plan to work 24 more years at KSU. My current salary, with 3 summer teaching loads, is $96000. With 2% annual increment and with promotion and tenure increment, I will make more than 3 million in the next 24 years. If KSU will not reconsider my P&T and will not award me P&T, I will be forced to go to court for violation of KSU's non-discrimination policy as well as violation of KSU's own policies on P&T.

Sincerely,

**Mohammed Chowdhury**
Assistant Professor of Statistics,
School of Data Science,
Kennesaw State University,
Kennesaw, Georgia, 30144.
Cell Phone: 765-212-5120
School Email: mchowd10@kennesaw.edu
Personal Email: mohammed@gwmail.gwu.edu

**OIE additional Questions with Response and answers:**

1. Is it your claim that your P&T denial was due to discrimination based on a protected class (i.e. race, color, national origin, ethnicity, etc.)?
**Answer:** Yes to all of the above. I am from a south-east Asian country Bangladesh and I am underrepresented in terms of race, color, faith, national origin, and ethnicity. I am 100% sure that my P&T denial was based on false, wrong, misleading, and inaccurate information because of my race, color and national origin. DRC, Chair Dr. Ni, and Dean Dr. Kojo violated the Department P&T guideline and College P&T guideline by putting false, wrong, misleading, and inaccurate information in their letters. I have provided all documents with proof in my 19-page letter to EEO, which clearly indicates that my P&T portfolio was not properly evaluated.

2. If so, please specify which protected class the alleged discrimination was based on.
**Answer: See above.** By denying my promotion and tenure unfairly, discrimination was committed against me. Because previously promoted and tenured faculty had smaller number of research articles with less quality and taught smaller number of unique courses than I taught. They have done it because they considered that I am underrepresented and doing more works than they are doing.

3. Also, please explain why you feel your P&T was treated differently in comparison to others not in your protected class.
**Answer:** My P&T was treated differently in comparison to others because they purposefully targeted only teaching part of TSM by cherry picking of students' negative evaluations only and completely ignoring students' good and positive evaluations. They barely mentioned that I supervised and mentored 7/8 students in my five years, which are two parts of the TSM (TSM has three parts such as Teaching, Supervision and Mentoring). I met other two P&T criteria such as RCA and PS. Department P&T guideline clearly said that meeting RCA criteria is enough to secure promotion and tenure.

4. Regarding your Retaliation claims, can you please provide more clarity on how Dr. Ni retaliated against you? Please provide more information surrounding the events you believe led to Dr. Ni's alleged retaliation.
**Answers:** I have provided a lot of information about retaliation in my nineteen-page letters to EEO. Please also read my letters written to Provost and President. Also please read my 1st and 2nd rebuttal letters corresponding to my P&T, and two 2019 ARD rebuttal letters. I have attached these letters with this email also. I have attached following documents with this document

5. Is it your claim that Dr. Hayes insulted you because of your protected class?
**Answer:** Dr. Hayes insulted me in front of all college faculty because he wanted me to resign after I got insulted. He has done it because I am underrepresented.

6. If so, please provide more information as to why you believe Dr. Hayes' insult was discriminatory?
**Answer:** Because I was not introduced purposefully whereas other faculty and staff were introduced in the meeting. I am the only person who was not introduced.
7. Please provide the names and titles of the members of the DRC.
**Answer:**
**Dr. Victor Kane**, Chair of DRC and Associate Professor, School of Data Science and Analytics, KSU. He has been Associate Professor at least from 2014. It is known in the Department that he did not conduct research for publications. He was hired from industry as a chair of the department. I have heard about it from a Department colleague.

**Dr. Joe DeMaio**, Member of DRC, Professor, School of Data Science and Analytics, KSU. He was the chair of the Math Department and a female Professor complained about him. He was relocated to Statistics Department. I was told about this by Symon Kitimei, a Senior Lecturer of Mathematics.

**Dr. Nicole Ferguson**, Member of DRC, Associate Professor, School of Data Science and Analytics, KSU. She was promoted to the Associate Professor with minimum number (3) of publications. One of the students in her class wanted to commit suicide and campus police came to visit her when I was in my office. He taught 5 unique courses whereas I taught 11 unique courses and 6 of them are at graduate level.